IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | | |
|---|---|---|
| The ESTATE of SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf. | ) ) ) ) ) | No.    17-cv-862 |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| CITY OF MILWAUKEE, WISCONSIN AND DOMINIQUE HEAGGAN-BROWN, | ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

NOW COME Plaintiffs, ESTATE of SYLVILLE K. SMITH, by Personal

Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her

own behalf, complaining of Defendants CITY OF MILWAUKEE,

WISCONSIN and DOMINIQUE HEAGGAN-BROWN, and state as follows:

### INTRODUCTION

1.     Sylville Smith—a loving 23 year-old father, son, brother, and friend—

should be alive today, raising his three-year-old son. Instead, Sylville Smith's life

was tragically and unjustifiably taken through an act of homicide by former

Milwaukee Police Department Officer Dominique L. Heaggan-Brown.

2.     Heaggan-Brown should not have been on the street the day he killed

Sylville—he should have never been hired and should have been disciplined when

1

he engaged in a pervasive pattern of excessive force and misconduct. The City of Milwaukee, however, disregarded the obvious and, through its policies and practices, caused this tragedy.

3. This action, brought pursuant to 42 U.S.C. § 1983 and the laws of the State of Wisconsin, seeks some measure of redress for the actions of Officer Heaggan-Brown and the Milwaukee Police Department. Those actions have left a family and community irreparably harmed.

4. Though nothing can ever bring Sylville Smith back—and no form of redress can ever compensate his family members for their loss—this action seeks to hold accountable those responsible for the violation of constitutional and state-law rights of not only Sylville Smith, but others harmed by the Defendants' actions: Smith's family, friends, and, in the end, all residents of the City of Milwaukee.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of the action pursuant to 28 U.S.C. § 1331.

6. Venue is proper under 28 U.S.C. § 1391(b). All parties reside in Milwaukee County, and the events giving rise to the claims asserted herein all occurred within this district.

## PARTIES

7. Plaintiff Mildred Haynes is the mother of Sylville Smith, the Personal Representative of the Estate of Sylville Smith, and a resident of Milwaukee, Wisconsin. Ms. Haynes is a party to this action in both her personal capacity, on her

own behalf, and as the personal representative of Sylville Smith's estate.

8.    Plaintiff Patrick Smith is the father of Sylville Smith, and a resident of Milwaukee, Wisconsin.

9.    Defendant Dominique Heaggan-Brown is a former Milwaukee police officer who, at all times relevant to this action, was acting under color of law and within the scope of his employment as a Milwaukee police officer.

10.    The City of Milwaukee is a Wisconsin municipal corporation, which operates the Milwaukee Police Department (the "MPD" or "Department"), and sets city-wide policy for the conduct of police officers employed by the Department.

## FACTS

### *The Killing of Sylville Smith*

11.    On August 13, 2016, a Saturday, Sylville Smith spent the afternoon with an old friend.

12.    Around 3:30pm, Smith, who had been driving, parked a car on the 3200 block of N. 44th St., on Milwaukee's near north side.

13.    At the same time, Defendant Heaggan-Brown was patrolling the same area in a marked MPD patrol SUV.

14.    Two other MPD officers, Officer Malafa and Officer Voden, followed behind Defendant Heaggan-Brown.

15.    Within a minute of parking, Smith had been boxed in by Heaggan-Brown's marked MPD patrol SUV to the side, and the car being driven by Malafa.

16.    Defendant Heaggan-Brown had pulled up slightly ahead of

3

Smith's car.

17.     When Defendant Heaggan-Brown parked, he immediately "jumped out" of his Squad car, intending to arrest Smith and the passenger of the car, even though he lacked probable cause to perform an arrest.

18.     (Jumping out of the car in this manner was part of the City of Milwaukee's "jump out boys" practice and custom where MPD police officers would go to predominately African-American neighborhoods, would pull up next to people (whether on foot, on a bike, or in a car), detain them without probable cause—another unconstitutional practice—and often use excessive force along the way).

19.     At the same time Defendant Heaggan-Brown was "jumping out," Smith exited the car he was driving and began to run north.

20.     Heaggan-Brown immediately drew his gun, and pointed it at Smith, as he began to run after him.

21.     Defendant Heaggan-Brown knew that there was no lawful basis for drawing his weapon as he got out of his squad car—he had not seen a crime in progress and faced no threat of imminent danger at all.

22.     Smith ran into the gangway between 3216 and 3218 N. 44th St. As he was rounding the corner, Smith fell to the ground, directly in front of a chain link fence.

23.     Defendant Heaggan-Brown, who had partially holstered his service weapon while running, again withdrew his gun as Smith fell.

24.     Defendant Heaggan-Brown observed Smith fall to the ground.

25.     Smith had been carrying a black pistol, which he dropped as he

4

fell.

26.     Smith was obviously attempting to disarm himself after he fell
by attempting to throw the pistol over the fence.

27.     At no time did Smith aim or fire the gun at Defendant Heaggan-
Brown, or any other person.

28.     Defendant Heaggan-Brown observed that, in attempting to
throw the gun, Smith was not in a position to fire the weapon, because he
was holding it awkwardly by the barrel, pointing at Smith himself.

29.     As Smith began to throw the gun, Officer Heaggan-Brown fired
one shot, hitting Smith in the right bicep.

30.     The harm to Smith from this gunshot was substantial, not just
because he had been shot, but also because he had been shot by a "hollow
point" bullet.  Hollow-point bullets are designed to inflict damage on the
people they hit and, though outlawed by the Geneva conventions, are used by
the Milwaukee Police Department.

31.     At the time of the first shot, it was obvious that Smith was
trying to disarm himself, and that Defendant Heaggan-Brown was not in any
danger.

32.     Defendant Heaggan-Brown's use of deadly force in shooting
Smith in the bicep was excessive and unlawful.

33.     After he was shot, Smith fell backwards onto the ground. He
was then completely unarmed.

34.     Defendant Heaggan-Brown knew that Smith was unarmed after
the first shot.

35.    Defendant Heaggan-Brown observed Smith respond to the bullet wound by falling to the ground and knew that he had struck the target.

36.    The momentum of the fall (and the gunshot) caused Smith to end up in something like the fetal position—curled upside down on the ground, with his knees bent up near his chest, and his hands near his head.

37.    Given the presence of the house, the chain-link fence, Defendant Heaggan-Brown, and Officer Malafa, it was obvious that Smith was cornered.

38.    Being unarmed and shot with a hollow-point bullet, and writhing on the ground in pain, Smith posed absolutely no threat to Defendant Heaggan-Brown, or anyone else, whatsoever.

39.    Defendant Heaggan-Brown knew that Smith posed absolutely no threat.

40.    Nonetheless, as Smith lay unarmed on the ground, curled halfway into a ball, with his hands near his head, Defendant Heaggan-Brown fired a second shot into Smith's chest.

41.    As he fired, Defendant Heaggan-Brown was standing directly over Smith—an execution-style shooting of an unarmed civilian.

42.    This gunshot was completely unjustified.

43.    This gunshot, which perforated the heart and a lung, caused the death of Sylville Smith.

44.    At no point during this incident did Smith take any action that would justify the use of deadly force.

6

45. At no point during this incident did Smith pose an imminent threat of death or serious bodily harm sufficient to justify the use of deadly force by Defendant Heaggan-Brown.

46. Indeed, the killing of Sylville Smith via the second shot, as depicted in images of the shooting, shocks the conscience. It was unconscionable for Defendant Heaggan-Smith to kill Sylville Smith by shooting him at point-blank range, standing above him, while Smith had already been shot and was completely unarmed.

47. Following the killing of Sylville Smith, Defendant Heaggan-Brown was stung by a bee. In the moments that followed the shooting, Defendant Heaggan Brown was more concerned about his single bee sting than the fact that Sylville Smith was lying on the ground, suffering immense pain. Defendant Heaggan-Brown's first call for medical help was for himself, not the person he'd just shot twice.

48. Indeed, more than 90 seconds had gone by before Defendant Heaggan-Brown rendered any aid to Sylville Smith, and even then he quickly stopped rendering aid when a small amount of blood ended up on his thumb, which he then rubbed on Sylville Smith's shirt.

### *Defendant Heaggan-Brown Should Have Never Been Hired*

49. Dominique Heaggan-Brown began his association with the MPD in July 2010, when he was hired as a "police aide."

50. Police aides are uniformed civilian employees, hired at age 17-19, who

7

work for the department doing a variety of tasks and are expected to complete 24 college credits at the same time. Police aides are given preference to enter police training programs, putting them on track for an MPD career.

51.     In December 2011, an MPD officer cited Heaggan-Brown for driving 80 miles per hour in a 50 mph zone. The officer later voided the citation to give Heaggan-Brown a second chance, because he was a police aide. Heaggan-Brown wrote to his MPD superiors, assuring them he would not do it again.

52.     Two days after this first incident, Heaggan-Brown was again pulled over for speeding, this time driving 74 mph in a 55 mph zone. This time, he pleaded guilty, and again wrote to his superiors, telling them it had been a mistake. He suffered no professional consequences.

53.     In November 2012, while Heaggan-Brown was still a police aide, police officers responding to a report of shots fired in his neighborhood searched his apartment. Although Heaggan-Brown was not there, about twelve other people were, and the apartment smelled strongly of marijuana. Police made three arrests, and Heaggan-Brown was afterward counseled on department policies instructing officers to avoid associations that could affect their integrity.

54.     These warning signs should have prevented Defendant Heaggan-Brown from being made an MPD officer in the first place.

55.     Defendant Heaggan-Brown's lack of professional judgment and responsibility was obvious. The Department, in making Defendant Heaggan-Brown an officer deliberately ignored the obvious red flags present at the time he was made an officer.

8

56.     Unsurprisingly, Defendant Heaggan-Brown's misbehavior—and the City's willingness to look the other way and, in effect, condone his actions—continued.

57.     In 2013, three years to the day before he shot and killed Sylville Smith, Heaggan-Brown became a Milwaukee Police Officer, beginning with the department's standard 16-month probationary period.

58.     Defendant Heaggan-Brown's behavior during his "probationary" period reveal that he should have never been made an MPD officer, that he lacked professional judgment, and that he was likely to violate the constitutional rights of citizens.

59.     For instance, in 2013, Heaggan-Brown appeared in a YouTube video, in uniform, entering an apartment with a marijuana bong on the refrigerator. MPD's investigation absolved him of any wrongdoing.

60.     In March 2014, while he was still on probation, Defendant Heaggan-Brown's police firearm was stolen from his closet. In the course of investigating this incident, investigators learned that he had been living with a convicted felon in direct violation of police policy.

61.     Also in 2014, Defendant Heaggan-Brown may have been involved in an armed robbery. Despite knowing of this allegation, the Department did not investigate the incident whatsoever. In March 2015, despite these incidents, Defendant Heaggan-Browns' probationary period ended, and he became a full sworn police officer.

62.     In September 2015, police officers found a photo of Defendant

9

Heaggan-Brown, posing with three men and apparently displaying gang signs, posted on the website of an alleged gang member. The Department did nothing.

### *Defendant Heaggan-Brown Should Have Not Have Been On the Street As a Milwaukee Police Officer On August 13, 2016*

63.     As the foregoing makes clear, Defendant Heaggan-Brown should not have been patrolling 44th Street, or any Milwaukee street, on August 13, 2016.

64.     But, in addition to the problems raised above, Defendant Heaggan-Brown's history of excessive force provided further reason for the City of Milwaukee to have intervened to prevent this tragedy.

65.     During his short tenure as a Milwaukee Police Officer, Defendant Heaggan-Brown was involved in an extraordinary number of "use of force" incidents. There were at least 16, and eight of them took place between April and June of 2016.

66.     Defendant Heaggan-Brown was also investigated six times for behavior demonstrating poor judgment, and repeatedly referred to departmental ethics rules.

67.     The Department was aware that Defendant Heaggan-Brown was routinely using unnecessary, often excessive, force.

68.     Defendant Heaggan-Brown's supervisors, and the supervisors above them, knew Defendant Heaggan-Brown was routinely using unnecessary, often excessive force.

69.     Nonetheless, Defendant Heaggan-Brown was not disciplined, reassigned, or retrained at any point.

70.     Instead, the Department ratified Defendant Heaggan-Brown's behavior, even placing him on an overtime squad for the express purpose of "showing force" and presence.

71.     As a result, Defendant Heaggan-Brown learned that, with the agreement of the Department and pursuant to its practices and customs, he could make false statements after a use of force incident to make it appear as if an unconstitutional use of force was actually lawful.

72.     For example, in April of 2016 Defendant Heaggan-Brown and another MPD officer used excessive force on Ronnie Martin, who was tased in violation of his constitutional rights. As depicted in the body camera audio, on information and belief, Defendant Heaggan-Brown can be heard concocting a false story of what he and the other officer would say justified the use of force.

73.     Defendant Heaggan-Brown, who was not disciplined or reprimanded in any way as a result of this use of force or in creating a false story to attempt to justify it,  was acting pursuant to the Department's customs and practices. These customs and practices allow officers to use force with impunity and then lie about it later without facing any repercussions.

74.     Indeed, the same thing happened with the killing of Sylville Smith. Defendant Heaggan-Brown believed he could use force with impunity, and then lie about it in the aftermath. The day after killing Sylville Smith, Officer Heaggan-Brown met a man at a Milwaukee bar, where Heaggan-Brown bragged that he could do whatever he wanted, without repercussions.

75.     In addition, Defendant Heaggan-Brown knew that the shooting was

11

unconstitutional, and that he was not justified in using deadly force against Sylville Smith. As he had before, and consistent with the City of Milwaukee's policies, practices, and procedures, Defendant Heaggan-Brown decided to try to invent and concoct post-hoc justifications for his actions, even though they were false. In so doing, and in providing a statement to investigators, Defendant Heaggan-Brown made false statements designed to minimize his misconduct (e.g., falsely claiming that he had removed his Taser and not his handgun when he first got out of the car); and to attempt to justify the shooting.

76. Had the Department intervened, rather than endorsing Defendant Heaggan-Brown by placing him on overtime, in response to the prior use of force incidents, Sylville Smith would still be alive.

77. And, other victims would not have been harmed either. Defendant Heaggan-Brown's ability to do whatever he wanted, with full endorsement of the MPD, led him to commit numerous other crimes both before and after the shooting of Sylville Smith.

78. After the shooting, the Department falsely told the media—and the residents of Milwaukee—that Heaggan-Brown had been placed in protective custody and "fled" the City.

79. In fact, Defendant Heaggan-Brown was out and about; he was in Milwaukee, bragging about the shooting at a bar. He would go on to commit additional acts of misconduct and sexual assault that evening.

80. All the while, the Department stood behind Heaggan-Brown's decision to kill Sylville Smith.

81. After Defendant Heaggan-Brown was charged with sexual assault and other crimes, he was finally discharged from the Milwaukee Police Department.

82. Owing to its polices, practices, and customs, MPD would not have fired or disciplined Defendant Heaggan-Brown for shooting and killing Sylville Smith—actions that they continue to stand behind even now.

### Milwaukee's Unconstitutional Practices and Policies

83. The Milwaukee Police Department should never have made Dominique Heaggan-Brown a sworn police officer. Once they had hired him, they deliberately ignored numerous red flags, and encouraged his misconduct, blowing past opportunities to supervise, retrain, reassign or discipline him in any way

84. The City's failures to train, discipline, and supervise Defendant Heaggan-Brown lead directly to Sylville Smith's death, in violation of his constitutional rights.

85. In the aftermath of the shooting of Sylville Smith, policymakers for the City publically endorsed Defendant Heaggan-Brown's actions.

86. Milwaukee Police Chief Edward Flynn disclosed Sylville Smith's name, followed immediately by a reference to his arrest record, unconscionably implying that prior arrests could somehow justify being killed unarmed at point-blank range on the street.

87. Chief Flynn also publically declared—even though the Department's investigation had not even begun—that he did not believe that Heaggan-Brown had departed from department policy or violated the law. Chief Flynn made these

13

statements because he knew that, pursuant to the City's longstanding policies, practices, and customs, the result of any investigation was predetermined—the City would find the shooting justified.

88.     Chief Flynn, as the chief policymaker for the department, expressly ratified the actions of Defendant Heaggan-Brown. His statements are indicative of the Department's policies and practices to defend MPD officers at all costs, thereby creating an atmosphere and environment where officers can (and do) use excessive force without any accountability or consequence.

89.     Chief Flynn, despite the egregious conduct described above, also defended the hiring of Defendant Heaggan-Brown.

90.     The endorsement of the Department's decision to hire Defendant Heaggan-Brown, as well as an endorsement of his actions, reflects not only the City's practices and policies in supporting their officers who use excessive force at any cost, but also serves as evidence of the City's deliberate indifference to the uses of deadly force by its officers, including Defendant Heaggan-Brown

### *Milwaukee's Long-standing Pattern and Practice of Endorsing the Unconstitutional Use of Excessive and Deadly Force*

91.     The City of Milwaukee has repeatedly failed to supervise and discipline MPD officers who have used deadly force against unarmed individuals. In fact, the MPD has a history of accepting and encouraging such conduct. Officers in the City of Milwaukee have killed at least three unarmed citizens since 2011, but none of them have been disciplined or re-trained. These failures to train and discipline—in the face of widespread de-facto policies allowing the use of excessive

14

and deadly force—cause, are deliberately indifferent to, and even encourage the use of unconstitutional deadly force by members of the Department.

92. The Department's treatment of Officer Christopher Manney is just one example of these polices, practices, procedures, and failures to train, supervise, and discipline. On April 30, 2014, Officer Manney shot and killed Dontre Hamilton, a mentally ill man who had been sleeping peacefully on a bench in Red Arrow Park. Officer Manney had not received Crisis Intervention Team (CIT) training. CIT training would have taught Manney how to engage with mentally ill individuals, and how to interact with Mr. Hamilton in a way that did not escalate their confrontation and result in Mr. Hamilton's death.

93. Christopher Manney was ultimately fired from the MPD, but not due to his use of excessive force. The City thus remained deliberately indifferent to the use of unjustified deadly force by MPD officers against unarmed individuals.

94. In 2011, Derek Williams died in the back of an MPD squad car after struggling to breathe for eight minutes, during which time three MPD officers ignored his pleas for help. Williams was 22 years old. During the arrest, Officer Richard Ticcioni held Williams down with a knee to the back, at which time Williams began complaining that he could not breathe. Neither Ticcioni, nor the other two officers involved, Jeffrey Cline and Jason Bleichwehl, were disciplined or faced any charges for the incident.

95. Instead, in 2016, Officer Ticcioni was promoted to the position of Detective within the MPD, over the objections of community members. In this way, the MPD demonstrated again its indifference to the unconstitutional use of force.

15

96.     Additionally, the MPD has a history of officers using excessive force to non-lethal effect with impunity. Curtis Harris provides just one recent example.

97.     In 2003, Curtis Harris was arrested and taken to the police station. There, Officer Kevin Clark slammed his head into the wall, rendering him a quadriplegic for life. Officer Clark was never charged, fired, or disciplined for this incident.

98.     The City's handling of Officers Clark, Ticcioni, Manney, and Heaggan-Brown—by failing to discipline or train them, and even promoting one of them following the killing of an unarmed individual—demonstrates how the police department has not only tolerated, through a lack of discipline, but has actually encouraged, through public statements of support and internal promotions, officers' uses of excessive force as a matter of Department policy.

### *Plaintiffs' Severe Emotional Trauma and Damages*

99.     The Defendants' actions imposed substantial harm upon Sylville Smith during the period of time after he was shot by Defendant Heaggan-Brown until he ultimately passed away. The excruciating pain and fear Sylville Smith felt during those final moments is unquantifiable.

100.    Smith's son S.R-S., who is now three years old, will grow up without his father because of the actions of Defendant Heaggan-Brown and the Milwaukee Police Department. At the age of two, he lost his father, who went from being a major part of his life to simply being absent. For the rest of his life, he will have to face the world without the love, care, and support that his father would have

provided for him.

101.    Plaintiffs Patrick Smith and Mildred Haynes have suffered an unfathomable loss—the death of their oldest son. They have both also suffered severe emotional distress—which is ongoing—as a result of the actions of Defendant Heaggan-Brown. The aftermath of the shooting imposed, and continues to impose, severe emotional pain; as the images of the conscience-shocking shooting; the sight of Sylville Smith following his autopsy; and the other personal and public pain are the direct result of Defendant Heaggan-Brown's conduct, and the policies of the City of Milwaukee. In addition, Plaintiffs Patrick Smith and Mildred Haynes have been forced to bear financial loss as a result of the loss of Sylville Smith, including but not limited the costs of an unexpected funeral, and other expenses related to the death of Sylville Smith,

## Count I – Federal Law
## Excessive Force

102.    Each of the Paragraphs in this Complaint is incorporated as if restated fully herein.

103.    As described in the preceding paragraphs, the conduct of the Defendant Heaggan-Brown toward Sylville Smith constituted excessive force in violation of the Fourth Amendment of the United States Constitution.

104.    The misconduct described in this Count was objectively unreasonable and undertaken with willfulness and reckless indifference to the rights of others.

105.    The misconduct described in this Count was undertaken pursuant to

17

the policy and practice of the City of Milwaukee, such that Defendant City of Milwaukee is also liable, in that:

a. As a matter of both policy and practice, the City of Milwaukee encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control and discipline its officers such that its failure to do so manifests deliberate indifference;

b. As a matter of both policy and practice, the City of Milwaukee facilitates the very type of misconduct at issue here by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Milwaukee police officers to believe their actions will never be meaningfully scrutinized and, in that way, directly encouraging future uses of excessive deadly force such as those Plaintiff complains of;

c. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Milwaukee Police Department abuse citizens in a manner similar to that alleged by Sylville Smith in this Count on a regular basis, yet the Milwaukee Police Department investigates officer misconduct and makes findings of wrongdoing in a disproportionately small number of cases;

d. The Milwaukee Police Department's failure to meaningfully investigate police misconduct and to control its officers is further illustrated by its handling of Officer Heaggan-Brown's many prior use-of-force incidents,

18

including his tasering of an unarmed man lying prone on the ground. Officer Heaggan-Brown was not disciplined for any of these incidents and remained on full active duty throughout his career until he was discharged for unrelated reasons;

e. In fact, the Milwaukee Police Department encouraged Heaggan-Brown to feel he could act with impunity, by repeatedly declining to discipline him for infractions of many kinds throughout his career;

106.    As a result of the City of Milwaukee's policy and practice and the unjustified and unreasonable conduct of the Defendant Heaggan-Brown, Plaintiffs have suffered injuries, including death and severe emotional distress for Sylville Smith's family.

107.    This Count is brought by the Estate of Sylville Smith, by personal representative Mildred Haynes.

## Count II—Federal Law
## Fourteenth Amendment (Due Process)

108.    Each paragraph of this Complaint is incorporated as if restated fully herein.

109.    In the manner described more fully above, Defendant Heaggan-Brown, under color of law and within the scope of his employment shot and killed Sylville Smith, depriving him of liberty, in violation of his rights secured by the Fourteenth Amendment.

110.    As described more fully above, the Defendant Heaggan-Brown's

19

second gunshot shocks the conscience and involved truly egregious and unreasonable actions by him, which caused the death of Sylville Smith.

111.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the life of Sylville Smith.

112.     As a result of Defendant Heaggan-Brown's misconduct described in this Count, Sylville suffered injuries, including but not limited to physical injury loss of liberty, emotional distress, and ultimately death.

113.     This Count is brought by the Estate of Sylville Smith, by personal representative Mildred Haynes.

## Count III—State Law
## Assault and Battery

114.     Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

115.     In the manner described more fully above, Defendant Heaggan-Brown intentionally and impermissibly harmed, wounded, and ultimately killed Sylville Smith, actions which amount to assault and battery under Wisconsin law.

116.     The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

117.     As a result of these actions, Sylville Smith suffered severe injuries, including physical pain, emotional distress, and ultimately death.

118.     This Count is brought by the Estate of Sylville Smith, by personal

20

representative Mildred Haynes.

## Count IV—State Law
## Survival

119.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

120.    In the manner described more fully above, Defendant Heaggan-Brown's fatal gunshots ultimately caused the death of Sylville Smith. In the interim, between having been shot and when he ultimately passed, Sylville Smith suffered "other damage" to his person pursuant to Wis. Stat. § 895.01(1)(am).

121.    The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

122.    As a result of these actions, Sylville Smith suffered severe injuries, including physical pain, emotional distress, and ultimately death.

123.    This Count is brought by the Estate of Sylville Smith, by personal representative Mildred Haynes.

## Count V—State Law
## Wrongful Death

124.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

125.    In the manner more fully described above, Defendants intentionally and unjustifiably caused the death of Sylville Smith. Sylville Smith therefore had (as alleged in Counts I-IV above) a valid claim for damages against the defendants at the time of his death.

21

126. As a consequence, Sylville Smith's son, S.R-S., has lost the financial support he would have received from his father for the rest of his childhood. S.R-S., has also suffered, and will continue to suffer, significant emotional distress and harm, including but not limited to the loss off society and companionship with Sylville Smith.

127. In addition, Plaintiffs Mildred Haynes and Patrick Smith suffered, and continue to suffer, significant emotional distress and harm, including but not limited to the loss off society and companionship with Sylville Smith

128. The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

129. This Count is brought by the Estate of Sylville Smith, by personal representative Mildred Haynes, Patrick Smith, the father of Sylville Smith, and Mildred Haynes, on her own behalf.

## Count VI—State Law
### Intentional Infliction of Emotional Distress

130. Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

131. In the manner described more fully above, by causing the death of Sylville Smith, the Defendants intended to cause both physical and emotional distress.

132. In so doing, Defendant Heaggan-Brown's conduct was extreme and outrageous and caused Sylville Smith severe, disabling physical distress, emotional

22

distress, and ultimately death.

133.    Defendant Heaggan-Brown's conduct also imposed harm on Plaintiffs Mildred Haynes and Patrick Smith, who suffered, and continue to suffer, severe emotional harm on account of Defendant Heaggan-Brown's conduct, and having witnessed the video footage of that conduct, in addition to observing the aftermath of the shooting.

134.    The misconduct described in this Count was intentional and undertaken with malice, willfulness, and reckless indifference to the rights of others.

135.    This Count is brought by the Estate of Sylville Smith, by personal representative Mildred Haynes, Patrick Smith, the father of Sylville Smith, and Mildred Haynes, on her own behalf.

### Count VII—State Law
### Negligent Infliction of Emotional Distress

136.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

137.     In the manner described more fully above, by causing the death of Sylville Smith, Defendant Heaggan-Brown negligently caused both physical and emotional distress.

138.    In so doing, Defendant Heaggan-Brown's conduct was extreme and outrageous and caused Sylville Smith severe, disabling physical distress, emotional distress, and ultimately death.

139.    Defendant Heaggan-Brown's conduct also imposed harm on Plaintiffs

Mildred Haynes and Patrick Smith, who suffered, and continue to suffer, severe emotional harm on account of Defendant Heaggan-Brown's conduct, having witnessed the video footage of that conduct, in addition to observing the aftermath of the shooting.

140.    The misconduct described in this Count was negligent, willful, and undertaken with reckless indifference to the rights of others.

141.    This Count is brought by the Estate of Sylville Smith, by personal representative Mildred Haynes, Patrick Smith, the father of Sylville Smith, and Mildred Haynes, on her own behalf.

## Count VIII – State Law Indemnification

142.    Each of the Paragraphs of this Complaint is incorporated as if fully stated herein.

143.    During all times relevant to this complaint, Defendant Officer Heaggan-Brown was an employee of the Milwaukee Police Department, who acted within the scope of his employment in committing the acts described herein.

144.    Wisconsin law, Wisc. Stat. §895.46, requires public entities to pay any tort judgment for damages for which employees are liable within the scope of their employment activities.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, DOMINIQUE HEAGGAN-BROWN and the CITY OF MILWAUKEE, awarding compensatory damages and attorneys' fees, as well as punitive damages against DOMINIQUE HEAGGAN-

24

BROWN, and, in entering liability against the CITY, Plaintiff seeks equitable, injunctive relief, as well as any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

s/ Anand Swaminathan
*One of Plaintiffs' Attorneys*

Anand Swaminathan
anand@loevy.com
David B. Owens (*Motion for Admission Forthcoming)*
david@loevy.com
LOEVY & LOEVY
312 North May, Suite 100
Chicago, IL 60607
(312) 243-5900