IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | | |
|---|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf, | ) ) ) ) ) | No. 17-cv-862 |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN, | ) ) ) | |
| Defendants. | ) | |

# <u>EXHIBIT 6</u>

Heaggan-Brown Deposition Transcript Vol. 1

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

In the Estate of Sylville K. Smith vs City of Milwaukee, et al.

2:17CV862-LA

Transcript of the Testimony of:

# DOMINIQUE HEAGGAN-BROWN

October 02, 2018





```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF WISCONSIN
 2    _____

 3    THE ESTATE OF SYLVILLE K.
      SMITH, by Personal
 4    Representative Mildred
      Haynes, Patrick Smith, and
 5    Mildred Haynes, on her own
      behalf,
 6
                Plaintiffs,
 7
          vs.                        Case No. 2:17CV862-LA
 8
      CITY OF MILWAUKEE, WISCONSIN,
 9    and DOMINIQUE HEAGGAN-BROWN,

10              Defendants.

11    _____

12

13

14

15     VIDEO DEPOSITION OF DOMINIQUE L. HEAGGAN-BROWN,

16

17        witness in the above-entitled action, taken
          under the provisions of the Federal Rules of
18        Civil Procedure, before Mary P. Hader,
          Registered Professional Reporter and Notary
19        Public in and for the State of Wisconsin, at
          Dodge Correctional Institution, 1 West Lincoln
20        Street, Waupun, Wisconsin, on October 2, 2018,
          commencing at 8:55 a.m. and adjourning
21        at 4:06 p.m.

22

23

24

25
```

```
 1                        APPEARANCES:

 2


 3


 4    FOR THE PLAINTIFFS:
                LOEVY & LOEVY
 5              ATTORNEY DAVID B. OWENS
                311 North Aberdeen Street, 3rd Floor
 6              Chicago, IL    60607

 7


 8


 9    FOR THE DEFENDANTS:
                MILWAUKEE CITY ATTORNEY'S OFFICE
10              ASSISTANT CITY ATTORNEY NAOMI E. GEHLING
                DEPUTY CITY ATTORNEY JAN SMOKOWICZ
11              841 North Broadway, 7th Floor
                Milwaukee, WI    53202-3515
12


13


14


15

16
      ALSO PRESENT:
17              Jon Hansen, CLVS, Videographer

18

19

20

21

22

23

24

25
```

```
 1                    WITNESS INDEX

 2   WITNESS NAME:            EXAMINATION BY:    PAGE:

 3   Dominique Heaggan-Brown   Mr. Owens         5-297

 4

 5                    EXHIBIT INDEX

 6   NUMBER:                                     PAGE:

 7   Exh.  1 -- MPD Investigation Employee Case    74
                File History
 8   Exh.  2 -- Letter 10-31-16                    74
     Exh.  3 -- Letter MPD DHB005123               74
 9   Exh.  4 -- Use of Force History               74
     Exh.  5 -- MPD Applicant Personal History    165
10              Questionnaire
     Exh.  6 -- Memo 2-12-10                      174
11   Exh.  7 -- Memo 1-7-13                       184
     Exh.  8 -- Memo Police Aide                  205
12              Transfers 11-28-12
     Exh.  9 -- MPD Investigation Employee Case   217
13              File History
     Exh. 10 -- Case Management                   224
14              Record MPD DHB004962
     Exh. 11 -- ACISS Interview 16-4915/15        230
15   Exh. 12 -- Text messages                     244
     Exh. 13 -- Officer Activity Report           286
16
     (Original exhibits attached to original transcript.
17   Copies of exhibits attached to transcript copies.)

18                   OBJECTION INDEX

19   BY:                                         PAGE:

20   Ms. Gehling                              33, 275

21

22                     REQUESTS

23   ITEM:                                       PAGE:

24          (No requests were made during
            the course of this proceeding.)
25
```

```
 1              THE VIDEOGRAPHER:  Good morning.  We
 2   are on the record.  This is the videotape
 3   deposition of Dominique Heaggan-Brown in the
 4   matter of the estate of Sylville K. Smith,
 5   et al, versus City of Milwaukee, et al, in the
 6   United States District Court, Eastern District
 7   of Wisconsin, Case number 17-CV-862-LA.  This
 8   deposition is taking place at Dodge County
 9   Correctional, Waupun, Wisconsin.  Today's date:
10   October 2, 2018.  The time:  8:55.  My name is
11   Jon Hansen, CLVS, videographer with U.S. Legal,
12   Milwaukee, Wisconsin.  At this time, if counsel
13   could please state their appearance for the
14   record, after which our reporter will swear in
15   the witness and we can proceed.
16              MR. OWENS:  This is David B. Owens on
17   behalf of the estate of Sylville Smith.
18              MS. GEHLING:  Naomi E. Gehling,
19   Assistant City Attorney, and Jan Smokowicz,
20   Deputy City Attorney on behalf of all
21   defendants.
22              THE REPORTER:  Please raise your right
23   hand.
24          DOMINIQUE L. HEAGGAN-BROWN,
25       having been called as a witness herein,
```

```
 1        didn't intentionally omit anything from the
 2        police aide application, correct?
 3   A    Yes.
 4   Q    All right.  You have here also the DCI statement
 5        of your interview related to the shooting of
 6        Sylville Smith?
 7   A    Yes.
 8   Q    Now, you've read this a few times, right?
 9   A    Yes.
10   Q    And is this accurate?
11   A    Yes.
12   Q    Okay.  And you had the opportunity to just go --
13        to go over this with your attorneys before it
14        was finalized, correct?
15   A    Yes.
16   Q    And this is something that came up during your
17        criminal trial, right?
18   A    Yes.
19   Q    And did you review -- read this document on
20        Friday?
21   A    I actually read it this morning.
22   Q    Okay.  Well, that was my next question.  Did you
23        also read it on Friday?
24   A    No.
25   Q    You didn't read it during your meeting with your
```

1          attorney?

2    A    No.  I glanced over the documents, but I

3         actually didn't read it with my attorney, no.

4    Q    Okay.  And then -- but you did read it this

5         morning?

6    A    Yes.

7    Q    Okay.  And so am I right that you have had the

8         opportunity to review the statement after

9         meeting with your union attorneys, your criminal

10        defense attorneys, and now your attorneys for

11        the City of Milwaukee?

12   A    That is correct.

13   Q    All right.  Is there anything inaccurate in this

14        statement?

15   A    No.

16   Q    Is there anything that you want to correct or

17        change?

18   A    No.

19   Q    And, just for the record, this is not Bates

20        stamped, but it is ACISS interview 16-4915/15.

21        It's report 15 from DCI, just for the record,

22        and it's a nine page document.  Does that sound

23        right?

24   A    Yes.

25   Q    Did I describe that correctly?

| 1 | A | That's correct. |
| 2 | Q | Okay.  Thank you. |
| 3 | | And this accurately describes what |
| 4 | | happened with the events leading up to the |
| 5 | | shooting of Sylville Smith? |
| 6 | A | Yes. |
| 7 | Q | And the foot chase that you had before you fired |
| 8 | | two shots at Sylville Smith? |
| 9 | A | Yes. |
| 10 | Q | Did you fire two shots? |
| 11 | A | Did I fire two shots? |
| 12 | Q | Yes, sir. |
| 13 | A | Yes. |
| 14 | Q | Okay.  Was there three? |
| 15 | A | I fired two shots. |
| 16 | Q | All right. |
| 17 | A | I don't know anything about a third shot. |
| 18 | Q | I'm just -- I'm -- I'm asking for your |
| 19 | | testimony.  Okay? |
| 20 | A | Okay. |
| 21 | Q | You're aware that some witnesses thought they |
| 22 | | heard three shots, right?  Did you hear that? |
| 23 | A | I heard a lot of things so it was hard to |
| 24 | | diminish -- |
| 25 | Q | Fair enough. |

```
 1            of -- a small amount of people taser trained,
 2            so -- which means that we were all we have -- we
 3            will all we have to be available to go use a
 4            taser if anybody needed a taser, but, other than
 5            that, that's the only thing I can recall --
 6    Q      Okay.
 7    A      -- from us having talks about uses of force at
 8            the district.
 9    Q      Okay.  And the use of force claim for -- related
10            to Sylville Smith -- or, excuse me, related to
11            Ronnie Martin --
12    A      Yes.
13    Q      -- you were cleared in that one, right?  From
14            the department.
15    A      I believe so, yes.
16    Q      Have you seen any of the reports on that?
17    A      I've seen the reports that I drafted up, but I
18            haven't really heard anything else about that.
19    Q      Okay.  Do you -- now, you gave an interview
20            related to the shooting of Sylville Smith.  We
21            talked about that statement, right?
22    A      That's correct.
23    Q      And you gave that interview before the criminal
24            charges were --
25    A      Yes.
```

```
 1   A     Yes.

 2   Q     Were you referring to the defense and arrest

 3         tactics manual, a copy of which I've given you

 4         from December '14 here?  Is that what you meant

 5         by the manual?

 6   A     I believe so, yes.

 7   Q     Well, you were trained in this manual, right,

 8         the DAT manual?

 9   A     Correct, correct.

10   Q     And, you know, when you shot and killed Sylville

11         Smith, you were required to follow the DAT

12         manual, right?

13   A     Yes.

14   Q     That was your training?

15   A     Yes.

16   Q     And you were required to follow the Milwaukee

17         Police Department use of force policy, correct?

18   A     That's correct.

19               MR. OWENS:  Are you doing all right?

20               MS. GEHLING:  There's only five more

21         minutes before they come at 11:30.

22               MR. OWENS:  Unless this is a moment of

23         reckoning.

24               MR. SMOKOWICZ:  Should we go off the

25         record for a minute just to --
```

 1      correct?

 2  A   Yes.

 3  Q   All right.  August 15th, that's the day that you

 4      gave your statement to internal affairs,

 5      correct?

 6              Do you want to see a copy just to

 7      confirm the dates?

 8  A   Yes.

 9              MS. GEHLING:  And while you're looking

10      for that, do you mean DCI?

11              MR. OWENS:  Yeah.  What did I say?

12              MS. GEHLING:  Internal affairs.

13              MR. SMOKOWICZ:  You said internal

14      affairs.

15              MR. OWENS:  Oh, sure; thanks.

16                      EXAMINATION

17  BY MR. OWENS:

18  Q   I just want us to get on the same page number,

19      so I'm going to ask you those same three

20      questions again, but with the last one correct.

21      All right?

22              August 13, in the afternoon, that's

23      when you shot and killed Sylville Smith,

24      correct?

25  A   Yes.

 1   Q    August 14th, Sunday, that's the evening that you

 2        went to the bar, the Eastsider, with N.S.,

 3        correct?

 4   A    Yes.

 5   Q    You woke up the next morning and you took N.S.

 6        to the hospital, correct?

 7   A    I'm not sure if that's the sequence of how

 8        everything happened the next morning.

 9   Q    What happened the next morning?

10   A    Monday; maybe it was Monday.  I think it was

11        maybe Monday that I -- I went to the hospital,

12        or maybe -- yeah, Monday morning.  It was Monday

13        morning.

14                  MR. OWENS:  We can mark this as

15        Exhibit 11, please.

16                  (DLHB Exhibit No. 11

17              marked for identification.)

18                  MR. OWENS:  Thank you.

19                     EXAMINATION

20   BY MR. OWENS:

21   Q    All right.  Exhibit 11, this is a copy of a

22        document that you had multiple copies of here

23        with you at the prison, correct?

24   A    Yes.

25   Q    This is the one that you previously testified

1       was true and accurate, correct?

2    A   Yes.

3    Q   All right.  And do you see that the date

4       listed here where it says occurrence

5       from 8-15-2016, 11:15 to occurrence,

6       through 8-15, 2016?

7    A   Correct.

8    Q   Okay.  And then if you look at the page one, the

9       very top, it says on Monday, August 15

10      at 11:15 a.m., and then it goes on there and

11      describes the interview with you.  Do you see

12      that?

13   A   Correct.

14   Q   Okay.  So we've got -- the 13th is the day of

15      the shooting?

16   A   Yes.

17   Q   Saturday?

18   A   Yes.

19   Q   Sunday is the day you go to the bar.  Monday is

20      the day of the interview, correct?

21   A   Yes.

22   Q   You went to the hospital before this interview,

23      right?

24   A   Yes.

25   Q   All right.  And when you woke up in the

```
 1        squad that had a dashboard camera on it?
 2   A    Correct.
 3   Q    Why was that?
 4   A    Well, there's a -- the department has a
 5        procedure about squad cars.  And most squad cars
 6        have cameras.  There are squads that do not have
 7        them.  But, in most cases, if you are a outlier,
 8        they -- the lieutenant will request or they
 9        would prefer you to be into a squad car that has
10        an actual working dash camera on it.
11   Q    Okay.  And that was something that was at the
12        discretion of the lieutenant.  Is that correct?
13   A    I can't honestly say if the discretion was on
14        the lieutenant, but they had a lot of say so.
15        They wouldn't let -- not let us go out just
16        because there's a car with a malfunctioning
17        camera or -- or a -- or a car without a camera
18        at all.
19   Q    Okay.  But you were a bike cop, right?
20   A    Bicycle patrol, yes.
21   Q    Right.  And you were -- I'm sorry.  You were a
22        member of the District 7 bicycle patrol,
23        correct?
24   A    That's correct.
25   Q    And as a member of the District 7 bicycle
```

```
 1   A    No, not intentionally encourage pursuits.

 2   Q    Do you -- do you have any memory of -- of an

 3        officer saying, hey, let's try to get some more

 4        chases or anything like that?

 5   A    Malafa, I believe, went on an OPS.  He said it

 6        on the radio.  I do remember, I think my

 7        attorney was showing me some connections or

 8        radio transmissions, Malafa made a quick -- a

 9        little comment like that.

10               MS. GEHLING:  If I can just remind

11        you, when you're talking about your attorneys,

12        if you could identify which attorneys and let's

13        get it down for the record.

14               THE WITNESS:  Okay.  Steven and

15        Jonathan, my criminal defense attorneys.

16                         EXAMINATION

17   BY MR. OWENS:

18   Q    Okay.  So you remain -- you were reminded of the

19        fact that Officer Malafa said that, right?

20   A    I wasn't reminded.  They were just going through

21        radio transmissions.

22   Q    All right.  And so you -- you heard the radio

23        transmission of Officer Malafa say, let's try to

24        get a foot pursuit going, right?

25   A    I don't know exactly what he said, but it was --
```

1   Q    Something like that.

2   A    -- something to that nature or to that effect.

3   Q    All right.  And that was right before you

4        engaged Sylville Smith and Mr. Pritchard,

5        correct?

6   A    I'm not sure.  I'm not sure if that happened

7        exactly right before.

8   Q    Well, do you remember what happened on the audio

9        right after that?

10  A    Again, if I don't know right before, I wouldn't

11       know right after.  I -- I -- I believe I split

12       up on a traffic stop, so I don't know if he may

13       have made that comment earlier or was that later

14       in the shift.  I don't really remember what time

15       he actually said that on our detail.

16  Q    Okay.  Did it surprise you when he said it?

17  A    Did it surprise me?

18  Q    Yeah.

19  A    No, I wouldn't say it surprised me.

20  Q    Isn't it true that you approached the car that

21       Sylville Smith was parked in, the intention of

22       getting -- engaging in a foot pursuit?

23  A    No.

24  Q    Why did you jump out of your car in the way that

25       you did?

1    A    Because the -- the actions of Pritchard, the

2         passenger, led me to believe that an immediate

3         and unprovoked flight upon the path of seeing a

4         police officer, I mean, that's constituted as

5         resisting.  So I knew based off my observations

6         of him that he wasn't going to go with the

7         program, he was going to flee.  He was going to

8         attempt to flee.

9    Q    Okay.  So you jumped out of the car, right?

10   A    I didn't jump out of the car, but I got out of

11        the vehicle.

12   Q    Got out of the car very quickly?

13   A    Correct.

14   Q    Fair enough?

15             And you were ready to engage in a foot

16        pursuit, right?

17   A    I was not ready to engage in a foot pursuit.  I

18        was --

19   Q    You were --

20   A    I was trying to digest -- I mean, anything is

21        happening that would be complacent for me to

22        just say, oh, they're going to run.  We could

23        have been confronted by gunfire right away, so I

24        don't know.  I'm just -- you were ready for

25        whatever happens.  It's no foot pursuit or --

```
 1        you don't know.
 2   Q    Okay.  Well, you didn't see them committing any
 3        violent crimes, right?
 4   A    Correct.
 5   Q    And you didn't see them committing any felonies,
 6        correct?
 7   A    When you say they, I just want to correct that.
 8        I didn't see Sylville at first at all inside of
 9        the vehicle or whatnot.  All I seen was the
10        observations of the passenger.
11   Q    Okay.  You didn't see Mr. Pritchard waving a gun
12        around, right?
13   A    I did not.
14   Q    You weren't there specifically on a call.  There
15        was a crime in progress, right?
16   A    Correct.
17   Q    You weren't there -- you didn't see
18        Mr. Pritchard committing any violent acts
19        against any individual, correct?
20   A    Correct.
21   Q    When you pulled up on the car, you observed
22        somebody.  It's your testimony that you thought
23        he was going to engage in a foot pursuit,
24        correct?
25   A    He was about to flee or hide something or get
```

1          rid of something.  He was about to do something.

2    Q    Okay.  And you engaged in foot pursuits pretty

3         regularly as a member of the District 7 bike

4         patrol, correct?

5    A    I wouldn't say a full -- I wouldn't categorize

6         it as a bike patrol.  It's just some of us,

7         we -- everybody doesn't like to do work, I would

8         say.  I wouldn't say everybody likes to run and

9         do stops, but we -- we try -- I can speak for

10        the group I was with, me, myself, and Malafa, we

11        actually liked to make stops and we know that

12        when we're going into areas, it's a possibility,

13        so --

14   Q    Okay.  I -- I -- my question was a little bit

15        different, which is, it was something that you

16        did regularly, correct?

17   A    Yes.

18   Q    All right.  And you saw a plate.  You saw the

19        car with out-of-state plates, right?

20   A    Correct.

21   Q    And you got out of the car pretty quickly,

22        right?

23   A    Correct.

24   Q    All right.  You immediately withdrew your

25        firearm, correct?

 1          it just doesn't save or go over to the hard

 2          drive or whatnot.

 3                    So whenever -- the policies has been

 4          amended because I was one of the first guys to

 5          get a body camera.  They were just implementing

 6          the system.  So that the training that they have

 7          for the body cameras may not be as detailed as

 8          it is now that -- I don't know if everybody has

 9          the body camera, so whenever we had contacts or

10          citizen contacts with people, we're supposed to

11          activate that body camera and record it.

12     Q    Okay.  And so -- and just to be clear, I'm

13          talking about your experience in August of 2016.

14          If they've done something else now, everybody

15          else would get really, really mad at me if I

16          tried to use that against you.

17     A    Right.

18     Q    Okay?

19     A    All right.

20     Q    So what I'm just asking is about your training

21          and experience in August of 2016.  Okay?  And it

22          was your understanding that the body camera was

23          always recording, correct?

24     A    Correct.

25     Q    But it would only save back -- it would start

1       recording audio when you tapped it on your

2       chest, correct?

3   A   I don't think it would start recording audio.  I

4       think it would start recording 15 to 30 seconds

5       without audio, and then audio would kick in.  So

6       it would catch the first 15 to 30 seconds

7       before -- I don't know -- yeah, I think it would

8       just take the prior footage, and I'm not really

9       sure, but I just know that it's a gap between

10      audio.  So I don't know if it's from when you

11      hit it or if it's 15 to 30 seconds already and

12      then it starts immediately recording, so --

13  Q   You have an understanding about the fact that

14      there is, from the time that you hit it, it goes

15      back 30 seconds to what has been previously been

16      recorded?

17  A   I have an understanding that that happens.

18  Q   Okay.  So just to get on the same page, that, if

19      you have a body camera that's running, then when

20      you hit it, it starts recording, but you'll

21      have 30 seconds of silent video before that

22      without audio.  Is that your understanding?

23  A   15 to 30 seconds, I believe, approximately, yes.

24  Q   Okay.  And, in this instance, you didn't -- you

25      activated your body camera almost immediately

```
 1        guess you don't like the phrase bike patrol.
 2        How would you describe it?
 3    A   Bike patrol.  That's a fair statement.
 4    Q   Okay.
 5    A   You said bike cop at first, so --
 6    Q   District 7 bike patrol?
 7    A   Yes.
 8    Q   All right.  As a member of the District 7 bike
 9        patrol, even though you didn't like it, you
10        weren't looking for it, you did routinely engage
11        in foot pursuits, correct?
12    A   I didn't say I didn't like foot pursuits.  I
13        said that wasn't my intention to get into foot
14        pursuits.  But I loved the job.  I like to be
15        physically active.  I like helping people, so I
16        wouldn't say I didn't like what I was doing,
17        but --
18    Q   Did you regularly engage in foot pursuits as a
19        member of the District 7 bike patrol?
20    A   Yes.
21    Q   And had you engaged in foot pursuits of
22        individuals who had firearms as a member of the
23        District 7 bike patrol?
24    A   Yes.
25    Q   And had you recovered firearms from individuals
```

```
 1         as a result of foot pursuits in your experience
 2         as a member of the District 7 bike patrol?
 3    A    Yes.
 4                   MR. OWENS:  And I want to just have
 5         you help me understand this document.
 6                   We can mark this as Exhibit 12?
 7                   MS. GEHLING:  No.
 8                   MR. OWENS:  13.  Okay.
 9                   (DLHB Exhibit No. 13
10                marked for identification.)
11                        EXAMINATION
12    BY MR. OWENS:
13    Q    All right.  So I'm going to jump around a little
14         bit, but it's -- trust me, it's for the -- the
15         purpose of expediting things to the extent I
16         really -- I can.  I'm showing you what's been
17         marked as Exhibit No. 11, which is, of course,
18         your statement that you gave to DCI, the one
19         we've been discussing.  And I'm just going to
20         draw your attention to page number four, the
21         second full paragraph there.  Do you see where
22         you mentioned having previously stopped somebody
23         as a result of a foot pursuit who had a firearm
24         about a week before and there's the address
25         there?
```