IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | | |
|---|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf, | ) ) ) ) ) | No. 17-cv-862 |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN, | ) ) ) | |
| Defendants. | ) | |

# EXHIBIT 16-2

Waller Expert Report

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

# WALLER & ASSOCIATES, LLC

15850 W. Bluemound Road, Suite 308
Brookfield, Wisconsin 53005
(262) 782-5515 • Fax (262) 641-0508
www.wallerassociates.com

Dennis Waller, CLI
denny1@gdinet.com

January 4, 2019

Attorney Danielle Hamilton
Loevy & Loevy
311 North Aberdeen
3rd Floor
Chicago, IL 60607

Re: **Estate of Sylville Smith v. City of Milwaukee, et al.**
USDC, Eastern District, WI; Case No.: 17-cv-862

Ms. Hamilton:

The following report was presented per your request for my opinions on certain issues related to this litigation.

## *Background and Qualifications:*

I have served as a consultant/expert witness in more than 700 cases involving issues related to police policy, procedure, and practice. I have been retained in thirty-six states including Wisconsin plus the District of Columbia. I have served as an expert witness in federal courts, state courts, and before administrative hearings. I have been retained by counsel for the prosecution, plaintiff, and defense.

I have a Bachelor of Science degree in Police Administration from Michigan State University. I have a Master of Science degree in Public Administration from Florida International University. I have received over 3,700 hours of law enforcement training including hundreds of hours from Michigan State University, the University of North Florida, Northwestern University, University of Wisconsin, International Association of Chiefs of Police; Metropolitan Police Institute; Public Agency Training Council, and Milwaukee Area Technical College.

I have served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief. I have been certified as a police training instructor in Michigan, Florida, North Carolina, and Wisconsin. I have served as the director of a regional

1

police training academy in Raleigh, North Carolina. I have been certified as a Defensive and Arrest Tactics Instructor, Police Firearms Instructor, OC Instructor, Psycho-Motor Skill Design Instructor, and Glock Armorer. I have been certified as an Internal Affairs Investigator/Supervisor. I have been trained as an Assessor for the Commission on Accreditation for Law Enforcement Agencies. I have earned the status of Fellow of the American College of Forensic Examiners and Diplomate of the American Board of Law Enforcement Experts. I am a Certified Legal Investigator, one of approximately 100 in the country.

Throughout my years as a police instructor and supervisor, I have trained hundreds of officers in numerous subject areas including conducting investigations, use of force, report writing, interviewing and interrogation, and police ethics. I have taught in a variety of law enforcement and related subject areas at the college and university level including the police function, police administration, criminal investigation, and policy development seminars in high liability areas such as arrest procedures and use of force.

Please refer to the attached curriculum vitae.

*Methodology:*

The methodology I use to examine police-related issues involved in litigation is explained below. This methodology is the same, or similar to, that utilized by experienced and respected expert witnesses in the field of police practice. The basic methodology I use has been accepted in over 700 cases I have reviewed for matters before federal courts, state courts, and administrative hearings.

A. <u>Develop an Understanding of the Facts</u>   Following a review of the information provided, develop and state an understanding of the facts. The facts and circumstances are specific for each case. If you change the understanding of the facts, the opinions may change or no longer be applicable.

B. <u>Analyze the Actions of the Officers</u>   The second step involves analysis of the actions of the involved law enforcement officers based on documentation by the officers, relevant testimony, departmental and/or external investigations, physical evidence, and any other relevant information. Determine what the officers did and their stated justification for what they did.

C. <u>Compare with Standards of Training and Practice</u>   The third step involves comparing what and why the involved officers did with various standards of training and practice. Standards of training and practice include relevant Supreme Court cases; departmental policies and procedures; applicable statewide police training programs/systems; model policies, training, and research from such institutions as the International Association of Chiefs of Police, Police Executive Research Forum, National Criminal Justice Reference

2

Service, Commission on Accreditation for Law Enforcement Agencies, Public Agency Training Council, and the Northwestern University Center for Public Safety.

D. <u>Define and Explain Consistencies and/or Inconsistencies</u>  The fourth step involves explaining how what the officers did, or did not do, was consistent or inconsistent with the applicable standards of training, practice, and professional ethics. The purpose is to assist the triers of fact in understanding the sometimes complex terminology, procedures, and the scope of acceptable practices in law enforcement which may otherwise be presented in a confusing and/or misleading manner.

***Materials Reviewed:***
    Complaint;
    Defendant City of Milwaukee Pleadings;
    Defendant Dominique Heaggan-Brown Pleadings;
    Photo Stills:
        Officer Heaggan-Brown's Body Camera;
        Officer Mafala's Body Camera;
    Body Camera Videos:
        Officer Heaggan-Brown;
        Officer Mafala;
    Milwaukee PD SOP's:
        440 – Early Intervention Program;
        450 – Personnel Investigations;
        453 – Officer-Involved Deaths and Other Critical Incidents;
        455 – Critical Incident Review Board;
        460 – Use of Force;
        467 – Electronic Control Device;
        870 – Suspensions/Official Discipline;
    Memos to Captain Riestra:
        August 22, 2017;
        November 3, 2017;
    Critical Incident Review presentation to FPC on May 1, 2018;
    Dominique Heaggan-Brown Personnel File;
    Wisconsin Department of Justice DCI Investigation of the Sylville Smith Shooting;
    MPD IAD File for Dominique Heaggan-Brown Sexual Assault;
    Milwaukee County Medical Examiner Autopsy Report of Sylville Smith and photos;
    State v. D. Heaggan-Brown Trial Transcripts;
    Dominique Heaggan-Brown – Deposition/Exhibits;
    Former Chief Edward Flynn – Deposition/Exhibits;
    Officer Ndiva Malafa – Deposition/Exhibits;
    Officer Richard Voden – Deposition/Exhibits;
    Assistant Chief Michael Brunson – Deposition/Exhibits;
    Sgt. Allen Groszczyk – Deposition/Exhibits;
    Lt. Timothy Leitzke – Deposition/Exhibits;
    Captain Nicole Waldner – Deposition/Exhibits;
    Captain Heather Wurth – Deposition/Exhibits;
    Captain James Shepard – Deposition/Exhibits;

3

State of Wisconsin LESB DAAT Manual;
Sylville Smith – Timelines Spreadsheet [Smith 4767-4774].

**Understanding of the Facts:**

Dominique Heaggan-Brown applied to become a Milwaukee Police Department [MPD] aide in 2010. Even during his time as a police aide, the MPD hierarchy was made aware of problems with Heaggan-Brown's decision-making, which resulted in several internal affairs investigations and were obvious signs that Heaggan-Brown needed to be monitored. This included a number of senselss traffic violations, e.g. excessive speed, and the misuse of MPD electronic resources. While in the abstract or in isolation, these are not necessarily indicative of the lack of ability to become a sworn officer, the overall pattern reflects demonstrated poor judgment at a time when he was apprenticing for his job. The final psychological evaluation/profile of Mr. Heaggan-Brown as a police aide before he became a police officer advised that although the test results indicated he was within acceptable parameters, he ranked high in aggressiveness and had low emotional self-control which would require monitoring particularly when under pressure. Mr. Heaggan-Brown completed the police aide program despite known disciplinary and judgment issues. Mr. Heaggan-Brown was appointed as an MPD officer in 2013 but discharged just three years later in 2016.

In his extremely short time as an officer, Officer Heaggan-Brown was involved in a high number of situations illustrative of poor decision-making, judgment, and aggressiveness. MPD officers were summoned to Officer Heaggan-Brown's residence for disturbance calls. Heaggan-Brown appeared in photographs and other media glorifying violence and "life on the streets."

Officer Heaggan-Brown was involved in a high number of use of force incidents. Investigation of these matters did not result in any discipline. For the first six months of 2016, Officer Heaggan-Brown was the number one officer on the outliers' list, a program utilized by the Milwaukeee PD to monitor use of force and other incidents outside the norms established by the Department. Officer Heaggan-Brown had also been on the outliers' list for the entire year of 2015. MPD's "use of force" committee met in August of 2016 and was aware of the fact that Officer Heaggan-Brown was the top person on the outliers list, but took no corrective action. Officer Heaggan-Brown was also on the Department's "early intervention" list given the number of complaints that had been lodged against him. No records have been provided by MPD that any corrective actions were taken with respect to Officer Heaggan-Brown.

On August 13, 2016, Officer Heaggan-Brown was working an overtime assignment with two other MPD Officers, Ndiva Malafa and Richard Voden. The overtime assignment involved the officers "showing a police presence" by engaging in frequent traffic stops however trivial. The traffic stops were used as a means of "engaging" with citizens. Here, the officers approached a parked car, just after radioing one another about trying to get into a foot chase. In approaching the parked vehicle, Officer Heaggan-Brown jumped out of his squad with his firearm pointed toward the parked vehicle. The officers subsequently engaged in the foot pursuit they were seeking. Officer Heaggan-Brown and Officer Malafa pursued a fleeing subject with a pistol,

Sylville Smith. The foot pursuit of Mr. Smith was captured on the body cameras of the two officers. Officer Voden pursued the other subject.

During the pursuit Mr. Smith tripped rounding a corner between two buildings and fell to the ground against a fence while dropping the pistol. In an attempt to continue fleeing, Mr. Smith picked up the pistol by the barrel and stood up as he threw the gun over the fence. As this was happening, Officer Heaggan-Brown fired one shot striking Mr. Smith in the right bicep area. Officer Heaggan-Brown was aware the pistol went over the fence into the back yard.

Immediately as he was being shot, Mr. Smith fell to the ground. Approximately 1.69 seconds later Officer Heaggan-Brown fired a second shot into the torso of Mr. Smith. The second shot was fatal. Up to this point, Officer Malafa had not drawn his firearm.

Shortly after the second shot was fired, both officers holstered their firearms. Officer Heaggan-Brown indicated the location of Mr. Smith's pistol to Officer Malafa. No mention was made of a potential second firearm in Mr. Smith's possession. Mr. Smith was not searched or handcuffed. No mention of a possible second firearm was made to other responding officers who became involved in applying CPR to Mr. Smith. The only mention made to responding officers was of the pistol that Mr. Smith had thrown into the backyard. Officer Heaggan-Brown made a public safety statement to Sgt. Pratchet at the scene. One of the purposes of a public safety statement is to assist in the discovery of potential evidence or hazards to the community and to make responding officers made aware of their presence. No documentation has been provided that Officer Heaggan-Brown mentioned anything about a possible second gun being at the scene or in Mr. Smith's possession.

With regard to potential criminal liability this officer-involved shooting [OIS] was investigated by the Wisconsin Department of Justice, Division of Criminal Investigation [DCI]. DCI investigators requested Officer Heaggan-Brown be interviewed. After consulting with his attorneys, after his attorneys were allowed to view the body camera video from both officers, and after Officer Heaggan-Brown was given time to complete at least two sleep cycles, Officer Heaggan Brown voluntarily answered questions. Officer Heaggan-Brown and his attorneys had a subsequent opportunity to review the written report documenting the interview and found no contextual issues with the report. Heaggan-Brown also subsequently affirmed this statement during his sworn deposition testimony.

Officer Heaggan-Brown stated he made the decision to shoot Mr. Smith a second time because he [Heaggan-Brown] "…feared that the black male was reaching for a second gun hidden in his waistband…" As a result of the DCI investigation, a criminal charge of first degree reckless homicide was filed against Officer Heaggan-Brown. He was subsequently tried in June 2017. A jury found him not guilty and he was acquitted of the charge.

An Internal Affairs administrative review of the incident was held in abeyance pending the ultimate resolution of the DCI investigation. However, an MPD Critical Incident Review board

5

determined the actions of Officer Heaggan-Brown were justified and consistent with MPD policy and training.

## *Opinions:*

Based on the totality of my training, education, and experience in law enforcement; as a law enforcement trainer; as a police science/criminal justice educator; and, as a police practices consultant, I have developed the following opinions to a reasonable degree of professional certainty in the field of law enforcement practice.

A      The foregoing facts set the context in which I have specifically examined the fatal shooting of Mr. Sylville Smith, which resulted from the second shot fired by Officer Heaggan-Brown. The second shot fired by Officer Heaggan-Brown resulted in the death of Sylville Smith. It was the result of a conscious, but unjustified, decision by the officer to use deadly force that was not consistent with a lawful purpose, i.e., self-defense, his training, and nationally accepted standards of police training and practice.

    1     Officer Heaggan-Brown gave a statement to DCI indicating that he was aware that Mr. Smith had thrown the pistol over the fence. Mr. Smith was unarmed and laying on the ground with Officer Heaggan-Brown standing over him at the time. Officer Heaggan-Brown stated he feared that Mr. Smith was reaching for a second gun hidden in his waistband when he fired the fatal shot.

        a     To justify shooting someone on the basis of defense of self or others, the shooter must establish that he/she had a rational basis for believing they or another were at imminent risk of death or great bodily harm. This was not present when Officer Heaggan-Brown fired the fatal shot.

        b     Officer Heaggan-Brown's actions subsequent to firing the second shot are <u>in</u>consistent with a rational belief that Mr. Smith may have had a second gun in his waistband.

           1)   According to Officer Malafa's trial testimony [pp. 155-6] Officer Heaggan-Brown never mentioned a concern that Mr. Smith had a second weapon and never requested that Mr. Smith be searched.

           2)   Examination of the video and individual frames of the coverage from the body cameras operated by Officer Malafa and Officer Heaggan-Brown establish that Mr. Smith was never handcuffed or searched after being shot.

           3)   Officer Heaggan-Brown gave specific instructions to Officer Malafa about locating and protecting the pistol that Mr. Smith threw over the fence. Acting in manner consistent with his training and MPD

6

policy, Officer Heaggan-Brown should have expressed, but did not, a similar concern about locating and protecting a second firearm possessed by Mr. Smith.

4) Acting in a manner consistent with nationally accepted standards of police training and practice, an officer in legitimate fear of death or great bodily harm would not forego efforts to secure the alleged weapon and delivery system. Officer Heaggan-Brown made no such efforts.

5) After Officer Heaggan-Brown made a public safety statement to Sgt. Pratchet, there is no documentation that MPD officers on the scene took any measures to look for a second firearm. Sgt. Pratchet testified [p. 12] at the criminal trial that one of the reasons for conducting the public safety statement protocol is to determine "…where the evidence is…"

    c    Officer Malafa agreed [deposition, p. 163] that after Mr. Smith threw the gun over the fence there was no longer a weapon or delivery system. These are two of three basic factors in which officers are trained to evaluate the need for, and appropriateness of, using deadly force.

2    The two shots fired by Officer Heaggan-Brown were not fired in rapid, continuous succession, such as if an officer was firing double taps or multiple shots until there was a conclusive indication the threat had ended. This is indicative that a conscious decision was made to fire the second shot after the first shot was fired.

    a    Only two shots were fired. Officer Heaggan-Brown provided a separate justification for each shot.

    b    Investigator Matthew Knight of the District Attorney's office and a former firearms trainer with the Milwaukee PD presented evidence and testimony [trial, p. 40] that he could fire five aimed rounds within 1.69 seconds. Other published studies have indicated that some officers can fire their weapons in a continuous manner at an even faster rate.

    c    The fact that Mr. Smith went from partially standing when he was struck by the first shot to laying on the ground before he was targeted by Officer Heaggan-Brown taking the second shot is indicative of a conscious decision by the officer to shoot a second time.

B    The Milwaukee Police Department's policies, practices, and customs caused, permitted, and accepted the unnecessary shooting of Mr. Smith by Officer Heaggan-Brown.

7

1. Given Officer Heaggan-Brown's large number of complaints, which caused him to be placed into the early intervention program, and his far higher than normal uses of force, which caused him to be placed on the outliers list, the Department failed to take any meaningful action to hold Heaggan-Brown accountable and improve his decision-making.

2. Officer Heaggan-Brown was not provided with retraining, significant mentoring, or reinforcement of the necessity of having appropriate justification for his actions, particularly with regard to the use of deadly force.

3. The Milwaukee PD turned a blind eye to the consequences of officers using poor judgment, as exemplified by Heaggan-Brown's conduct throughout his short career. That consequence in this case was the unjustified use of deadly force.

4. The Milwaukee Police Department had programs in place to screen new officers for potential problems and to identify officers who may be exhibiting inappropriate conduct. Mr. Heaggan-Brown was identified as an individual who may not meet the requirements and expectations of a Milwaukee Police officer; however, he was still hired.

5. Subsequently, when he was identified through other programs, i.e., the outliers and early intervention lists as someone who utilized force at levels far above the norm and who generated a high number of complaints, the actions of Officer Heaggan-Brown, including the unnecessary and unjustified slaying of Sylville Smith, were as a matter of practice condoned, rationalized, excused, or simply accepted.

6. The Milwaukee Police Department knew, or should have known early on that Mr. Heaggan-Brown was not an ideal candidate to be a MPD officer. The fact that Heaggan-Brown's lack of professional judgment was obvious is indicative of the Milwaukee PD ignoring obvious red flags before making Heaggan-Brown an officer.

   a. His application for police aid was incomplete.

   b. He did not conform to the code of conduct while a police aide.

      1) He received multiple serious traffic violations.

      2) He exhibited unprofessional conduct related to sexual harassment in a previous job.

      3) He had a questionable citation for disorderly conduct.

8

    c     His psychological evaluation/profile indicated a high level of aggressiveness, low emotional self-control, and the need for monitoring particularly when under pressure. Chief Flynn indicated [deposition, p. 119] he would have been concerned if he had been made aware of it.

    d     He had questionable associations with known gang members and drug abusers, associations that continued when he was a police officer.

7    Although the Milwaukee Police Department has a number of formal programs in place to identify problem officers, these appear to be more window dressing than a genuine effort to identify and deal with problem, or potential problem, officers.

    a     As a result, Heaggan-Brown was able to continue misbehaving while the Department condoned his actions. During his probationary period as a sworn officer, Heaggan-Brown repeatedly had questionable associations with known gang members and drug abusers.

    b     After his probationary period, Heaggan-Brown continued to exhibit poor judgment and a lack of responsibility. He was investigated six times for behavior demonstrating poor judgment, and repeatedly referred to departmental ethics rules. His training records show he failed to ever acknowledge approximately half of the Department's policies and procedures. MPD officials acknowledge this was a departure from Department rules and training [Capt. Waldner, p. 22-23]. Heaggan-Brown was never disciplined.

    c     The Department's continued acceptance or ratification of Heaggan-Brown's behavior emboldened him. In response to being involved in an extraordinary number of "use of force" incidents, the Department placed him on an overtime squad for the express purpose of "showing presence" and being "proactive" by making arrests and conducting traffic stops.

         1) In the first half of 2016, Officer Heaggan-Brown had ten uses of force, putting him on the top of the outliers list. The average use of force for an MPD officer during that time period was 1.5. In the same time period, Heaggan-Brown was being investigated for multiple disciplinary issues. Heaggan-Brown's "uses of force" were all deemed justified and he was given no more than a reprimand for any his infractions.

9

2) The following summary of incidents spanning only six months demonstrate a disturbing pattern of aggressiveness, poor judgment, and inappropriate uses of force:

   a) January 9, 2016 – Officer Heaggan-Brown was being investigated for associating with people involved in criminal behavior and behavior that could discredit the department. These allegations were not sustained. Heaggan-Brown was merely given a policy review.

   b) April 5, 2016 - Officer Heaggan-Brown used a TASER on Breon Eskridge while Eskridge was walking away from the officer. Heaggan-Brown was also being investigated for sexual assault in the fourth degree. The Department found these allegations to be baseless.

   c) April 15, 2016 – Heaggan-Brown used a TASER on Ronnie Martin after Martin was pulled from his vehicle. Martin filed a complaint with the Fire and Police Commission alleging that the officers threw him to the ground, beat him, and TASERed him.

   d) April 30, 2016 – Heaggan-Brown used a TASER on Marcel Burks after wrestling him to the ground. Burks reported he was having trouble breathing after the encounter.

   e) May 12, 2016 – Coveonte Williams alleged Heaggan-Brown took him to the ground and TASERed him for walking into the area where Heaggan-Brown had told him to stay away from.

   f) May 24, 2016 - Officer Heaggan-Brown shot a TASER at Jaquan White but missed.

   g) May 31, 2016 – Jimmy Bates was TASERed in the back by Officer Heaggan-Brown.

   h) June 2, 2016 – Charles Johnson was TASERed by Officer Heaggan-Brown for resisting arrest. Johnson alleged that Officer Heaggan-Brown also kicked him and punched him in the face.

   i) June 27, 2016 - La Vance Crisler was TASERed in the back by Officer Heaggan-Brown for allegedly refusing to show his hands.

   j) June 30, 2016 – Officer Heaggan-Brown took a minor to the ground who had been on a bike.

10

8. For a year and one-half prior to this incident as a relatively new police officer, Heaggan-Brown, was on the outliers' list. This would indicated to MPD supervisors and administrators that his use of force was at a much higher level than the norm.

    a. MPD officers on this list should be counseled by supervisors and their use of force was supposed to be more closely monitored. Heaggan-Brown was not retrained or disciplined at any point as a result of being on the outliers list.

    b. Chief Flynn [p. 58] admitted it was rare for the Milwaukee PD to sustain an excessive force complaint between 2014 and 2016.

    c. Chief Flynn [p. 134] acknowledged that the overall picture of Officer Heaggan-Brown was of someone not using good judgment.

9. The MPD Critical Incident Review Board determined the deadly force used by Officer Heaggan-Brown was justified, within policy, and consistent with his training.

    a. Chief Flynn relied on the opinion of his DAAT instructors that two shots within 1.69 seconds should not be judged separately.

        1) Chief Flynn claimed [p. 157] that Officer Heaggan-Brown did not make two separate decisions when he fired two shots. Chief Flynn stated [p. 107] that Officer Heaggan-Brown's statement to the contrary was not the determinative factor.

        2) Chief Flynn admitted [p. 22] that officers are trained and it is department policy that each use of force has to be justified on its own within limits.

        3) Chief Flynn disagreed with the District Attorney's decision to charge Officer Heaggan-Brown criminally with the shooting of Mr. Smith. The District Attorney's position is every shot needs to be justified.

    b. Chief Flynn [p. 105] did _not_ consider Officer Heaggan-Brown's statement to DCI investigators indicating after shooting Mr. Smith the first time he observed Mr. Smith throw the gun over the fence before deciding to shoot him a second time.

11

1) In his testimony at Officer Heaggan-Brown's criminal trial, Mr. Willis concluded that Officer Heaggan-Brown made a specific decision to fire a second bullet into the body of Mr. Smith.

2) Mr. Willis even determined what training Officer Heaggan-Brown's decision was based upon, i.e., the "plus-one rule."

10   Within days of shooting Mr. Smith, Officer Heaggan-Brown was investigated by the Milwaukee PD for a number of sexual assault and related charges.

    a    Based upon this criminal investigation, Mr. Heaggan-Brown was terminated from the Milwaukee Police Department.

    b    Mr. Heaggan-Brown also faced criminal charges resulting from the sexual assault investigation. He pled no contest or guilty to several charges while awaiting his criminal trial for shooting Mr. Smith.

    c    Chief Flynn testified [p. 101] that the shooting incident was not related to the decision to terminate Mr. Heaggan-Brown.

C   Officer Heaggan-Brown was criminally charged for the shooting of Sylville Smith. The Department nonetheless has concluded that the only way they would have deemed the shooting <u>un</u>justified was if it resulted in a criminal conviction. It is problematic and a departure from police practice standards to only be willing to address issues and/or impose discipline on officers if the Department believes that person is, or will be, criminally convicted.

    1    The Department ignored and was indifferent to the numerous "red flags" and other obvious problems with Officer Heaggan-Brown. Members of the Department's administration were specifically made aware of these issues in 2016 leading up to the shooting of Mr. Smith; yet, they did nothing to affirmatively address Heaggan-Brown's conduct.

    2    MPD representatives have confirmed that (1) the fatal shooting of Mr. Smith was conducted pursuant to city policy and practice, and that (2) the City's response to the fatal shooting, including imposing no discipline or training, was consistent with the practices, customs, and policies of the Department. Such policies, practices, and customs are plainly inadequate and encourage the violation of citizens' constitutional rights, as happened when Heaggan-Brown fatally shot Mr. Smith.

My Opinions may be added to, or amended, upon review of additional information.

12

Respectfully submitted,

*[signature]*

Dennis Waller

Encl.
 CV
 FS
 Testimony List

13