IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | | |
|---|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf, | ) ) ) ) ) | No. 17-cv-862 |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN, | ) ) ) | |
| Defendants. | ) | |

# EXHIBIT 16-3

Waller Rebuttal Report – March 29, 2019

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

# WALLER & ASSOCIATES, LLC

15850 W. Bluemound Road, Suite 308
Brookfield, Wisconsin 53005
(262) 782-5515 • Fax (262) 641-0508
www.wallerassociates.com

**Dennis Waller, CLI**
denny1@gdinet.com

March 29, 2019

Attorney Danielle Hamilton
Loevy & Loevy
311 North Aberdeen
3rd Floor
Chicago, IL  60607

Re: **Estate of Sylville Smith v. City of Milwaukee, et al.**
USDC, Eastern District, WI; Case No.: 17-cv-862

Ms. Hamilton:

The following report was presented per your request for my rebuttal opinions on certain issues related to this litigation. This report will supplement my report in this matter dated January 4, 2019.

### Additional Materials Reviewed:

Report of Robert C. Willis dated March 4, 2019, entitled Estate of Sylville [sic] v. The City of Milwaukee, Dominique Heaggan-Brown, et al.;
Defendant City of Milwaukee's Response to Requests to Admit.

### Opinions:

D    The report of Robert Willis does not change any of the conclusions addressed in my report. His report only strengthens some of my conclusions.

   1    The Milwaukee Police Department disregarded clear warning signs with respect to the conduct of Heaggan-Brown which should have been addressed long before this shooting incident.

   2    The Milwaukee Police Department remains indifferent to the systemic flaws, gaps, and failure within its customs, practices, and policies which allowed

1

Heaggan-Brown to become and remain a police officer until he finally faced criminal charges. This is illustrated by the following factors:

- a  Milwaukee PD's continued treatment of the fatal shooting.

- b  Utilization of Robert Willis to "spin" elements of what occurred in a favorable light.

- c  MPD's admission that the only way Heaggan-Brown would have been disciplined for his actions were if he was criminally convicted of the homicide of Sylville Smith.

3  Police departments should not confine their disciplinary process and training only to avoid criminal liability or only imposing meaningful discipline if they conclude a crime had been committed.

4  The City's continued defense of the Heaggan-Brown is further evidence of its own deliberate indifference.

E  Robert Willis' report made deliberately misleading statements that are contradictory to his prior testimony and the facts of this case, unsubstantiated, or clearly untrue. The following are salient examples.

1  Mr. Willis concluded that Officer Heaggan-Brown's approach considerations were appropriate based upon seeing a car apparently parked too far from the curb. Mr. Willis ignored the fact, that as shown in the video, Heaggan-Brown immediately jumped out of the car and drew his weapon pointing it at Mr. Smith. This action was not justified at the time and is inconsistent with accepted police practices.

2  Mr. Willis [report, p. 13] stated "Plaintiff's expert somehow has determined that Smith 'in an attempt to continue fleeing', picked up his 'pistol by the barrel and stood up.' Plaintiff's expert is clearly biased and factually inaccurate, due to making that false and self-serving assumption."

- a  During the "Understanding of the Facts" that I used as a basis for my opinions, I stated "In an attempt to continue fleeing, Mr. Smith picked up the pistol by the barrel and stood up as he threw the gun over the fence."

- b  Officer Malafa [deposition, p. 99] confirmed that Mr. Smith did not exhibit any threatening behavior toward him besides having a firearm and running from the police. The obvious corollary is Mr. Smith was attempting to continue fleeing when he was shot.

2

c   In Heaggan-Brown's statement [p. 6] to DCI investigators, which he confirmed was accurate, he stated "...the black male fell onto the fence, and he believed the black male threw the pistol over the fence with his right hand."

d   The body camera video from Heaggan-Brown shows Mr. Smith fleeing, falling to the ground as he approaches the gate, grabbing his gun by the barrel, and throwing the gun over the fence as he turns away from the officer while reaching for the fence. Officer Malafa's body camera video shows substantially the same thing.

e   During his trial testimony on June 19, 2017, Mr. Willis acknowledged:

   1) [p. 73] "...Smith actually has his hand on the barrel of the gun."

   2) [p. 93] "...he [Heaggan-Brown] believed the black male threw the pistol over the fence with his right hand."

f   On page 31 of his report Mr. Willis acknowledged that "...Smith tossed his handgun over the fence."

g   Mr. Willis obviously considered Mr. Smith's attempt to flee. In his report [p. 33] Mr. Willis stated, "...Smith could easily have continued his rolling movements, gotten up and jumped the fence..."

3   On page 25 of his report, Mr. Willis made the following statement which is presented as written, "Foot pursuits are dangerous events, 40% or more of subjects who flee officers taken them s are subsequently involved in a deadly force encounter with them."

   a   I agree that foot pursuits are dangerous events. Beyond that his statement is confusing and poorly presented.

   b   If Mr. Willis is attempting to say that 40% of the subjects who flee from officers are involved in a deadly force encounter with them, that is patently false.

      1) No credible source was provided to support that fact.

      2) I have never seen, nor heard, of any study or credible source that has made that claim.

3

- 3) These officers were involved in numerous other foot pursuits, some of which also involved suspects with weapons, but were not involved in deadly force incidents.

- c As evidenced by their radio communications, these officers were actively attempting as part of their method of operation to engage in foot pursuits. Part of their strategy was to surprise people by jumping out of their police vehicles and pointing guns. This questionable and ill-advised practice could easily result in a misinterpretation of the officer's intent causing people to flee regardless of what they may or may not have been doing because of their fear of being shot.

4 On page 27 of his report, Mr. Willis erroneously defined probable cause. What he actually defined in paragraph 3.b. was reasonable suspicion. There is a world of difference between the two concepts, particularly as it relates to the actions in which police officers are legally justified in taking.

5 On page 32 of his report, Mr. Willis claimed that although Heaggan-Brown "…was aware that Smith had discarded the large black handgun over the fence before he shot Smith….the possibility of a second deadly weapon caused him to fear for his life." Mr. Willis then talked about the "Plus One Rule" to justify Heaggan-Brown's actions.

- a In his trial testimony [p. 37] Mr. Willis testified that the crux of the plus-one rule is do not assume the subject has only one weapon.

- b Mr. Willis [p. 138] testified Mr. Smith was "…moving his hand <u>potentially</u> [emphasis added] towards a concealed weapon would be the intent."

- c Mr. Willis neglected to indicate that justification for the use of deadly force requires a rational fear of death or great bodily harm, not a generalized possibility that could apply to virtually any situation.

- d Through his trial testimony Mr. Willis attempted to utilize and misapply the "plus-one" concept as a major component of a police officer's use of force training in the State of Wisconsin.

- e The "plus-one rule" stated by Mr. Willis is primarily a consideration to be used when searching individuals. It is also a consideration to make when assessing the need to use force; however, it is anything but an absolute factor.

    - 1) When questioned about the "plus-one rule" at trial, Mr. Willis testified:

4

<ol>
<li style="list-style-type: lower-alpha;">"I don't think there's an official title of plus-one rule." He [p. 125] believed there was a discussion of searching for weapons, if you locate one search for more.</li>
<li style="list-style-type: lower-alpha;">On page 85 in the DAAT Manual, "If you find a weapon, assume there is another." Mr. Willis acknowledged there is no paragraph devoted to it and there is no bold type.</li>
</ol>

2) Mr. Willis admitted [p. 128] he did <u>not</u> know if Heaggan-Brown had ever been trained on the concept of plus-one.

f    Mr. Willis' emphasis on the "plus-one" rule was admittedly inconsistent with its primary application in Wisconsin law enforcement training. It should also be noted that Heaggan-Brown never raised any indication that Mr. Smith may have had another weapon until after his [Heaggan-Brown's] attorneys viewed his body camera video prior to Heaggan-Brown providing a statement to the DCI investigators.

6    Mr. Willis indicated plaintiff's expert did not consider other plausible reasons for Heaggan-Brown firing the second round into Smith. [Note - Mr. Willis made that statement even though Heaggan-Brown said in the DCI interview that was his primary reason.] Because plaintiff's expert made no mention of other possible reasons for Heaggan-Brown's actions, his opinions are therefore replete with confirmation bias and also incomplete.

    a    Mr. Willis' comment is unfounded and inaccurate.

    b    The DCI report of Heaggan-Brown's interview [p. 6] states, "P.O. Heaggan-Brown stated….the black male moved his right hand toward his waist band….P.O. Heaggan-Brown feared that the black male was reaching for a second gun hidden in his waistband…"

7    Mr. Willis made an erroneous blanket statement in his report [p. 34]. He stated, "If Heaggan-Brown feared for his life, deadly force was justified."

    a    That simply is not true.

    b    To be justified the use of deadly force must be objectively reasonable based upon a rational fear of imminent death or great bodily harm.

8    In his report [p. 35] Mr. Willis erroneously stated that after firing the second shot Heaggan-Brown transitioned into follow-through protocols.

5

- a  Mr. Willis states it is almost physically impossible for an officer to stop shooting immediately during a gunfight. While that may be partially true in some situations, this was not a gunfight.

    1) Mr. Willis has testified that Heaggan-Brown made two separate decisions to fire his weapon. According to his trial testimony [p. 69], Mr. Willis testified the decision-making process takes .2 to .3 of a second. Mr. Willis [p. 74] acknowledged there was 1.69 seconds between the two shots fired by Heaggan-Brown.

    2) Discovery responses from attorneys representing Heaggan-Brown and the City of Milwaukee have admitted that Heaggan-Brown made two separate decisions to shoot Mr. Smith.

    3) After the second shot, Heaggan-Brown did not fire his weapon again. In fact, he holstered it even though Mr. Smith was never searched for a second weapon or handcuffed.

- b  If one believes that Heaggan-Brown actually believed Mr. Smith was reaching for another weapon when he shot him the second time, no explanation is given about why Heaggan-Brown failed to follow through on established protocols regarding searching for and securing the second weapon.

    1) Heaggan-Brown gave specific instructions to Officer Malafa about locating and protecting the pistol that Mr. Smith threw over the fence. Consistent with his training and Milwaukee PD protocols, Heaggan-Brown should have expressed and/or acted upon, but did not, a similar concern about locating and protecting the second firearm he allegedly assumed was possessed by Mr. Smith.

    2) Heaggan-Brown made no mention of a possible second weapon when he made a public safety statement to Sgt. Pratchet shortly after the shooting occurred.

    3) The "second-gun" theory did not surface until after Heaggan-Brown had an opportunity to consult with his attorneys after they had viewed the body camera video, but before Heaggan-Brown was interviewed.

        a) The "second-gun" theory is inconsistent with the contemporaneous evidence of what Heaggan-Brown did and failed to say at the time.

6

       b) The "second-gun" theory emerged after-the-fact in circumstances that could, when viewed objectively, be considered suspect.

My opinions may be added to, or amended, upon review of additional information.

Respectfully submitted,

*[signature]*

Dennis Waller

7