IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | |
|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN,<br><br>Defendants. | No. 17-cv-862<br><br>JURY TRIAL DEMANDED |

# EXHIBIT 20

Richard Voden Deposition

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

# Estate of Sylville Smith, et al. v. City of Milwaukee, et al.

2:17CV862LA

Transcript of the Video Deposition of:

# Richard Voden

December 19, 2017



800.899.7222 • www.GramannReporting.com

MILWAUKEE  414.272.7878 • FAX: 414.272.1806 • 740 North Plankinton Ave, Suite 400, Milwaukee, WI 53203
MADISON  608.268.0435 • FAX: 608.268.0437 • 14 West Mifflin Street, Suite 311, Madison, WI 53703

1　　　　　　　IN THE UNITED STATES DISTRICT COURT

2
　　　　　　　　　EASTERN DISTRICT OF WISCONSIN
3　　　---------------------------------------------------------

4　　The ESTATE of SYLVILLE K. SMITH,
　　　by Personal Representative
5　　Mildred Haynes, Patrick Smith,
　　　and Mildred Haynes, on her own behalf,
6
　　　　　　　　　　　　Plaintiffs,
7
　　　　　　　　vs.　　　　　　　　Case No. 2:17 cv 862-LA
8
　　　CITY OF MILWAUKEE, WISCONSIN
9　　and DOMINIQUE HEAGGAN-BROWN,

10　　　　　　　　　　　　Defendants.

11　　---------------------------------------------------------

12

13
　　　　　　　　Videotape Deposition of RICHARD VODEN
14
　　　　　　　　　Tuesday, December 19th, 2017
15

16　　　　　　　　　　　　　1:01 p.m.

17　　　　　　　　　　　　　　at

18　　　　　　　　　　GRAMANN REPORTING, LTD.
　　　　　　　　　　740 North Plankinton Avenue
19　　　　　　　　　　　Milwaukee, Wisconsin

20

21
　　　　　　　　Reported by Tammy R. O'Neal, RPR
22

23

24

25

1            Videotape Deposition of RICHARD VODEN, a
2       witness in the above-entitled action, taken at the
3       instance of the Plaintiffs, pursuant to the Federal
4       Rules of Civil Procedure, pursuant to Subpoena,
5       before Tammy R. O'Neal, RPR and Notary Public, State
6       of Wisconsin, at Gramann Reporting. Ltd., 740 North
7       Plankinton Avenue, Milwaukee, Wisconsin, on the 19th
8       day of December, 2017, commencing at 1:01 p.m. and
9       concluding at 5:19 p.m.

10    A P P E A R A N C E S:

11            LOEVY & LOEVY, by
                 Mr. David B. Owens and
12               Ms. Danielle Hamilton
                 311 North Aberdeen Street, 3rd Floor
13               Chicago, Illinois 60607
                 Appeared on behalf of Plaintiffs.
14
                 MILWAUKEE CITY ATTORNEY'S OFFICE, by
15               Ms. Naomi E. Gehling
                 841 North Broadway, 7th Floor
16               Milwaukee, Wisconsin 53202-3515
                 Appeared on behalf of Defendants.
17
       Also Present:  Desmond Rodriguez, CLVS, Videographer
18                           I N D E X

19    EXAMINATION BY                                    PAGE

20    BY MS. HAMILTON:                                    5

21

22

23

24

25

1                         E X H I B I T S

2      NUMBER                                        PAGE IDENTIFIED

3      Exh. 5    Topic acknowledgements                    48
       Exh. 6    DAT guide                                 56
4      Exh. 7    Use of force policy                       62
       Exh. 8    Statement of Officer Voden                76
5      Exh. 9    CAD report for day of incident            80
       Exh. 10   Scene reconstruction from DCI file        99
6      Exh. 11   Milwaukee Police Department radio        125
                 transmissions

7

8   (Original exhibits retained by court reporter, then returned
    to Mr. Owens. Copies avaliable to attorneys who ordered them)

1                TRANSCRIPT OF PROCEEDINGS
2                THE VIDEOGRAPHER:  We are on the record at
3     1:01 p.m. on Tuesday, December 19, 2017.  This is
4     volume No. 1, DVD one, of the video deposition of
5     Officer Voden taken by the plaintiff in the matter of
6     the Estate of Sylville Smith, et al. versus the City
7     of Milwaukee, et al. filed in the U.S. District
8     Court, Case No. 2:17 cv 862-LA.
9                This deposition is being held at Gramann
10    Reporting located at 740 North Plankinton Avenue,
11    Suite 400, in Milwaukee, Wisconsin 53203.  My name is
12    Desmond Rodriguez from the firm of Gramann Reporting
13    and I am the videographer.  The court reporter is
14    Tammy O'Neal of Gramann Reporting.
15               Counsel will now state their appearance and
16    affiliation for the record starting with the
17    plaintiff and then the court reporter will swear in
18    the witness.
19               MS. HAMILTON:  Daniel Hamilton on behalf of
20    the plaintiffs.
21               MR. OWENS:  My name is David B. Owens on
22    behalf of the plaintiffs.
23               MS. GEHLING:  Naomi Gehling on behalf of
24    all defendants including the deposed officers.
25               RICHARD VODEN, called as a witness herein,

1　　　having been first duly sworn on oath, was examined and

2　　　testified as follows:

3　　　　　　　　　　　　　EXAMINATION

4　　　BY MS. HAMILTON:

5　　Q　　Good afternoon.  Can you spell your first and last

6　　　　　name.

7　　A　　Yeah, first name is Richard, R-I-C-H-A-R-D.  Last

8　　　　　name is Voden, V as in Victor, O-D-E-N.

9　　Q　　And Officer Voden, have you ever given a deposition

10　　　　 before?

11　　A　　I have not.

12　　Q　　So there are a couple of rules that I want to explain

13　　　　 to you since this is your first time giving a

14　　　　 deposition.  The first is that the court reporter is

15　　　　 transcribing everything we're saying, and she can

16　　　　 only record verbal answers.  So can you answer with

17　　　　 yes and no and use words and not uh-uh or uh-huh or

18　　　　 shake your head or --

19　　A　　Yes.

20　　Q　　-- anything like that?  Great.  The second rule is

21　　　　 that I'm going to try to ask questions that make

22　　　　 sense.  If you don't understand my question, you're

23　　　　 certainly allowed to ask me to clarify or to

24　　　　 rephrase.  Do you understand that?

25　　A　　Yes.

```
 1    Q    What was that shift?
 2    A    4:00 p.m. to midnight.
 3    Q    And you mentioned Officer Malafa was your partner
 4         then?
 5    A    Him as well as several other officers were my
 6         partner.  I didn't have a direct partner, we just
 7         worked together as a team.
 8    Q    And you were regularly working with Officer
 9         Heaggan-Brown then?
10    A    As well as the other officers, yes.
11    Q    As a bike officer are you primarily assigned to one
12         district?
13    A    Yes.
14    Q    What district were you signed to in August 2016?
15    A    District 7.
16    Q    Let's back up a little bit.  Where were you born?
17    A    City of Milwaukee.
18    Q    And where did you go to high school?
19    A    Riverside High School.
20    Q    What year did you graduate?
21    A    2006.
22    Q    Did you go to college?
23    A    I did.
24    Q    Where did you go?
25    A    UWM.
```

1　　　　　in overtime or through the entire shift?
2　　Q　Through the entire shift.
3　　A　Okay.  Through the entire shift without overtime,
4　　　　　one.
5　　Q　And then what about with overtime?
6　　A　Depending on the amount of overtime there is allowed
7　　　　　that we're working, it could vary from five to who
8　　　　　knows how many, 20 depending on how long we're
9　　　　　working.
10　Q　Would you work the same number of overtime hours each
11　　　　time, or would it vary every time?
12　A　It wouldn't vary every time, but it could vary.
13　Q　What was the range of overtime hours that you would
14　　　　work?
15　A　Personally?
16　Q　Uh-huh.
17　A　I would work between two hours to 12 hours.
18　Q　So in a 12-hour shift, overtime shift, how many
19　　　　traffic stops would you make on average?
20　A　On average I would say two an hour, so 24.
21　Q　How did you sign up for the overtime detail?
22　A　There was a sign-up sheet in the lieutenant's office.
23　Q　And was it just a matter of signing up, you're
24　　　　signing your name on the sheet and then you were part
25　　　　of the overtime detail?

1  Q  So you said for high traffic stops, you could stop
2     people for speeding, defective equipment, erratic
3     driving behavior, seatbelts.  Any other reasons?
4  A  Sure, light violations, going through stop signs
5     going through red lights, parking violations, any
6     kind of traffic violation or just violation in
7     general.
8  Q  And when you stopped people for any of these
9     violations, would you arrest them?
10 A  Not specifically, no.  If they had a warrant, then
11    yes.
12 Q  Would you write them a ticket?
13 A  Most of the time, no.
14 Q  So you'd stop them, and what would happen after that?
15 A  We'll make contact with them.  We will speak with
16    them and warn them on whatever violations they had.
17    We will run their information, make sure they don't
18    have any warrants, car's not stolen and go on from
19    there.
20 Q  And then --
21 A  Sorry, go ahead.
22 Q  No, you go ahead.  Sorry.
23 A  You can go ahead.
24 Q  I would like you to finish answering the question.
25 A  Sure.

1　　Q　You were going to say something?
2　　A　I was just going to say -- what was I going to say?
3　　　　Oh, at that time in August it was just a show of
4　　　　presence, not a necessarily show of tickets.
5　　Q　So you would stop people, warn them to show your
6　　　　presence, and then let them go?
7　　A　Correct.
8　　Q　Are you familiar with the term jumping out?
9　　A　No.
10　　Q　Have you ever heard that phrase before?
11　　A　Jumping out in regards to what?
12　　Q　The phrase jumping out in regards to police officers.
13　　A　No.
14　　Q　Have you ever heard of the phrase "jump-out boys"?
15　　A　On like songs, yes.
16　　Q　What is your -- what does it mean?
17　　A　I do not know.
18　　Q　What songs have you heard the phrase "jump-out boys"?
19　　A　I couldn't tell you the specific song, but I've heard
20　　　　them in songs before.
21　　Q　Okay.  You don't know what it means?
22　　A　No.
23　　Q　Do you believe it's in reference to police officers?
24　　A　I do not know.
25　　Q　So you said you do a lot of these traffic stops to

```
 1            show police presence.  Were you in particular
 2            neighborhoods or areas in the city doing this?
 3      A     In District 7.
 4      Q     What neighborhood -- is there more than one
 5            neighborhood in District 7?
 6      A     Yes.
 7      Q     What are the neighborhoods?
 8      A     By name I'm not sure, but as far as deployment, the
 9            areas would change depending on the need for the
10            crime.
11      Q     In August of 2018 were you targeting -- sorry, 2016,
12            were you targeting Sherman Park, the neighborhood in
13            Sherman Park?
14      A     For traffic?
15      Q     Yes.
16      A     In some areas, yes.
17      Q     Some areas of Sherman Park?
18      A     Yeah.
19      Q     What areas?
20      A     Sherman and Burleigh.  Sherman and Cap -- or yeah,
21            Sherman and Capitol.  Sherman and Center.
22      Q     So as a bike -- as a bike officer working overtime
23            detail and stopping people, would you have to get off
24            your bike?
25      A     In the overtime detail I'd be inside a vehicle,
```

1　　　　　　flee, then yes, we will chase them to see, at that

2　　　　　　point it could have potentially been some kind of

3　　　　　　crime going on, to further investigate.

4　　　　　　　　　　I'm sorry, do you mind if I grab a glass of

5　　　　　　water as well?

6　　　　　　　　　　MS. HAMILTON:  No.  Why don't we take a

7　　　　　　little break actually.

8　　　　　　　　　　THE WITNESS:  That works.

9　　　　　　　　　　(Recess taken from 1:44 to 1:52 p.m.)

10　　　　BY MS. HAMILTON:

11　　Q　　So you were -- we're talking about the overtime

12　　　　　　detail and showing a police presence making a lot of

13　　　　　　traffic stops.  You said you were in high crime --

14　　　　　　you were doing this in high-crime areas?

15　　A　　Yes.

16　　Q　　Do you remember what areas?

17　　A　　They changed from day to day, but Capitol Drive,

18　　　　　　Sherman Drive, Burleigh, Center, Hampton sometimes.

19　　Q　　In these areas where you would get out of your car

20　　　　　　and people would run, you would -- you said you would

21　　　　　　chase them under certain circumstances?

22　　A　　Yeah.

23　　Q　　What were the circumstances which you chased them?

24　　A　　As I mentioned before, if we had gotten complaints of

25　　　　　　drug-related areas, people conducting drug

```
 1              transactions, or there's been shootings and
 2              gun-related crimes in that specific area.  Or if we
 3              know particular blocks that have been troubled and
 4              known for drug and gun violence, with the totality of
 5              the circumstances, you know, we go into that area,
 6              someone sees us, looks shifty, looks at us weird and
 7              then just takes off running and it's all about how
 8              they're running and things like that, you can -- we
 9              usually -- typically pursue.
10       Q      When people would have guns or drugs that you'd
11              chase, they would often try to get rid of those --
12       A      Correct.
13       Q      -- the contraband, right?
14       A      Correct.
15       Q      They would like throw it over a gate maybe?
16       A      Yeah.
17       Q      Have you had a lot of experiences with you chasing
18              people who would try to get rid of their contraband?
19       A      Yes.
20       Q      Would you agree that their intent is to get rid of
21              the contraband so they don't get arrested?
22       A      Yes.
23       Q      So you mentioned that you talked to Officer
24              Heaggan-Brown vaguely after the incident.  What did
25              he say to you when you talked to him about this
```

```
 1              MS. GEHLING:  I'm just going to note for
 2        the record this isn't -- I don't know necessarily how
 3        this CAD was produced to DCI or how it was printed
 4        out to DCI.  This isn't the actual like CAD that came
 5        like -- that we produced in our production.  This is
 6        the summary as is stated on the synopsis on the first
 7        page.  It's the summary of the CAD.  So I don't know
 8        exactly if -- how it would match up to the actual
 9        CAD.
10              MS. HAMILTON:  Right, yeah.  I think I
11        actually have the -- what you produced to us.  Maybe
12        it's better to use that if we have that.  Is that it?
13        All right.  Let me have you look at the actual CAD
14        produced.
15              (Discussion held off the record.)
16              (Recess taken from 3:19 to 3:29 p.m.)
17    BY MS. HAMILTON:
18    Q    So let's go back to your statement.  I forget what
19         exhibit number it is.
20              MS. GEHLING:  Eight I believe.
21    BY MS. HAMILTON:
22    Q    Eight.
23    A    Okay.
24    Q    So you reviewed this statement this morning?
25    A    Last night.
```

1　　Q　Last night, sorry. And everything in the statement
2　　　　is accurate, right?
3　　A　Yes.
4　　Q　There's nothing in this statement that's different
5　　　　from what you remember, right?
6　　A　No.
7　　Q　And you were truthful when you gave the statement,
8　　　　right?
9　　A　Yes.
10　Q　So I want to go through as we were talking about what
11　　　happened the day of. So we left off at you making
12　　　eight or nine traffic stops. And then what happened
13　　　after that?
14　A　We conducted a stop in the area of 44th and Auer.
15　Q　Okay.
16　A　I don't recall the exact address.
17　Q　Okay.
18　A　And -- yeah.
19　Q　What -- who did you stop then at 44th and Auer?
20　A　We stopped a vehicle that was parked too far from the
21　　　curb.
22　Q　How did you know it was too far from the curb?
23　A　Training, experience, the way it was parked it was
24　　　outside -- it was visibly outside of -- it's kind of
25　　　sticking out into the street with how far -- the

1 to the siren burst, I remember seeing a male on the
2 passenger side of the vehicle.  He was against the
3 driver's side door.  The door was open, and he was in
4 the threshold of the door.
5 Q Okay.
6 A As we approached, activated the lights.  The
7 passenger ducked underneath the door inside the
8 vehicle.  His legs and rear end were still outside
9 the vehicle, but his top side was bent under and went
10 inside the vehicle.
11 He exited the vehicle and then briskly
12 attempted to start walking away as we were stopping
13 our vehicle to make contact with the vehicle and the
14 occupants including him.
15 MS. GEHLING:  I'm sorry, did you say -- he
16 said passenger side, then driver's and passenger's so
17 I just want to -- for a clear record, did you catch
18 the driver comment?
19 MR. OWENS:  Can you just read the answer
20 back, the question and answer, please?
21 (Testimony read.)
22 BY MS. HAMILTON:
23 Q When you said driver's side in the answer that we
24 just read back, were you referring to the driver's
25 side of the vehicle or the passenger side of the