IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | |
|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf,<br><br>      Plaintiffs,<br><br>  v.<br><br>CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN,<br><br>      Defendants. | No. 17-cv-862<br><br>JURY TRIAL DEMANDED |

# EXHIBIT 21

Richard Voden Statement

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

# Wisconsin Department of Justice DCI
## ACISS Interview 16-4915/20
Report Date: 08/17/2016

| Primary Information | |
|---|---|
| Description: | Interview of P.O. Richard Voden - Re: OID |
| Occurence From: | 08/14/2016 00:00 |
| Occurence To: | 08/14/2016 00:00 |
| Reporting LEO: | Tijerino, Ricardo E SA (Milwaukee Special Assignments DCI / Wisconsin Department of Justice DCI) |
| Backup LEO: | Gibbs, Raymond R (Milwaukee Special Assignments DCI / Wisconsin Department of Justice DCI) |
| Approval Status: | Approved |
| Approved Date: | 09/14/2016 |
| Approved By: | Virgil, Tina R (DCI Administrative Services / Wisconsin Department of Justice DCI) |

| Synopsis |
|---|
| On 08-14-2016 S/A's Tijerino and Gibbs interviewed Milwaukee Police Officer Richard C. Voden - Re: OID. |

| Related Subjects | | | | | |
|---|---|---|---|---|---|
| Name | Type | Sex | Race | DOB | Relationship |
| Pritchard, Demario Devoughn | Person | Male | Black | 08/09/1992 | Associate Of Suspect |
| Smith, Sylville K | Person | Male | Black | 04/11/1993 | Deceased |

| Record Status Information | |
|---|---|
| Record Origination Operator: | Tijerino, Ricardo E SA (Milwaukee Special Assignments DCI / Wisconsin Department of Justice DCI) |
| Record Origination Date: | 08/17/2016 17:09 |
| Last Update Operator: | Virgil, Tina R (DCI Administrative Services / Wisconsin Department of Justice DCI) |
| Last Update Date: | 09/14/2016 15:20 |

| Reporting LEO | Date | Supervisor | Date |
|---|---|---|---|
| Tijerino, Ricardo E SA (Milwaukee Special Assignments DCI / Wisconsin Department of Justice DCI) | | Virgil, Tina R (DCI Administrative Services / Wisconsin Department of Justice DCI) | 9/16/2016 |

Narrative begins on the following page.



Voden
EXHIBIT 8
12-19-17
Gramann Reporting, Ltd.

On 08-14-2016, at approximately 3:20 PM, at the Milwaukee DCI office, S/A's Tijerino and Gibbs interviewed Milwaukee Police Officer Richard C. Voden - Re: OID. Also present during this interview were Attorneys Brendan Matthews and Jackie Schwartz from the Law Firm of Cermele and Matthews, as well as Milwaukee PD Detective Keith Kopcha and Lt. Paul Formolo.

S/A Gibbs asked Voden, hereinafter referred to as Voden, if he was there voluntarily and had not been compelled to give a statement to DCI agents. Voden stated that he was there voluntarily and he had not been ordered or compelled to cooperate with DCI agents or furthermore, give DCI agents a statement.

At that time S/A Tijerino asked Voden if he would consent to having his interview recorded. After consulting with his attorney Voden declined to be recorded.

At that time Voden provided the case agents the following information:

He has been assigned to early shift (4:00 PM - 12:00 AM) at District Seven (7) since his appointment date: 08-06-2012. Voden further stated that he had been assigned to the bicycle unit since early winter of 2016. Voden is assigned to Squad 7238 but on the day of the incident (08-13-2016) he was assigned to Squad 7275 with P.O. Ndiva Malafa, hereinafter referred to as Malafa, who is also assigned to the bicycle unit at District 7. Voden stated that his People Soft # is: 022646.

Voden stated that he is on off group nine (9) which is described as a 5/2 - 4/2 rotation. Voden stated that Saturday (08-13-2016) was the first day of his regular rotation, he got a good night's sleep the previous night (6-7 hours) and he is not currently on any medications and he did not consume any alcohol during the previous 24 hours.

At this time S/A Tijerino asked Voden to describe what happened on Saturday, 08-13-2016. Voden stated that on Saturday, 08-13-2016 he started at 2:00 PM as he had signed up to work an overtime shift. S/A Tijerino asked Voden to explain what the overtime detail consisted of. Voden stated that the OT was part of a Traffic Safety program which encouraged Officers to make frequent traffic stops and conduct Field Interviews of subjects with the main purpose being that we (Law Enforcement) show presence in the community and we identify as many people as we can.

Voden stated that he and P.O. Malafa took out unmarked Squad # 646 which has no Squad camera and has lights underneath the rear view mirror.

Voden stated that they were working the OT detail with P.O. Heaggen-Brown as they normally did. S/A Tijerino asked Voden how often they worked with Heaggen-Brown, hereinafter referred to as Heaggen-Brown. Voden stated that Heaggen-Brown was also assigned to the bicycle patrol at District 7 and they would often work together for safety. S/A Tijerino asked Voden if they were all in the same vehicle. Voden stated that he was in the unmarked Squad (#646) with P.O.

Page 1

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

Malafa and Heaggen-Brown had taken out a marked Chevy Tahoe Squad (#124) and he was driving by himself. Voden further stated that they often worked as a group so that one vehicle could execute the traffic stop and the other vehicle would be the backup vehicle.

S/A Tijerino asked for how long they had been operating like this. Voden stated that they had been doing the OT detail for approximately two (2) months and all three (3) of them had been signing up together. Voden also stated that the OT detail was available to anyone at the PD that wanted to work it.

S/A Gibbs asked Voden what his uniform attire was on Saturday, 08-13-2016. Voden stated that he was wearing his full Milwaukee Police Bicycle Unit Uniform, which consisted of dark blue bicycle pants and a dark blue polo style short sleeve shirt. Voden described the polo shirt as having a Milwaukee PD patch on the left sleeve, embroidered Milwaukee PD Badge on the left chest and his last name sewn onto a Velcro strip which was attached to the right chest of the shirt. Voden stated that he wore a ballistic vest underneath the uniform shirt.

Voden stated that he was equipped for duty on 08-13-2016 with his full complement of Milwaukee Police equipment, which included his duty belt. On the duty belt Voden carried the following equipment:

A double magazine pouch containing two (2) magazines. Each magazine was loaded with fourteen (14) unfired forty (.40) caliber cartridges.

One (1) medium sized flashlight carried in a pouch.

One (1) expandable baton holder and one (1) baton.

Two (2) way radio with holder. The radio was equipped with an extended cord and microphone, which was attached to the left shoulder of Voden's uniform shirt.

A pair of handcuffs in a pouch.

A second pair of handcuffs in a holder.

One (1) Smith and Wesson M&P forty caliber pistol loaded with fourteen unfired forty caliber cartridges in a magazine seated in the magazine well of the pistol, and an additional unfired forty caliber cartridge in the chamber of the pistol.

One (1) O.C. spray in a pouch.

It should be noted that Voden stated that he did not wear a body camera on the day of the incident. S/A Tijerino asked Voden why he was not wearing a body camera. Voden stated that he is not trained or assigned a Body Camera.

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

SMITH 000162

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 4 of 10   Document 50-24

P.O Voden was asked by SA Tijerino why there were only fourteen cartridges in his magazines. Voden responded that Milwaukee Police Officers were instructed at the training academy to not force the fifteenth cartridge into the magazine, because it would potentially damage the magazine and lead to a malfunction of the pistol. Officers were instructed to insert the magazine with fourteen cartridges into the magazine well of the pistol and charge the pistol, placing a cartridge in the chamber. An additional round would then be placed into the magazine after removing it from the magazine well of the pistol. After placing the fourteenth cartridge into the magazine, the magazine would be replaced into the magazine well of the pistol. Voden loaded his pistol in this fashion.

Voden stated that P.O. Heaggan-Brown was unable to log onto the squad computer on Squad #124 and he asked him (Voden) to try to log on to the computer of Squad #124 as well, and Voden could not do so either. Voden stated that they decided to put the two way radio on the squad on channel "OPS 3", and their hand held two way radios on the district seven (7) channel.

Voden stated that he along with P.O. Malafa and P.O. Heaggan-Brown performed approximately eight or nine traffic stops during the detail, and kept in constant radio contact with each other. Voden stated that they concentrated on the area of North 76th St., from Center to Capitol Dr., and issued numerous warnings to the people they stopped. Voden stated that the orders for the detail were to show a police presence in the areas they worked, not just write people tickets.

Voden stated that at approximately 3:15 P.M., they all decided to start driving towards the district seven station to be there in time for roll call at 3:48 P.M. Voden stated that while driving towards district seven, P.O. Malafa got on the radio and suggested they drive through the area of N. Sherman Blvd., and W. Burleigh St. S/A Tijerino asked Voden why they chose that area. Voden explained that this area was well known by the three officers as an area of high crime and drug activity. Voden stated that they had all made numerous arrests resulting in drug and weapons recoveries in the area. P.O. Brown stated that the area was a regular part of their bicycle patrol route due to the high amount of drug activity, shootings, gambling and other felony incidents.

Voden stated that P.O. Malafa drove his squad car east on Burleigh St., following Heaggen-Brown and as he approached N.49th St., Heaggan-Brown broadcast on OPS 3 that he wanted to check the area of 44th St. and W. Burleigh. Voden stated that P.O. Malafa acknowledged him and advised on OPS 3 that they were directly behind him. Voden explained that N. 44th St. and W. Burleigh was also an area with numerous drug dealing complaints. Voden recalled all of them, at various dates and times, being approached by residents on that block in the past who complained of vehicles with out of state plates coming into the area to buy drugs. The area was a residential area with numerous elderly residents.

S/A Tijerino asked Voden to explain what made a good bicycle Officer. Voden stated that as bicycle officers, their assignment was to get to know the people in the neighborhoods they patrol.

Page 3

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

Voden stated that if the officers saw people on the street, they were to make contact with them to let the citizens know they were in the area. S/A Tijerino asked Voden what he meant by making contact with the citizens. Voden stated that they would talk to citizens and find out what was going in the neighborhood, like drug dealing, gambling, shootings, etc.

Voden stated that they had all made numerous field interviews and arrests for drug possession in the area of North 44th St. and Burleigh, and many of the people that they talked to told them that the drug dealers on N. 44th St. drove rental cars with out of state plates and sold drugs from the rented vehicles.

Voden stated that based on his training and experience, he knew that rental cars were usually newer model vehicles, often with out of state registration plates. Voden added that approximately one week earlier, the three (3) of them (P.O. Malafa, Voden and Heaggen-Brown) had, along with P.O. Wellman been involved in a foot pursuit of a suspect in the area of 3109 N. 44th St., Milwaukee (WI). Voden stated that during the course of that foot pursuit an arrest was made and they recovered a handgun.

P.O. .Voden stated that while following P.O. Heaggan-Brown, P.O. Malafa turned his squad north on N. 44th St., from W. Burleigh, and P.O. Heaggan-Brown called out over the radio: black vehicle with out of state plates. Voden stated that they were still south of Auer, approaching the stop sign when he saw the dark vehicle. Voden stated that he thought the vehicle was parked too far from the curb. Voden stated that he knew the maximum distance a vehicle could be parked from the curb was twelve inches. P.O Voden stated that there were no cars parked behind the dark vehicle, and he believed that the vehicle was parked three (3) houses north of Auer.

Voden stated that P.O. Heaggan-Brown parked his vehicle west of the black vehicle, activated a short burst of the siren and started to get out of his squad. Voden stated that he continued to watch the dark vehicle, and saw a heavy set black male wearing a white shirt exit the front passenger seat. Voden stated that the black male appeared to be leaning into the car, with his body between the open front passenger door and the passenger compartment of the vehicle. P.O. Brown stated that the black male's head was above the roof line of the car. Voden saw the man look at his unmarked MPD Police squad, then quickly duck under the roof line of the vehicle. Voden stated that he saw the unknown B/M lean into the passenger compartment, exit the vehicle then quickly turned and began to briskly walk away from the dark vehicle.

Voden stated that the heavy-set B/M's actions were indicative of someone dealing drugs or hiding weapons inside of the vehicle and he thought the subject was preparing to run from the police. S/A Tijerino asked Voden how he knew that the subject was going to run. Voden stated that based on his knowledge and experience he believed that the subject was going to run. Voden also stated that he had been involved in a number of foot pursuits. Voden added that he, P.O. Malafa and Heaggen-Brown often were involved in foot pursuits with people who behaved in the same manner that the heavy set black male behaved.

Page 4

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

SMITH 000164

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 6 of 10   Document 50-24

Voden stated that as they pulled behind the vehicle he could also see that there was a subject seated in the driver's seat. Voden stated that he saw P.O Heaggan-Brown move quickly to the front of his marked squad car and turned to the east.

Voden stated that he saw a B/M wearing what appeared to be a white shirt exit through the drivers side door. Voden stated that while the subject with the white shirt exited the vehicle he saw the subject cradling a black handgun. S/A Tijerino asked Voden if he could describe the handgun that the subject was carrying. Voden stated that he recalls the handgun being similar in size to the Smith & Wesson M&P, .40 caliber that they carry. Voden further stated that as the subject got out of the vehicle, his back was initially towards him (Voden) but as the subject bladed to go in front of the black vehicle, he saw the handgun. Voden stated that he then saw the subject duck down and run N/B from the vehicle as he cleared the drivers side door and then turn E/B in front of the vehicle (black Ford Fusion).

Voden stated that he then heard someone shout: "Stop! Police!" Voden stated that he is not sure who yelled out the verbal commands. Voden further stated that he did not recall anyone yell out that there was a gun.

Voden stated that at this point he saw P.O. Heaggan-Brown and P.O. Malafa start pursuing the subject with the handgun through the subjects path of travel. S/A Tijerino asked Voden why he did not join in the foot pursuit. Voden stated that he turned his attention towards the heavy set B/M as he exited his vehicle. Voden stated that he withdrew his firearm and pointed it at the subject and gave him verbal commands to get on the ground. Voden stated that the subject did not comply and fled W/B and as he was running between two (2) vehicles the subject tripped and fell in the middle of the street.

Voden stated that as the subject was attempting to get up, he jumped on him and gave him verbal commands to stop resisting and he restrained him. Voden stated that at this point he re-holstered his weapon. S/A Tijerino asked Voden what he meant when he stated that he jumped on the subject. Voden stated that he applied a control technique while on top of the subject.

Voden stated that he did not recall hearing anyone yell out anything or over the air. Voden stated that a few moments later he heard what he thought were 3-4 shots.

Voden stated that while he was on the subject's back he saw P.O. Heaggan-Brown and Malafa standing N/E of him. Voden stated that he then sees P.O. Malafa walk to the front of the residence and started to broadcast: "Shots fired! Shots fired!"

Voden stated that he also sees P.O. Heaggan-Brown standing in the gangway but can't see what he is doing.

S/A Tijerino asked Voden why he could not see everything that was going on. Voden stated that there was a line of vehicles between him and the location of Heaggen-Brown and P.O. Malafa

Page 5

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

and he was still kneeling over the heavy set B/M while trying to observe what was going on. Voden further stated that the homes were also elevated and the porch blocked his view.

S/A Tijerino asked Voden what he did next. Voden stated that he focused back on the subject and finished handcuffing him, then rolled him over, sat him up and then helped him to his feet.

Voden stated that he then escorted the subject to the back of a marked squad and placed him inside because he knew that the squad would have a camera.

S/A Tijerino asked Voden how he knew that there was a camera in the back of that vehicle (squad). Voden stated that he assumed that since the emergency lights were activated that the cameras were activated.

S/A Tijerino asked Voden what happened next. Voden stated that he then started to hear other squads responding to the scene and he got on the air to make sure the responding squads knew that they were on North 44th Street.

S/A Tijerino asked Voden to continue telling the case agents what happened. Voden stated that at this point he closed the door of the squad (Tahoe) and went back and searched the subject he had just placed in the back of the squad. Voden stated that as a result of his search he located a cell phone on the subject's front right pocket and he placed the cell phone on the dashboard of car 124.

Voden stated that more squads and officers were arriving on scene. Voden further stated that he still did not know the identity of the subject and at this point he asked another officer to stand by with the subject.

Voden stated that after he got another officer to stand by with the subject he went to check on Heaggen-Brown and Malafa and as he approached them he recognized the subject laying on the ground as the same subject that he had seen a few moments earlier with the black handgun. Voden further stated that a few moments later Heaggen-Brown started chest compressions on the subject. Voden observed that Heaggen-Brown was not wearing gloves as he performed chest compressions so he took over for Heaggen-Brown. Voden added that he was also not wearing gloves at this time.

Voden stated that he retrieved a sanitizer wipe for himself so he could clean his hands. Voden stated that he then went back to Squad 124 so he could get the subject's name.

Voden stated that at this point he sees cops everywhere, cops putting up crime scene tape and Sgt Fuerte was on scene and started asking him questions about where he was when the incident happened and Voden informed him at that time that there is a second subject in custody.

Voden stated that Officer Sanchez was standing by with the other subject.

Page 6

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

SMITH 000166

Voden stated that he then went back to Squad 646 and ran the black Ford Fusion. Voden stated that he never went inside of the vehicle and does not know if anyone else went inside the vehicle. Voden further stated that he did not see anyone go in the vehicle while he was there.

Voden stated that a few minutes later P.O. Carson came over to him and informed him that he would be sitting with him until the designated investigators arrived on scene.

Voden stated that sometime later Sgt. Bourques arrived on scene and he provided a Public safety Statement.

S/A Tijerino asked Voden at what time they had activated their emergency lights. Voden stated that they had both activated their emergency lights as they crossed the stop sign. Voden further stated that Heaggen-Brown had only run one (1) cycle of the siren. S/A Tijerino asked Voden to explain what one (1) cycle meant. Voden stated that it meant that the siren only went off for a short amount of time.

S/A Tijerino asked Voden why he ran the black vehicle in his squad car instead of Heaggen-Brown's marked squad. Voden stated that Heaggen-Brown was having issues with the computer in his squad (124) and had not been able to log in. Voden further stated that he had tried to log in to that computer using his information and also had trouble getting it to work so they had decided to just use the computer in Squad 646. Voden stated that this was also the time when they had decided to use Ops 3 to communicate and run plates. S/A Tijerino asked Voden when all of this occurred. Voden stated that this all occurred in the beginning of their shift.

S/A Tijerino asked Voden if he did anything else prior to being placed in a vehicle with P.O. Carson. Voden stated that he parked Squad 124 on the west side of the street facing north so other vehicles could move in the block.

Voden also stated that he observed two (2) flip phones on the ground, one by the drivers side door of the black vehicle and one behind the Tahoe (124), towards the rear of the Tahoe, between the Ford Fusion and the Tahoe. Voden further stated that he collected both cell phones and put them on the dashboard of Squad 124.

S/A Tijerino asked Voden if he saw anything else or did anything else. Voden stated that he recalls seeing a female officer standing by the fence, just east of him, with what he would assume was an item of evidence.

S/A Tijerino asked Voden if he recalled who the officer was that was standing by the fence. Voden stated that it was P.O. Cassandra Benitez.

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

SMITH 000167

Case 2:17-cv-00862-LA Filed 06/14/19 Page 9 of 10 Document 50-24

S/A Tijerino asked Voden if he knew what P.O. Benitez was standing by. Voden stated that as he walked closer to the fence he saw a black handgun similar to the one he had seen the B/M carrying earlier as he exited the black Ford Fusion.

Voden stated that as he was doing chest compressions he saw the wounds on the subject laying on the ground in his arm and then one in the chest. Voden further stated that the subject was making movements as if he was gasping for air.

S/A Tijerino asked Voden if he recalled anything else about the scene or the incident that had just occurred. Voden stated that the only other thing he recalled was that there were lots of bees in the area.

This interview was terminated at approximately 4:45 PM.

On Tuesday, 09-06-2016 S/A's Tijerino and Gibbs met with P.O. Voden and Attorneys Brendan Matthews and Jackie Schwartz at the Milwaukee DCI Office. At that time Voden and his Attorneys were given the opportunity to review this report (16-4915/20).

At the conclusion of their review the Attorneys pointed out some misspelling mistakes but found no contextual issues with the report.

*This document contains neither recommendations nor conclusions of the Division of Criminal Investigation. It is the property of this Division, and is loaned to your agency. Its contents are not to be distributed outside your agency.*

SMITH 000168