IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | | |
|---|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf, | ) ) ) ) ) | No. 17-cv-862 |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) ) | |
| CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN, | ) ) ) | |
| Defendants. | ) | |

# EXHIBIT 24

Heaggan-Brown Deposition Transcript Vol. II

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

In the Estate of Sylville K. Smith vs City of Milwaukee, et al.

2:17CV862-LA

Transcript of the Video Deposition of:

# DOMINIQUE HEAGGAN-BROWN, VOL. II

October 24, 2018





```
 1            IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF WISCONSIN
 2   _____

 3   THE ESTATE OF SYLVILLE K.
     SMITH, by Personal
 4   Representative Mildred
     Haynes, Patrick Smith, and
 5   Mildred Haynes, on her own
     behalf,
 6
              Plaintiffs,
 7
         vs.                          Case No. 2:17CV862-LA
 8
     CITY OF MILWAUKEE, WISCONSIN,         VOLUME 2
 9   and DOMINIQUE HEAGGAN-BROWN,

10            Defendants.

11   _____

12

13

14

15         CONTINUED VIDEO DEPOSITION OF
              DOMINIQUE L. HEAGGAN-BROWN,
16

17      witness in the above-entitled action, taken
        under the provisions of the Federal Rules of
18      Civil Procedure, before Mary P. Hader,
        Registered Professional Reporter and Notary
19      Public in and for the State of Wisconsin, at
        Dodge Correctional Institution, 1 West Lincoln
20      Street, Waupun, Wisconsin, on October 24, 2018,
        commencing at 8:53 a.m. and terminating
21      at 10:38 a.m.

22

23

24

25
```

```
 1                    APPEARANCES:

 2


 3


 4   FOR THE PLAINTIFFS:
             LOEVY & LOEVY
 5           ATTORNEY DAVID B. OWENS
             311 North Aberdeen Street, 3rd Floor
 6           Chicago, IL   60607


 7


 8


 9   FOR THE DEFENDANTS:
             MILWAUKEE CITY ATTORNEY'S OFFICE
10           ASSISTANT CITY ATTORNEY NAOMI E. GEHLING
             DEPUTY CITY ATTORNEY JAN SMOKOWICZ
11           841 North Broadway, 7th Floor
             Milwaukee, WI   53202-3515
12


13


14


15


16   ALSO PRESENT:
             Jon Hansen, CLVS, Videographer
17


18


19


20


21


22


23


24


25
```

```
 1                      WITNESS INDEX

 2    WITNESS NAME:          EXAMINATION BY:      PAGE:

 3    Dominique Heaggan-Brown   Mr. Owens      305 - 392

 4


 5


 6                      EXHIBIT INDEX

 7    NUMBER:                                    PAGE:

 8    Exh. 14 -- Photo                            305
      Exh. 15 -- Oath of Office                   305
 9    Exh. 16 -- Standard operating procedure     305
      Exh. 17 -- MPD investigation employee case  333
10            file history
      Exh. 18 -- MPD evaluation information       337
11            regarding internal matters
      Exh. 19 -- Photo                            348
12    Exh. 20 -- Photo                            348
      Exh. 21 -- Photo                            352
13    Exh. 22 -- ACISS interview 16-4915/15       359
      Exh. 23 -- Scene diagram                    372
14    Exh. 24 -- Photo                            375

15    (Original exhibits attached to original transcript.
      Copies of exhibits attached to transcript copies.)
16


17


18


19                     OBJECTION INDEX

20    BY:                                        PAGE:

21    Ms. Gehling                                 354

22


23                       REQUESTS

24          (No requests were made during
             the course of this proceeding.)
25
```

```
 1            (DLHB Exhibit Nos. 14, 15, and 16
 2              marked for identification.)
 3              THE VIDEOGRAPHER:  Good morning.
 4      We are on the record.  Today's date is
 5      October 24, 2018.  The time is 8:53.  This is
 6      the continuation, volume two, media number one
 7      of the video deposition of Dominique
 8      Heaggan-Brown.
 9              At this time, will the reporter please
10      swear in the witness.
11              THE REPORTER:  Please raise your right
12      hand.
13              DOMINIQUE L. HEAGGAN-BROWN,
14          having been called as a witness herein,
15          being first duly sworn, was examined and
16          testified as follows:
17              THE REPORTER:  Thank you.
18                      EXAMINATION
19   BY MR. OWENS:
20   Q   Good morning, sir.
21   A   Morning.
22   Q   This is the second day of your deposition.  Do
23      you understand that?
24   A   Yes.
25   Q   And between the completion of the testimony you
```

```
 1            was an active foot chase.
 2     Q      Okay.  I know that there was a passenger by the
 3            car.  Did that person standing over there impact
 4            your decision to use deadly force?
 5     A      It -- everything that happened was a result of
 6            my decisionmaking that day, but --
 7     Q      Sure.
 8     A      -- as I stated before that, everything that
 9            happens is like an ongoing analysis, a
10            continuation of events that -- that helps me
11            determine what -- what do I feel is appropriate
12            at that time or what's best for the situation.
13            We're always responding to someone's actions so
14            it was me responding to actions being done by
15            two individuals.
16     Q      Sylville Smith didn't threaten you; didn't say
17            anything to you, correct?
18     A      He didn't say anything to me?
19     Q      Yes.
20     A      I don't recall him saying anything to me.
21     Q      All right.  You didn't see him being assaulted
22            or committing a violent act toward the passenger
23            of the car, right?
24     A      I'm not -- not personally --
25     Q      Okay.
```

1   A   That the gun was -- I remember seeing a gun
2       pointed in my direction, so I don't -- I don't
3       know how else to explain it.
4   Q   Okay.  Well, you -- you saw that he -- he wasn't
5       holding the gun by the handle, correct?
6   A   I did not at the time.  I couldn't tell you how
7       he was holding that firearm.  I just remember
8       seeing a firearm pointed in my direction.
9   Q   Okay.  And other than fleeing and holding the
10      gun, anything else that you thought showed some
11      kind of intent to do you or other body -- others
12      bodily harm?
13  A   There was a lot.  As a police officer, I'm also
14      a community caretaker.  It's -- my safety is
15      relevant as well as the safety of the community,
16      so I don't want to get too caught up into saying
17      that that's not our job to protect the
18      community, too.  So there's a lot of things that
19      come into play when --
20  Q   Sir, you understand you have to have a specific
21      imminent threat that you can articulate, right?
22      I'm not asking about general ideas or protecting
23      the whole neighborhood.  That wouldn't justify
24      you to just go around and shoot somebody if you
25      saw them running with a gun, right?

```
 1   A    I never said that.
 2   Q    Do you agree with what I just said?
 3   A    I do agree.
 4   Q    Okay.  So what I'm asking you, for specific
 5        justification for the use of deadly force.  Do
 6        you understand that?
 7   A    Yes.
 8   Q    Okay.  And what I want to know is what that was
 9        with respect to Mr. Smith as it relates to
10        whether or not there was some kind of imminent
11        threat of a third party, not yourself.
12   A    Yes.
13   Q    Who?
14   A    My partner.
15   Q    Okay.  And so who -- how in which -- how -- and
16        -- strike that.
17             In what ways did you perceive any type
18        of threat from Mr. Smith with respect to your
19        partner?
20   A    He was literally in close proximity of me, like
21        right behind me, I want to say.  So we're in a
22        narrow gangway.  There's no cover.  And with a
23        big -- big firearm as -- as Sylville had,
24        bullets, he could have easily been shot and --
25   Q    So -- so what was -- what I'm asking about is, I
```

1       understand a person with a gun can shoot a
2       police officer, right? That's what you're
3       saying, right?
4   A   Yes.
5   Q   People are allowed to own guns, right?
6   A   Yes.
7   Q   People are allowed to open carry guns in the
8       state of Wisconsin, right?
9   A   Yes.
10  Q   Okay. So what is it about what Sylville Smith
11      did specifically that made you perceive him as a
12      threat to you or your partner besides just the
13      fact of having a gun?
14  A   Getting out of the car at close range with a
15      firearm; ignoring commands; having a firearm and
16      picking it up a second time or arming yourself a
17      second time with a firearm and then coming and
18      turning in the direction of a police officer.
19  Q   Okay. It's your testimony that he was turning
20      towards you.
21  A   Yes, that's what I recall, yes.
22  Q   He wasn't trying to get away from you. Is that
23      your testimony?
24  A   Not that I can recall, not at all.
25  Q   You don't think that Sylville Smith was trying

```
 1         prior statement, correct?
 2    A    There were several reasons, but that was -- yes,
 3         that was a --
 4    Q    Well, the only reason that you had to cite
 5         Mr. Smith for anything when you approached was
 6         being parked too far from the curb, right?
 7    A    Yes.
 8    Q    There was no other citation that you articulated
 9         in your statement as being a reason why you
10         could cite him for any kind of crime or
11         municipal violation, right?
12    A    Yes.
13    Q    Okay.  And you saw that the car had out of state
14         plates, right?
15    A    Yes.
16    Q    And being -- having out of state plates isn't
17         illegal, right?
18    A    No.
19    Q    My car is not illegal sitting in front of this
20         prison because it has Illinois plates, right?
21    A    That's correct.
22              MR. OWENS:  Okay.  And -- all right.
23              Why don't we make this 19 -- 19.  20.
24           (DLHB Exhibit Nos. 19 and 20
25              marked for identification.)
```

1              EXAMINATION
2    BY MR. OWENS:
3    Q    All right.  Sir, I'm going to hand you what's
4         been marked as Exhibits No. 19 and 20.  And
5         these are, I'll represent to you, pictures that
6         were taken by DCI that -- after the incident,
7         but -- okay.  So this is the car that you saw,
8         correct?
9    A    Correct.
10   Q    With out of state plates, right?
11   A    Yes.
12   Q    And this is the car that you thought was too far
13        from the curb, right?
14   A    Yes.
15   Q    That was the only infraction or unlawful
16        violation that you observed when you approached
17        the car, correct?
18   A    Correct and the activity that was going on.
19   Q    Well, you saw somebody standing next to the car,
20        right?
21   A    Correct.
22   Q    That's not illegal, is it?
23   A    It's not.
24   Q    Okay.  The only infraction that you observed as
25        a basis for going over to this car was it,

1              quote, being too far from the curb, right?
2     A        Correct.
3     Q        And looking at Exhibit No. 19, it's your
4              testimony that you observed that it was too far
5              from the curb, and that's why you -- that's why
6              you had a justification for writing them a
7              citation and approaching them.  Is that correct?
8     A        Yes.  As stated in my testimony that there was
9              activity on the passenger side and as -- a part
10             of our job is to try to -- we're also community
11             caretakers.  We're also here to see what's going
12             on with people.  We're not just here to write
13             tickets and do everything else, so, yeah, there
14             was -- with the exception of the -- I mean, with
15             the parking and the activity that I observed on
16             the passenger side, which was the immediate
17             provoked flight -- and unprovoked flight upon a
18             path of seeing a police officer, it all happened
19             simultaneously.
20    Q        Okay.  You -- the only -- well, let me get at
21             this differently.
22                   You still think the car from these
23             pictures and from your memory was too far from
24             the curb?
25    A        Correct.

```
 1   Q    How many times --
 2   A    Let me -- let me take that back.  From -- I
 3        mean, from this perspective right on the
 4        picture, it doesn't appear the same as if
 5        you're -- I mean, I was at a farther away
 6        distance.  I wasn't this close up on the car,
 7        you know, from this view, so I wouldn't -- I
 8        wouldn't say that.
 9   Q    Well, you ultimately parked directly in front of
10        the car, right?
11   A    Not in front of the car.  I think I was about
12        parallel, a little parallel with the vehicle.
13   Q    Okay.  But it's still your belief and testimony
14        today that this car was too far from the curb,
15        right?
16   A    And with the activity, correct, that's -- that
17        was -- that was a little bit concerning.
18   Q    Sir, I'm not --
19   A    It was --
20   Q    -- asking about that.  I'm asking you:  It's
21        still your belief that this car was too far from
22        the curb; yes or no.
23   A    Yes.
24              MR. OWENS:  Okay.  All right.
25              Can -- go ahead.  And why don't we
```

1     fence?
2  A  I did not see him fall.
3  Q  Okay. So it's your testimony that you saw him
4     standing and then you just saw him on the
5     ground?
6  A  I'm not saying I saw him standing and on the
7     ground. I seen him physically there in front of
8     me, but did I personally see him slip and
9     stum- -- fall and, no, I did not. I don't know
10    what -- I don't know what he did or what he was
11    doing in that position.
12 Q  Okay. What's the first point in which you
13    noticed the firearm?
14 A  The part that stuck out to me was near -- in the
15    gangway, by the fence area, I remember seeing a
16    gun pointed at me.
17 Q  Was that the first point in which you saw the
18    gun was when it was in his hand after he fell?
19 A  I honestly don't remember at the time of my
20    statement and that was what I recall just seeing
21    a gun pointed at me. I don't know when I first
22    initially -- I can't say when I first initially
23    seen a gun.
24 Q  Okay. Did you see the gun before Mr. Smith
25    in -- was on the ground?

```
 1   A    I don't recall.
 2              MR. OWENS:  Oh, I think we all get
 3        colored copies.
 4              All right.
 5              Why don't we mark this as Exhibit
 6        No. 23.
 7              Would you prefer a black and white
 8        stapled one?
 9              MS. GEHLING:  No, it doesn't matter.
10        I'd like this one turned over --
11              MR. OWENS:  Okay.
12              MS. GEHLING:  -- so she should mark
13        it.  She -- she -- she gets priority.
14              Thank you.
15              MR. OWENS:  Uh-huh.
16                 (DLHB Exhibit No. 23
17               marked for identification.)
18                     EXAMINATION
19   BY MR. OWENS:
20   Q    All right.  So, sir, I have -- I have what I'm
21        going to mark for you as -- what's been marked
22        for your deposition as Exhibit No. 23.  All
23        right.  So do you -- have you seen a report like
24        this before -- a diagram like this before?
25   A    I don't recall seeing this, no.
```

```
 1                  MS. GEHLING:  You have 10 minutes.
 2                  MR. OWENS:  Oh, wow.  Oh, very great.
 3             Can we take a two minute break?
 4                  THE VIDEOGRAPHER:  Going off the
 5        record at 10:30.
 6           (Break from 10:30 through 10:33 a.m.)
 7                  THE VIDEOGRAPHER:  Back on the record
 8        at 10:33.
 9                            EXAMINATION
10   BY MR. OWENS:
11   Q    Sir, you, I'm sure, are aware that sort of much
12        has been made out of some of your rap lyrics,
13        right?
14   A    Yes.
15   Q    Yeah.  I'm sure that you had no intention of
16        causing a riot, correct?
17   A    Correct.
18   Q    And we weren't talking about Baltimore; that was
19        just, you know, a rap player, right?
20   A    Correct.
21   Q    You know -- well, just -- just a couple of
22        things is that you didn't go to school with
23        Sylville Smith, correct?
24   A    That's correct.
25   Q    And you didn't know him before that date,
```

```
 1            correct?
 2   A    That's correct.
 3   Q    You know, if there were anything that you could
 4        say to his family, if you could speak with them,
 5        what would it be?
 6   A    I never had the time to think about that.  I
 7        would -- I would most definitely say my
 8        condolences to the family, but I say I haven't
 9        had a chance to think about it because, during
10        the process, I've just -- I've seen some of the
11        actions and things that were said and done by
12        family members, so -- which kind of had me, at
13        first, in a mind state where I wasn't too happy
14        with certain things, so -- but, as of now, I
15        look at things totally different from a
16        different perspective now, so --
17   Q    So if you could say anything to Mr. Smith's son,
18        what would you say?
19   A    I honestly don't know what I would say right
20        now.  I haven't had time to -- to --
21   Q    Have you thought about that at all?
22   A    No.
23   Q    Have you thought about the fact that his son
24        will grow up without a dad now?
25   A    I have.
```