IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | |
|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf,<br><br>      Plaintiffs,<br><br>v.<br><br>CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN,<br><br>      Defendants. | No. 17-cv-862<br><br>JURY TRIAL DEMANDED |

# EXHIBIT 28

Robert Willis Deposition Transcript

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------

ESTATE OF SYLVILLE SMITH,

        Plaintiff,

                      Civil Action No. 17-cv-0862
    -vs-

CITY OF MILWAUKEE and
DOMINIQUE HEAGGAN-BROWN,

        Defendants.

----------------------------------------------------------

        Examination of ROBERT C. WILLIS, taken at the instance of Plaintiff, under and pursuant to the Federal Rules of Civil Procedure, before KATHLEEN E. CARTER, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public in and for the State of Wisconsin, at City of Milwaukee, Office of City Attorney, 841 North Broadway, Room 716, Milwaukee, Wisconsin, on Tuesday, May 28, 2019, commencing at 10:29 a.m. and concluding at 4:33 p.m.

A P P E A R A N C E S

LOEVY & LOEVY, by
MS. DANIELLE HAMILTON,
311 North Aberdeen Street, 3rd Floor,
Chicago, Illinois 60607,
312.243.5900,
hamilton@loevy.com,
appeared on behalf of the Plaintiff.

CITY OF MILWAUKEE, OFFICE OF CITY ATTORNEY, by
MR. JAN A. SMOKOWICZ,
200 East Wells Street,
City Hall, Room 800,
Milwaukee, Wisconsin 53202-3551,
414.286.8014,
jsmoko@milwaukee.gov,
appeared on behalf of the Defendants.

\* \* \* \* \*

1                           I N D E X
2
   Examination:                                          Page
3
   By Ms. Hamilton....................................    4
4

5  Exhibits    Identified:                               Page

6  Exhibit 1 - Contract for Expert Services Between
               the City of Milwaukee and Robert C.
7              Willis..................................   13
   Exhibit 2 - Mr. Willis's Report Dated March 4,
8              2019....................................   16
   Exhibit 3 - Mr. Willis's Invoices..................   19
9  Exhibit 4 - Professional Biography Of Robert C.
               Willis..................................   71
10 Exhibit 5 - Series Of Photo Stills Titled "Frame
               By Frame"............................... 144
11 Exhibit 6 - Mr. Willis's Report In Pekrun v.
               Puente And The City Of Milwaukee....... 151
12

13 Disposition Of Original Exhibit/s:
   Attached To Original Transcript
14

15

16 Requests:                                        Page Line

17 By Ms. Hamilton - Copy Of The $3,000 Invoice
                     Sent To The City Of
18                   Milwaukee By Mr. Willis.....  21    21

19

20

21

22

23

24

25

|  |  |
|---|---|
| 1 | TRANSCRIPT OF PROCEEDINGS |
| 2 | ROBERT C. WILLIS, called as a witness |
| 3 | herein, having been first duly sworn on oath, was |
| 4 | examined and testified as follows: |
| 5 | EXAMINATION |
| 6 | BY MS. HAMILTON: |
| 7 | Q   Good morning.  Can you please state and spell your |
| 8 |     name for the record. |
| 9 | A   My name is Robert Charles Willis.  Robert, |
| 10 |    conventional spelling, Charles, conventional |
| 11 |    spelling, Willis, W-I-L-L-I-S. |
| 12 | Q   And, Mr. Willis, how many times have you been |
| 13 |    deposed? |
| 14 | A   I've been doing expert witness work for about 25 |
| 15 |    years and more, so I'm going to guess in the range |
| 16 |    of 75 to a hundred times.  It could be more or |
| 17 |    less.  I'm just guessing. |
| 18 | Q   Okay. |
| 19 | A   Quite a bit. |
| 20 | Q   Great.  So I won't go over the rules, then. |
| 21 | A   If you like, but I'm pretty -- pretty aware of |
| 22 |    them, and I violate them regularly, so you can jump |
| 23 |    at me if I do. |
| 24 | Q   Will do.  I'll hold you to that. |
| 25 |          Do you have any medical conditions that |

would teach the subject if no one else could, but my preferences were to teach firearms, defensive tactics, driving, professional communication skills, ethics, report writing, testifying in court, the real hands-on type subjects, but I would teach the others as well.

Q  Why did you retire as a full-time instructor for --
A  Had to. I looked at the numbers. I'm a member of the Wisconsin Retirement System, and I really had not considered it, but I looked at the numbers, and the numbers told me that I was going to lose a substantial amount of money if I kept working.

For instance, if I were to work one extra year -- let's say I retired in 2016 -- that would give me $100 extra per month on my pension, but I would have lost close to $53,000 by not having retired in 2015. In other words, I would never make that money up, and it would even have even gotten worse had I worked an extra two years.

So consequently it -- it was an economic decision. It was, you know, if I want to teach, I can still do so, but I can do it as an adjunct or as a consultant.

But the numbers, the pension numbers, told me I just could not economically afford not to

| | | |
|---|---|---|
| 02:57 1 | | capable of recording 30 seconds of action prior to |
| 02:57 2 | | activation."  That -- "The 'buffered' 30 seconds is |
| 02:57 3 | | video on" -- "is video only, not audio.  These |
| 02:57 4 | | on-body cameras were mounted on shoulder mounts, |
| 02:57 5 | | near the base of the right side of the necks of |
| 02:57 6 | | each officer.  These cameras are state-of-the-art |
| 02:57 7 | | but are subject to limitation." |
| 02:57 8 | Q | Okay.  My question there is if Heaggan-Brown turned |
| 02:57 9 | | on the body camera immediately, then how come there |
| 02:58 10 | | are 30 seconds in which there's no audio? |
| 02:58 11 | A | I think I just explained that in that paragraph. |
| 02:58 12 | | What happens is the camera is always on, but it's |
| 02:58 13 | | not always saving that recording.  It's called |
| 02:58 14 | | buffering.  The last 30 seconds is always |
| 02:58 15 | | available. |
| 02:58 16 | | So, for example, if I'm sitting in a |
| 02:58 17 | | squad car, and I don't have my camera on, and a car |
| 02:58 18 | | goes through a red light in front of me, and I go, |
| 02:58 19 | | "Oh, I better put my camera on," it's going to |
| 02:58 20 | | capture what happened 30 seconds ago, so I will |
| 02:58 21 | | actually capture that car going through that red |
| 02:58 22 | | light. |
| 02:58 23 | | If that weren't the case, I could put my |
| 02:58 24 | | camera on but would not have captured the car going |
| 02:58 25 | | through that red light.  So there is 30 seconds. |

```
02:58  1              Now, the limitations of the technology is
02:58  2     that that 30 seconds is video only, not audio.
02:58  3     Different versions of this Axon have different
02:58  4     buffering time frames.  Some buffer only 20
02:58  5     seconds, some buffer 30 seconds.
02:58  6              This iteration of this Axon buffered 30
02:59  7     seconds before audio went on.  So the officer has
02:59  8     nothing to do with that.  When the camera's turned
02:59  9     on, it's going to record for 30 seconds video only,
02:59 10     and after 30 seconds the audio will kick in as the
02:59 11     video continues.  That's just the design of the
02:59 12     camera.
02:59 13   Q Yes, but, in your understanding of the facts,
02:59 14     Heaggan-Brown turned on the video camera as soon as
02:59 15     he exited the vehicle; is that correct?
02:59 16   A Well, actually we have scenes of Heaggan-Brown
02:59 17     inside the vehicle, no audio but video, so it was
02:59 18     just prior to his exiting he had turned the camera
02:59 19     on.  So obviously he put the car in park, maybe he
02:59 20     turned the car off -- I'm not sure, I don't
02:59 21     recall -- and he may have gotten on the radio, but
02:59 22     somewhere in there he also turned on his camera
02:59 23     because it was operating while still inside the
02:59 24     squad and as he was getting out, and 30 seconds
02:59 25     later this event was pretty much over.
```

```
03:52  1            they're listed in the appendix to the study done by
03:52  2            Force Science.  Other studies have been done on the
03:52  3            phenomena of continued fire.
03:52  4      Q     Okay.  And is it your opinion in this case that
03:52  5            Heaggan-Brown made two conscious separate shots?
03:52  6      A     Well, it was his opinion.
03:52  7      Q     Is it your opinion?
03:52  8      A     Not -- it was -- to me it was a possibility.  To me
03:53  9            there were other things that may have come into
03:53 10            play, and it may not have been two separate
03:53 11            conscious decisions.
03:53 12                  I'm -- I'm okay both ways.  All right?
03:53 13            If it was a conscious decision on his part to fire
03:53 14            Round No. 2, I believe that was justified.  If it
03:53 15            wasn't, if it was a continuous process -- and a
03:53 16            continuous process doesn't mean continual rounds.
03:53 17            If it was a continuous moving dynamic activity, to
03:53 18            me that's a continuous process, there was a start
03:53 19            decision and eventually there was a stop decision.
03:53 20                  Studies, especially that one about the
03:53 21            start and stop decision, have told us that hard
03:53 22            enough as the start decision is to make, the
03:53 23            decision to stop is even more difficult.  It's some
03:53 24            very overt observable action must take place to
03:53 25            turn that survival instinct off when that is what
```