IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

| | |
|---|---|
| The ESTATE OF SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN, | ) ) ) |
| Defendants. | ) ) |

No. 17-cv-862

JURY TRIAL DEMANDED

# EXHIBIT 29

Ndivia Malafa Deposition Transcript

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

In the Estate of Sylville K. Smith vs City of Milwaukee, et al.

2:17-cv-862-LA

Transcript of the Video Deposition of:

# NDIVA MALAFA

June 25, 2018





```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF WISCONSIN
    ------------------------------------------------------------
 3
    THE ESTATE OF SYLVILLE K. SMITH,
 4  by Personal Representative
    Mildred Haynes, Patrick Smith,
 5  and Mildred Haynes, on her own behalf,

 6                 Plaintiffs,

 7          vs.                        Case No. 2:17-cv-862-LA

 8  CITY OF MILWAUKEE, WISCONSIN
    and DOMINIQUE HEAGGAN-BROWN,
 9
                   Defendants.
10
    ------------------------------------------------------------
11

12
                 Video Deposition of NDIVA MALAFA
13
                     Monday, June 25, 2018
14
                           10:08 a.m.
15
                              at
16
             U.S. LEGAL SUPPORT - GRAMANN REPORTING
17           740 North Plankinton Avenue, Suite 400
                    Milwaukee, Wisconsin 53203
18

19

20           Reported by Stephanie Koenigs, RPR

21

22

23

24

25
```

1                  Video Deposition of NDIVA MALAFA, a
2     witness in the above-entitled action, was taken at the
3     instance of the Plaintiffs, under and pursuant to the
4     provisions of Chapter 804 of the Wisconsin Statutes, and
5     pursuant to Notice, before me, STEPHANIE KOENIGS, RPR,
6     Notary Public in and for the State of Wisconsin, at U.S.
7     LEGAL SUPPORT - GRAMANN REPORTING, 740 North Plankinton
8     Avenue, Suite 400, Milwaukee, Wisconsin, on the 25th day
9     of June, 2018, commencing at 10:08 a.m. and concluding
10    at 3:12 p.m.
11
12                     A P P E A R A N C E S
13                 LOEVY & LOEVY, by
                   Ms. Danielle Hamilton
14                 Mr. David B. Owens
                   311 North Aberdeen Street, 3rd Floor
15                 Chicago, Illinois 60607
                   appeared on behalf of the Plaintiffs.
16
                   MILWAUKEE CITY ATTORNEY'S OFFICE, by
17                 Mr. Jan A. Smokowicz
                   841 North Broadway, Room 716
18                 Milwaukee, Wisconsin 53202
                   appeared on behalf of the Defendants.
19
                   ALSO PRESENT:
20                 Caleb Myszka, Videographer
21
22
23
24
25

I N D E X

EXAMINATION BY: PAGE:

Ms. Hamilton 5

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE: |
|---|---|---|
| Exh. 17 | Officer Malafa's Timecard | 35 |
| Exh. 18 | DAAT Manual Deadly Force Policy | 67 |
| Exh. 19 | Use of Force Policy | 67 |
| Exh. 20 | Incident Report 8/14/16 | 110 |
| Exh. 21 | Officer Malafa's DCI Statement | 126 |
| Exh. 22 | Squad Car Computer Messages | 169 |
| Exh. 23 | Incident Report 6/27/16 | 179 |
| Exh. 24 | Incident Report 6/2/16 | 186 |
| Exh. 25 | Incident Report 5/12/16 | 187 |

(Original exhibits were retained by the court reporter, then returned to Ms. Hamilton. Copies available to attorneys who ordered them.)

R E Q U E S T S

(No requests were made.)

```
 1              TRANSCRIPT OF PROCEEDINGS
 2              THE VIDEOGRAPHER:  Good morning.  We are
 3   on the record.  This is DVD 1 in the video
 4   deposition of Ndiva Malafa in the matter of In The
 5   Estate of Sylville K. Smith vs. City of Milwaukee,
 6   et al.  This deposition is taking place at U.S.
 7   Legal Support Wisconsin - Gramann Reporting,
 8   740 North Plankinton Avenue, Suite 400, Milwaukee,
 9   Wisconsin.  Today is June 25th, 2018, and it is
10   10:08 a.m.
11              My name is Caleb Myszka, and I'll be the
12   videographer today.  The court reporter is
13   Stephanie Koenigs, and we are appearing on behalf
14   of U.S. Legal Support Milwaukee.
15              Counsel will now state their appearance
16   and affiliation for the record, starting with the
17   plaintiff, and then the court reporter will swear
18   in the witness.
19              MS. HAMILTON:  Danielle Hamilton on
20   behalf of the plaintiffs.
21              MR. OWENS:  I'm David Owens on behalf of
22   the family and Estate of Sylville Smith.
23              MR. SMOKOWICZ:  Deputy City Attorney Jan
24   Smokowicz on behalf of the defendants.
25              NDIVA MALAFA, called as a witness herein,
```

1　　　　after having been first duly sworn, was examined
2　　　　and testified as follows:
3　　　　　　　　　　　　EXAMINATION
4　BY MS. HAMILTON:
5　Q　Good morning, Officer Malafa.
6　A　Good morning.
7　Q　My name is Danielle Hamilton, as I just said, and
8　　　　we represent the family and estate of Sylville
9　　　　Smith. Can you state and spell your name for the
10　　　record?
11　A　First name is Ndiva, spelled N-D-I-V-A. Last name
12　　　Malafa, M-A-L-A-F-A.
13　Q　Have you ever given a deposition before?
14　A　No.
15　Q　Are you represented by anybody here today?
16　A　I am. The City Attorney's Office.
17　Q　Are you represented by anyone else?
18　A　No.
19　Q　Were you represented by anyone during the criminal
20　　　trial of Officer Heaggan-Brown?
21　A　No.
22　Q　Let's go over some rules since this is your first
23　　　deposition. There are just a few. First of all,
24　　　the court reporter's taking down everything that we
25　　　say, so it's important that we don't speak at the

1       reasonable suspicion or a Terry stop and/or a
2       probable cause stop, if you take flight from the
3       police, then that would be resist, which is --
4       either can be a misdemeanor resist and/or a -- just
5       a citation.
6   Q   Mr. Smith didn't say anything to you, correct?
7   A   To my best recollection, no.
8   Q   Did he lunge toward you?
9   A   At what point?
10  Q   At any point.
11  A   To the best of my knowledge, no.
12  Q   What about the other passenger? Did they -- did he
13      yell at you?
14  A   Officer Voden dealt with the other passenger and --
15  Q   So you don't recall -- excuse me. Sorry. I cut
16      you off.
17  A   No. That's okay.
18  Q   So the other passenger didn't yell at you?
19  A   To the best of my knowledge, no.
20  Q   And that person didn't lunge at you either?
21  A   Correct.
22  Q   Did Mr. Smith exhibit any threatening behavior
23      towards you?
24  A   Besides possessing a semiautomatic firearm with an
25      extended magazine, which contains more rounds than

1            probable cause stop.
2   Q    Is that a no or is that a yes?
3                 MR. SMOKOWICZ:  I'm going to object to
4        the form of the question.  This is argumentative.
5   BY MS. HAMILTON:
6   Q    You can answer the question.
7   A    Can you restate it then?  I'm sorry.
8   Q    Other than having a firearm, did he exhibit any
9        threatening behavior toward you?
10  A    Besides the firearm and running from the police,
11       no.
12  Q    Okay.  You said you locked eyes for what seemed
13       like a minute.  Can you -- do you remember -- can
14       you describe what Mr. Smith looked like when you
15       were locked eyes for what seemed like a minute?
16  A    I just recall his eyes being widened.
17  Q    His eyes being widened?
18  A    Wide.  Yeah, wide.
19  Q    But again, he didn't say anything to you, right?
20  A    To the best of my recollection, no.
21  Q    All right.  You then said later on that you heard a
22       loud gunshot, correct?
23  A    Correct.
24  Q    And then you saw him -- you said his bicep looked
25       like it exploded or something to that effect?

```
 1         record while we look for this?
 2                   MS. HAMILTON:  Yeah.  Let's go off the
 3         record for a second.
 4                   THE VIDEOGRAPHER:  We are going off the
 5         record at 1:27 p.m.
 6                   (A brief discussion was held off the
 7         record.)
 8                   THE VIDEOGRAPHER:  We are back on the
 9         record at 1:28 p.m.
10                   MS. HAMILTON:  So this document was
11         titled -- was produced to us from DCI, and it's
12         titled 46.1 MILW body cam Ndiva Malafa family.mp4.
13         It's 11 minutes and 13 seconds long, and I'm going
14         to play it from the beginning.
15                   MR. SMOKOWICZ:  I'm sorry, 46.1 what?
16                   MS. HAMILTON:  MILW body cam Ndiva
17         Malafa_family.mp4.
18    BY MS. HAMILTON:
19    Q    Is the last time you looked at this before today
20         from the criminal trial or have you seen it since
21         then?
22    A    It would be from the criminal trial.
23    Q    Okay.  Can you see that?
24    A    I can.
25    Q    All right.  I'm just playing it from the beginning.
```

1  A    Okay.
2              (Whereupon the video was shown to the
3       witness.)
4  BY MS. HAMILTON:
5  Q    There's no sound on this.
6  A    It's a 30-second recycle.  There will be sounds at
7       30 seconds.
8  Q    That's right.  I'm stopping it at 1:18.
9              So now looking at it -- actually, first
10      question, did you know at the time or any time
11      before this event that when you hit the -- your
12      body cam that it would record the visual but not
13      the sounds?  Were you aware of that?
14 A    Yeah.  That is done in our training of the body
15      camera, yes.
16 Q    So now seeing it, is there any -- are there any
17      other differences from what you personally remember
18      and what the body cam shows?
19 A    I believe that the vehicle was a little bit darker
20      than I had stated on the record.  And then that he,
21      in fact -- Mr. Smith had fell at the fence line,
22      that Mr. Smith had, at that point, dropped the
23      firearm and then picked it up, that Mr. Smith had
24      began raising the firearm, at which point Officer
25      Heaggan-Brown discharged his weapon, hitting his

1　　　　cannot shoot a citizen running, even if they have a
2　　　　firearm, is that correct?
3　　　　　　　　MR. SMOKOWICZ:  Objection to the form of
4　　　　the question.  Incomplete hypothetical.  Calls for
5　　　　a legal conclusion.
6　　BY MS. HAMILTON:
7　　Q　　Go ahead.
8　　A　　Like stated before, you have to have weapon,
9　　　　intent, and delivery system to use deadly force.
10　Q　　You can't shoot at someone just because they have a
11　　　　firearm, is that correct?  You would agree with me
12　　　　that you cannot shoot someone just because -- who
13　　　　is running away just because they have a firearm?
14　　　　　　　　MR. SMOKOWICZ:  Object to the form of the
15　　　　question.  It's an incomplete hypothetical.  Calls
16　　　　for a legal conclusion.
17　　　　　　　　Go ahead and answer to the best of your
18　　　　ability.
19　　　　　　　　THE WITNESS:  Again, based off of that
20　　　　manual, that would be correct.
21　　BY MS. HAMILTON:
22　　Q　　Okay.  Let's keep reading.
23　　　　　　　　MR. SMOKOWICZ:  Is there a particular
24　　　　passage you want him to read, counsel?
25　　　　　　　　MS. HAMILTON:  I am looking for it.  Just

1  A   This is after I just observed the video, so now my
2      recollection would be based off the video, so I
3      would be able to state that I now know that I -- I
4      guess I would ask you is this based off of now me
5      seeing the video or --
6  Q   I'm trying to understand your memories from what
7      you couldn't recall at the time of this interview
8      and what you might be able to recall now.
9  A   Okay.  At the time of the interview and personal
10     recollection, again, I could not recall if I had
11     drawn my firearm.
12 Q   Okay.
13 A   After seeing the video --
14 Q   Yeah.
15 A   -- I now know that I drew the firearm after the
16     shots were fired and after I broadcast our
17     location.
18 Q   Okay.  But prior to -- before the shots were fired,
19     you had not taken out your handgun, right?
20 A   Based on the video, correct.  Yes.
21 Q   Okay.  Got it.  So moving down to the very last
22     paragraph on Smith280, if you'll read that whole
23     paragraph, and I think it goes into the next page,
24     and then I have some questions about that.
25 A   Okay.

```
 1        specifically five.  I cannot put a specific number
 2        on how many of those ended up in a fight.  And I
 3        guess if you articulate a fight, it would be people
 4        are throwing what would be considered in layman's
 5        terms punches at officers and/or resisting arrest.
 6   Q    You would agree that Mr. Smith was not trying to
 7        fight you from the ground after he fell, right?
 8              MR. SMOKOWICZ:  Objection.  Calls for
 9        speculation.
10   BY MS. HAMILTON:
11   Q    Would you agree with me?
12   A    Well, as shown on the video, Mr. Smith, instead of
13        fighting, picked up the firearm.
14   Q    So he did not fight you, according to the video,
15        right?
16   A    Again, according to the video, he picked up the
17        firearm.  So no, he did not fight; he picked up the
18        firearm instead.
19   Q    You don't have any specific memory of him picking
20        up the firearm though, right?
21   A    That's correct.
22   Q    You agree that he picked it up backwards, not in a
23        normal position, and threw it over the fence,
24        correct?
25   A    And as I've said before, are we going off of
```

1      personal recollection or are we going off the
2      video?
3  Q   The video.
4  A   The video then depicts, yes, that he picked it up
5      in a backwards manner and threw it over the fence,
6      correct.
7  Q   All right.  Directing your attention to 281.  It
8      says that you had a short bathroom break and you
9      also talked to your attorneys.
10             MR. SMOKOWICZ:  I'm sorry, what
11     paragraph?
12             MS. HAMILTON:  281, fourth paragraph
13     down.
14             THE WITNESS:  Yeah.  I was going to tell
15     him the time.  At 9:43.  Sorry.
16 BY MS. HAMILTON:
17 Q   Were there any other breaks during your interview?
18 A   If so, they would be dictated in this report, so
19     I -- I'm not sure.
20 Q   Why did you want to -- why did you want to take the
21     opportunity to talk to your attorneys at that time?
22             MR. SMOKOWICZ:  Object to the form of
23     the -- object to the question to the extent that it
24     calls for him to disclose attorney-client
25     privileged communications.

1　　　　　needed to shoot Mr. Smith?
2　　　　　　　　　MR. SMOKOWICZ:  Objection.  Calls for
3　　　　　speculation.  Incomplete hypothetical.
4　　　　　　　　　You can go ahead and answer.
5　　　　　　　　　THE WITNESS:  I guess, yes, I could have
6　　　　　side-stepped.  Yes.
7　　BY MS. HAMILTON:
8　　Q　　What training have you had -- or you've had
9　　　　　training about side-stepping in order to shoot a
10　　　　firearm before, correct?
11　　A　　Correct.
12　　Q　　So you could have done that in this instance,
13　　　　correct?
14　　A　　Correct.
15　　Q　　Nothing preventing you from doing that, correct?
16　　A　　I mean, there was no obstacles.  I guess based off
17　　　　of that, yeah, it would be correct.
18　　Q　　All right.  Just as a general matter, based on your
19　　　　experience and training with armed suspects, you
20　　　　said you've pursued a number of armed suspects
21　　　　before.  In your training and experience, you agree
22　　　　with me that most suspects try to get rid of the
23　　　　weapon, correct?
24　　A　　Correct.
25　　Q　　In all of the foot pursuits you've done, if the

1　　　suspect has been armed, they try to get rid of the
2　　　weapon because they don't want to be caught with
3　　　it, right?
4　　　　　　　MR. SMOKOWICZ:  Exempting this one of
5　　　course?  Excluding this one?
6　　　　　　　MS. HAMILTON:  I don't -- is that an
7　　　objection?
8　　　　　　　MR. SMOKOWICZ:  Yes.  It's an objection
9　　　as to the form of the question.
10　　　　　　　MS. HAMILTON:  Okay.
11　BY MS. HAMILTON:
12　Q　　Go ahead and answer, please.
13　A　　I mean, I guess there's been incidents where people
14　　　have fled from vehicles but they've left the
15　　　firearm in the vehicle.  In the case where subjects
16　　　have fled on foot with a firearm, they have tossed
17　　　it to the side and continued to run.  Again, it's
18　　　incident-by-incident basis.  We can't really put
19　　　this is exactly what happens every time because
20　　　everything happens so fluid on the street and
21　　　everything is -- every incident is different.
22　Q　　Right.  But in the majority of the circumstances,
23　　　suspects try to get rid of the gun?
24　A　　Either they leave them in the vehicle or they --
25　　　exactly -- try to get rid of them, yes.

```
 1   Q    Okay.  And based on the video, that's what happened
 2        in this instance, correct?
 3                 MR. SMOKOWICZ:  Objection.  Calls for
 4        speculation as to what Mr. Smith may have been
 5        doing.
 6   BY MS. HAMILTON:
 7   Q    You can answer.
 8   A    Based on the video, Mr. Smith picks up the firearm
 9        and throws it over his head.  So I guess based off
10        the video, that would be kind of tough to say what
11        Mr. Smith was thinking at that time, so I -- it
12        would be only based off the video.
13   Q    It would be based off the video -- based off the
14        video, you'd agree with me that Mr. Smith was
15        trying to get rid of the gun, correct?
16                 MR. SMOKOWICZ:  Again, objection.  Calls
17        for speculation.
18                 But you can go ahead and answer.
19                 THE WITNESS:  Again, I can't speak on
20        what Mr. Smith was attempting to do at that time.
21   BY MS. HAMILTON:
22   Q    All right.  Once he throws the gun over the fence,
23        now there was no weapon and there was no delivery
24        system.  Would you agree with me that that's true?
25   A    Based off the video?
```

```
 1   Q    Yes.
 2   A    Yes.  That would be correct.
 3   Q    I forgot to ask you earlier.  I know you reviewed
 4        the statement before your deposition today.  Is
 5        there anything inaccurate in your interview -- your
 6        statement to DCI?
 7   A    Along the lines of what?  Based off the video?
 8        Based off of witness statements?  I mean, are there
 9        going to be some discrepancies between the video
10        and my statement?  This is obviously personal
11        recollection five days after an extremely critical
12        incident, which causes high stress, so if there's
13        any discrepancies between this and the video,
14        that's the purpose of the body camera I guess would
15        be my answer to that.
16   Q    Right.  Thank -- I mean, thank you.  My question is
17        just while reading this statement, we've been
18        talking about it for a while, are there any
19        things -- are there any discrepancies between, you
20        know, what's in the statement and what you
21        remember?  What -- has anything, you know, come to
22        mind as we've been discussing it?  I'm just trying
23        to understand, as we sit here today, you know, sort
24        of the status of the statement.
25                  MR. SMOKOWICZ:  I'm going to object to
```