IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

The ESTATE OF SYLVILLE K. SMITH, by )
Personal Representative Mildred Haynes, )     No. 17-cv-862
Patrick Smith, and Mildred Haynes, on her )
own behalf, )
 )
        Plaintiffs, )     JURY TRIAL DEMANDED
 )
        v. )
 )
CITY OF MILWAUKEE, WISCONSIN )
and DOMINIQUE HEAGGAN-BROWN, )
 )
        Defendants. )

# **<u>EXHIBIT 40</u>**

State v. D. Heaggan-Brown  Opening Statements

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY
                        BRANCH 30

---------------------------------------------------------

STATE OF WISCONSIN,

                        Plaintiff,

        vs.                        Case No. 2016-CF-005562

DOMINIQUE L. HEAGGAN-BROWN,

                        Defendant.

**---------------------------------------------------------**

**JURY TRIAL (PM)**

**---------------------------------------------------------**

**JUNE 13, 2017**                        **HON. JEFFREY A. CONEN,**
                                        Circuit Court Judge,
LAURELL L. BRESLOW-COLLIEN, RPR     presiding.
Official Court Reporter


**CHARGE:**
Count 1: First-Degree Reckless Homicide




                A P P E A R A N C E S:

JOHN T. CHISHOLM, District Attorney, and BENJAMIN
LINDSAY, Assistant District Attorney, appeared on behalf
of the State of Wisconsin.

STEVEN R. KOHN and JONATHAN C. SMITH, Attorneys at Law,
appeared on behalf of the Defendant.

DOMINIQUE L. HEAGGAN-BROWN, Defendant, was present in
custody.

ALSO PRESENT:  J. Michael Damarco, Investigator

1

<u>I N D E X</u>

<u>PAGE</u>

PRELIMINARIES ...................................... 3

PRELIMINARY INSTRUCTIONS ........................... 7

OPENING STATEMENT BY MR. CHISHOLM .................. 18

OPENING STATEMENT BY MR. SMITH .................... 39

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 3 of 60   Document 50-43   SMITH004001

(1:33 p.m.)

THE CLERK:  Case No. 16-CF-5562, State
of Wisconsin vs. Dominique Heaggan-Brown,
first-degree reckless homicide.  Matter is here
for a jury trial.  Appearances.

MR. CHISHOLM:  John Chisholm on behalf
of the State.  Assisting me is Assistant DA Ben
Lindsay.

MR. SMITH:  Good afternoon, Your Honor.
Attorneys Jonathan Smith and Steven Kohn on behalf
of Mr. Heaggan-Brown who is present.

THE COURT:  All right.  Good afternoon.
We're going to this afternoon start with the
preliminary instructions.  I've provided the
parties with the preliminary instructions that the
Court intends to give, which will be No. 50, which
is preliminary instruction on juror conduct,
evidence, 103; 148, objections of counsel; 55,
note taking permitted; 58, transcript not
available for deliberations; 59, police reports;
300, credibility of witnesses; 120, first-degree
reckless homicide with the 805 modified
instruction that we had talked about before
involving the self-defense issue and privilege
issue in this case; 140, burden of proof and

3

```
 1          presumption of innocence; and 101, opening
 2          statements.
 3                    Any objection to those from the State?
 4                    MR. CHISHOLM:  No, Your Honor.
 5                    THE COURT:  And from the defense,
 6          subject to whatever objections you have made on
 7          the record at this point, are there any objections
 8          to anything else that I've mentioned subject to
 9          the objection with regard to 805?
10                    MR. SMITH:  No, sir.
11                    THE COURT:  All right.  So the Court
12          will start with the preliminary instructions, and
13          we will then move along to the opening statements.
14          We'll break for the evening.  And for continuity
15          sake, we'll start tomorrow morning at 9:00 and
16          work our way all the way through with evidence all
17          day tomorrow, and we should be on track, based on
18          what I've been told, to finish up the State's case
19          somewhere around middle of the day on Thursday, I
20          hope.
21                    Mr. Chisholm, somewhere around there?
22                    MR. CHISHOLM:  I believe so.
23                    THE COURT:  Give or take a little bit,
24          and then the defense case can start either
25          Thursday afternoon or Friday, and then we'll move
```

4

```
 1          into Monday and Tuesday.  So that's the hope right

 2          now, and we'll stay on track.  We do have

 3          uninterrupted time.  There is no other cases on

 4          the Court's calendar for the next week and a half

 5          so everything is dedicated to this case.

 6                    Having said that, as soon as the jurors

 7          are available, we will bring them in.

 8                    (An off-the-record discussion was held

 9          between the Court and the bailiff.)

10                    THE COURT:  We are just waiting for the

11          jury to get situated back there and get together

12          and be brought out into the courtroom.  After

13          that, the jury will be sworn and then we'll start

14          with the preliminary instructions.

15                    THE BAILIFF:  All rise for the jury.

16                    (The jury entered the courtroom.)

17                    THE BAILIFF:  You may be seated.

18                    THE COURT:  Jurors remain standing for

19          an oath.

20                    THE CLERK:  Can you all raise your

21          right hands?

22                    (The jury was sworn in.)

23                    THE COURT:  All right.  You may be

24          seated.  All right.  Good afternoon, ladies and

25          gentlemen.  Hopefully everything went well in the
```

5

transition and we'll have further transition later
this evening.  We are down to 15 jurors.  We have
lost a juror.  You are not to speculate as to the
reason, but we are ready to proceed with the 15
that we have so that there will be 12 and three
alternates.

We are going to start with the
preliminary instructions.  Listen carefully to the
preliminary instructions.  Preliminary
instructions are an overview of the law which you
are to follow in eventually making your decision
in this case.  There are only a handful of the
instructions that will eventually be given to you
at the end of the trial.  So they allow you to
listen to the testimony and see the evidence in
some framework or reference involving the law.

You do not have to memorize these
instructions.  At the end of the case, when we
give you the final instructions, you'll be given a
written copy of the final instructions to take
with you in the jury room to use during your
deliberations.  So just listen carefully to the
instructions.  We will then follow up with
additional -- with the argument -- I'm sorry,
opening statements of the attorneys, and then we

```
 1          will break for the evening and start up tomorrow

 2          morning at 9:00 and work through the evidence.

 3                    We are still on track to make it

 4          through my schedule as we've talked about

 5          beforehand.  This is timed out pretty well so

 6          we're still working on keeping on track within the

 7          time schedule and the timeframe of this case.

 8                    Before the trial begins, there are

 9          certain instructions you should have to better

10          understand your functions as a juror and how you

11          should conduct yourself during the trial.

12                    Your duty is to decide the case based

13          only on the evidence presented and the law given

14          to you by the Court.  Anything that you may see or

15          hear outside the courtroom is not evidence.  Do

16          not let any personal feelings about race,

17          religion, national origin, sex, or age affect your

18          consideration of the evidence.

19                    Do not begin your deliberations and

20          discussion of the case until all the evidence is

21          presented and I have instructed you on the law.

22          Do not discuss this case among yourselves or with

23          anyone else until your final deliberations in the

24          jury room.

25                    We will stop or recess from time to
```

7

SMITH 004006

```
1        time during the trial.  You may be excused from

2        the courtroom when it is necessary for me to hear

3        legal arguments from the lawyers.  If you come in

4        contact with the parties, lawyers, or witnesses,

5        do not speak with them.  For their part, the

6        parties, lawyers, and witnesses will not contact

7        or speak with the jurors.  Do not listen to any

8        conversation about this case.

9                Do not research any information that

10       you personally think might be helpful to you in

11       understanding the issues presented.  Do not

12       investigate this case on your own or visit the

13       scene.  Do not read any newspaper reports or

14       listen to any news reports on radio or television

15       about this trial.  Do not consult dictionaries,

16       computers, websites, or other reference materials

17       for additional information.  Do not seek

18       information regarding the public records of any

19       party or witness in this case.  Any information

20       you obtain outside the courtroom could be

21       misleading, inaccurate, or incomplete.  Relying on

22       this information is unfair because the parties

23       would not have the opportunity to refute, explain,

24       or correct it.

25                Do not communicate with anyone about
```

8

this trial or your experience as a juror while you
are serving on this jury.  Do not use a computer,
cell phone, or other electronic device with
communication capabilities to share any
information about this case.  For example, do not
communicate by blog, e-mail, text message,
Twitter, or in any other way on or off the
computer.  Do not communicate with anyone --
Strike that.

Do not permit anyone to communicate
with you, and if anyone does so despite you're
telling them not to, you should report that to me.
This case must be decided by you, the jurors,
based on the evidence presented in the courtroom.
People not serving on this jury have not heard the
evidence, and it is improper for them to influence
your deliberations and decision in this case.
After this trial is completed, you are free to
communicate with anyone in any manner.

These rules are intended to assure that
the jurors remain impartial throughout the trial.
If any juror has reason to believe that another
juror has violated these rules, you should report
that to me.  If jurors do not comply with these
rules, it could result in a new trial involving

9

```
1        additional time and significant expense to the
2        parties and taxpayers.
3                    You are to decide the case solely on
4        the evidence offered and received at trial.
5                    Evidence is:  First, the sworn
6        testimony of witnesses, both on direct and
7        cross-examination, regardless of who called the
8        witnesses; second, the exhibits the Court has
9        received, whether or not an exhibit goes to the
10       jury room; and third, any facts to which the
11       lawyers have agreed or stipulated or which the
12       Court has directed you to find.
13                   Attorneys for each side have the right
14       and the duty to object to what they consider are
15       improper questions asked of witnesses and to the
16       admission of other evidence which they believe is
17       not properly admissible.  You should not draw any
18       conclusion from the fact that an objection was
19       made.
20                   By allowing testimony or other evidence
21       to be received over the objection of counsel, the
22       Court is not indicating any opinion about the
23       evidence.  You jurors are the judges of the
24       credibility of the witnesses and of the weight of
25       the evidence.
```

10

1          You are not required to but you may

2   take notes during this trial except during opening

3   statements and closing arguments.  The Court will

4   provide you with materials.

5          In taking notes, you must be careful

6   that it does not distract you from listening -- or

7   from carefully listening to and observing the

8   witnesses.

9          You may rely on your notes to refresh

10  your memory -- or you may rely on your notes to

11  refresh your memory during the deliberations.

12  Otherwise, keep them confidential.  After the

13  trial, the notes will be collected and destroyed.

14         You will not have a copy of the written

15  transcript of the trial testimony available for

16  use during your deliberations.  You should pay

17  careful attention to all the testimony because you

18  must rely primarily on your memory of the evidence

19  and the testimony introduced during the trial.

20         During the course of the trial, the

21  attorneys may refer to or use police reports with

22  witnesses.  Normally, these police reports will

23  not be provided to you.  If you are not provided

24  with a police report, you should use your

25  collective memory regarding any reference to

1   police reports.

2            It is the duty of the jury to

3   scrutinize and to weigh the testimony of the

4   witnesses and to determine the effect of the

5   evidence as a whole.  You are the sole judges of

6   the credibility, that is, the believability of the

7   witnesses and of the weight to be given to their

8   testimony.

9            In determining the credibility of each

10  witness and the weight you give to the testimony

11  of each witness, consider these factors:  Whether

12  the witness has an interest or lack of interest in

13  the result of this trial; the witness's conduct,

14  appearance, and demeanor on the witness stand; the

15  clearness or lack of clearness of the witness's

16  recollections; the opportunity the witness had for

17  observing and for knowing the matters the witness

18  testified about; the reasonableness of the

19  witness's testimony; the apparent intelligence of

20  the witness; bias or prejudice, if any has been

21  shown; possible motives for falsifying testimony;

22  and all other facts and circumstances during the

23  trial which tend either to support or discredit

24  the testimony.  Then give to the testimony of each

25  witness the weight you believe it should receive.

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 13 of 60   Document 50-43   SM50143 004011

There is no magic way for you to evaluate the testimony; instead, you should use your common sense and experience. In everyday life, you determine for yourselves the reliability of things people say to you. You must do the same -- or you should do the same thing here.

First-degree reckless homicide, as defined in Section 940.02(1) of the Criminal Code of Wisconsin, is committed by one who recklessly causes the death of another human being under circumstances that showed utter disregard for human life.

Before you may find the defendant guilty of first-degree reckless homicide, the State must prove by evidence which satisfies you beyond a reasonable doubt that the following three elements were present. First, that the defendant caused the death of Sylville Smith. "Cause" means the defendant's act was a substantial factor in producing the death.

Second, that the defendant caused the death by criminally reckless conduct. "Criminally reckless conduct" means the conduct created a risk of death or great bodily harm to another person; and the risk of death or great bodily harm was

13

1       unreasonable and substantial; and the defendant

2       was aware that his conduct created the

3       unreasonable and substantial risk of death or

4       great bodily harm.

5                   Third, that the circumstances of the

6       defendant's conduct showed utter disregard for

7       human life.

8                   In determining whether the

9       circumstances of the conduct showed utter

10      disregard for human life, consider these factors:

11      Whether -- what the witness -- strike that, what

12      the defendant was doing; why the defendant was

13      engaged in that conduct; how dangerous the conduct

14      was; how obvious the danger was; whether the

15      conduct showed any regard for life; and all other

16      facts and circumstances relating to the conduct.

17                  Self-defense is an issue in this case.

18      The law of self-defense allows the defendant to

19      intentionally use force against another only if:

20      The defendant believed that there was an actual or

21      imminent unlawful interference with the

22      defendant's person or the person of Officer Ndiva

23      Malafa; and that the defendant believed that the

24      amount of force the defendant used was necessary

25      to prevent or terminate the interference; and the

1    defendant's beliefs were reasonable.

2            The defendant may intentionally use
3    force which is intended or likely to cause death
4    or great bodily harm only if the defendant
5    reasonably believed that the force used was
6    necessary to prevent imminent death or great
7    bodily harm to himself or Officer Malafa.

8            A reasonable -- strike that.  A belief
9    may be reasonable even though mistaken.  In
10   determining whether the defendant's beliefs were
11   reasonable, the standard is what an ordinary,
12   prudent, and reasonably intelligent police officer
13   would have believed in the defendant's position,
14   having knowledge and training that the defendant
15   possessed, and acting under the circumstances that
16   existed at the time of the alleged offense.

17           A "police officer" means any person
18   employed by the City of Milwaukee for the purpose
19   of detecting and preventing crime and enforcing
20   laws or ordinances and who is authorized to make
21   arrests for violations of laws or ordinances.

22           The reasonableness of the defendant's
23   beliefs must be determined from the standpoint of
24   the defendant at the time of the defendant's acts
25   and not from the viewpoint of the jury now.

15

1          The State must prove by evidence which

2     satisfies you beyond a reasonable doubt that the

3     defendant did not act lawfully in self-defense.

4          If you can -- strike that.  If you are

5     satisfied beyond a reasonable doubt that all three

6     elements of first-degree reckless homicide have

7     been proved and the defendant did not act lawfully

8     in self-defense, you should find the defendant

9     guilty.

10          If you are not so satisfied, you must

11     find the defendant not guilty.

12          In reaching your verdict, examine the

13     evidence with care and caution.  Act with

14     judgment, reason, and prudence.

15          Defendants are not required to prove

16     their innocence.  The law presumes every person

17     charged with the commission of an offense to be

18     innocent.  This presumption requires a finding of

19     not guilty unless in your deliberations you find

20     it is overcome by evidence which satisfies you

21     beyond a reasonable doubt that the defendant is

22     guilty.

23          The burden of establishing every fact

24     necessary to constitute guilt is upon the State.

25     Before you can return a verdict of guilty, the

SN150143004015

```
 1          evidence must satisfy you beyond a reasonable
 2          doubt that the defendant is guilty.
 3                    If you can reconcile the evidence upon
 4          any reasonable hypothesis consistent with the
 5          defendant's innocence, you should do so and return
 6          a verdict of not guilty.
 7                    The term "reasonable doubt" means a
 8          doubt based upon reason and common sense.  It is a
 9          doubt for which a reason can be given, arising
10          from a fair and rational consideration of the
11          evidence or lack of evidence.  It means such a
12          doubt as would cause a person of ordinary prudence
13          to pause or to hesitate when called upon to act in
14          the most important affairs of life.
15                    A reasonable doubt is not a doubt which
16          is based upon mere guesswork or speculation.  A
17          doubt which arises merely from sympathy or from
18          fear to return a verdict of guilt is not a
19          reasonable doubt.  A reasonable doubt is not a
20          doubt such as may be used to escape the
21          responsibility of a decision.
22                    While it is your duty to give the
23          defendant the benefit of every reasonable doubt,
24          you are not to search for doubt.  You are to
25          search for the truth.
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 18 of 60   Document 30-43   SN150143004016

The lawyers will now make opening

statements.  The purpose of an opening statement

is to give the lawyers an opportunity to tell you

what they expect the evidence will show so that

you will better understand the evidence as it is

introduced during the trial.  I must caution you,

however, that opening statements are not evidence.

                    Mr. Chisholm.

                    MR. CHISHOLM:  Thank you very much,

Your Honor, and thank you, ladies and gentlemen.

I'm going to take you back to August 13th of 2016.

On August 13 of 2016, Mr. Heaggan-Brown, while

working as a City of Milwaukee police officer,

shot Sylville Smith two times.  He shot him twice.

The first shot went through his right bicep,

through-and-through; the second shot entered his

chest.  That second shot killed Sylville Smith.

                    Now, when I take you back to that time,

it's really important that you understand the

location, the orientation, and what was taking

place on August 13th.  So if I take you back to

about 3:30 on August 13th, that's a Saturday.

It's in the summer, it's about 80 degrees that

day, you know, mostly cloudy but clear, and I'm

going to take you to the location of the 3200

```
 1        block of North 44th Street.  I'm going to show you
 2        a diagram because, again, it is important -- it's
 3        important --
 4                  MR. SMITH:  Your Honor.
 5                  MR. CHISHOLM:  -- that you get the
 6        opportunity.
 7                  THE COURT:  Mr. Chisholm.
 8                  MR. SMITH:  Can I just see?
 9                  MR. CHISHOLM:  Oh, I'm sorry.
10                  THE COURT:  Are you able to see it as
11        it's being pointed to?
12                  MR. SMITH:  No.
13                  MR. CHISHOLM:  Can I move it more
14        towards you?
15                  MR. SMITH:  I'll move to this side of
16        the table.  Thank you.
17                  MR. CHISHOLM:  Can everyone still see
18        that?  It's really important in this case that you
19        have an understanding of the context; the location
20        that this was taking place.
21                  So I'm taking you back now August 13th,
22        2016.  What you're looking at is a diagram.  Now,
23        this diagram is basically laid out so that you can
24        see that this is north 44th Street going north and
25        south.
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 20 of 60   Document 150-3004018

```
 1              The location that we're talking about
 2       is a gangway, the location between 3216-3218,
 3       that's a duplex; and 3210-3212 North 44th Street,
 4       another duplex.  Almost this entire incident
 5       occurred in a relatively small geographic area.
 6       So it starts right on North 44th Street and it
 7       ends about two or three houses north of -- north
 8       of Auer, right in that location right there.
 9              Now, the reason I want you to be
10       oriented there, and I think it's sometimes helpful
11       just to be able to picture what's taken place.
12       You'll get an opportunity to see the evidence
13       itself.  The most essential evidence you're going
14       to see is going to come from the police officers
15       themselves that were involved in this incident on
16       that day, and the form of that evidence is going
17       to come from body cameras.  You're going to see
18       body cameras from Mr. Heaggan-Brown, you're going
19       to see a body camera from Officer Ndiva Malafa,
20       and there was a third officer involved in this as
21       well, Officer Voden.  He did not have a body
22       camera that day.
23              So when I take you back to that
24       location, I can tell you what the evidence will
25       show is that on that day right around 3:30, 3:35
```

20

```
 1          in the afternoon, those three officers, Officer
 2          Heaggan-Brown, Officer Voden, and Officer Malafa,
 3          they were in two separate cars.  Officer
 4          Heaggan-Brown was driving a Tahoe, SUV-type
 5          vehicle.  He was by himself.  In an unmarked
 6          police squad right behind him were officers Malafa
 7          and Voden.  Officer Malafa is the driver.  Officer
 8          Voden's the passenger.  Officer Heaggan-Brown is
 9          the sole occupant of the SUV, but he's also the
10          driver.  Makes sense.
11               What happens is they're on routine
12          patrol, and they decide to go into this area,
13          right -- you want to picture it -- it's about a
14          couple blocks northwest of Sherman Park, right in
15          that area right there.  They're in this location
16          when they see a 2016 Ford Fusion black car that
17          you see in this diagram right there.  They later
18          determine that that's Sylville Smith's car.  With
19          him at the time is a gentleman by the name of
20          Demario Pritchard (phonetic).
21               What is described by the officers, and
22          what the evidence shows, is that Officer
23          Heaggan-Brown pulls his car up next to Sylville
24          Smith, and Officer Malafa pulls his car up
25          directly behind Sylville Smith's car.  They
```

21

```
 1        indicate that they're seeing activity that makes
 2        them suspicious.  They observe that this vehicle
 3        is parked more than 12 inches from the curb.
 4        Because of that, they decide to conduct a stop.
 5               At that point in time, it's important
 6        that you know that Officer Heaggan-Brown has
 7        positioned his car slightly to the north of
 8        Sylville Smith's car, and then Officer Malafa is
 9        directly behind him.  This is where the body
10        cameras kick in.  This is where we start to
11        capture the incident as it actually unfolded.
12               What you will observe from
13        Mr. Heaggan-Brown's body camera is you will see
14        him as he pulls up, you'll see him get out of his
15        car, and you will see that he immediately pulls
16        his gun out and points it in a westerly direction.
17               Now, when I give you these directions,
18        again, getting oriented is sometimes really
19        important.  So just so you know, you're looking at
20        me, you're looking to the west.  This is to the
21        north, this is to the east, and that's south.  I'm
22        telling you that just to orient you in the
23        courtroom itself, but on this diagram you have to
24        understand that this is north, this is east, and
25        this is west, and this is south (indicating).
```

SMITH-004021

What you'll see from Heaggan-Brown's
camera is that he gets out of his car and he goes
to the front of his squad car, and that's the
first time you're going to see him deploy his
weapon.  In other words, you'll actually see him
pull the weapon out, and you'll see him pointing
it towards the east.  At that point in time on his
camera, you're also going to see Officer Voden is
encountering the gentleman later determined to be
Mr. Pritchard who had been observed right next to
Mr. Smith's car.  He's actually walked back toward
the sidewalk, and you'll see -- just for a brief
second you're going to see Officer Voden running
to approach Mr. Pritchard.

At that point in time, you're going to
see Sylville Smith, who is at -- by this time he's
actually gotten out of his car and he starts
running to the north.  He's running to the north,
and that's when he actually intersects with
Heaggan-Brown, right at that point in time.  He
continues running to the north, he takes off
north; you will then see Officer Heaggan-Brown
starts in pursuit of Mr. Smith.  Pursues him to
the north, at which time you can observe that
Mr. Sylville Smith takes a hard right to the east,

1          he goes into this gangway.

2                    Just so you know, we'll measure this

3          out so you understand sort of the dynamics of what

4          you're dealing with, the actual layout itself, but

5          you're talking about 15 feet between the two

6          houses here.  Very standard layout in the city of

7          Milwaukee duplex area, right?

8                    So you have a sidewalk.  You'll learn

9          from the evidence that there's actually a fence

10         right across between these two houses right here;

11         there's a chain link fence right here.  What

12         you're going to observe from Mr. Heaggan-Brown's

13         body camera is that he begins in pursuit.  So he

14         actually puts his weapon back towards his holster.

15         It's to hard determine whether he ever actually

16         fully holsters it or not, but he puts it back

17         towards his holster and he starts running to the

18         north after Sylville Smith.

19                   The second piece of evidence that

20         you're going to see is coming from Officer Malafa.

21         Officer Malafa, his body camera also activates

22         almost at the same time as he stops his car behind

23         Sylville Smith's car.  Now, it's important that

24         you know that the way these body cameras work --

25         and this is evidence that will come in as well --

24

SMITH 004023

```
 1        is that they don't start recording until a button
 2        is pressed, but they constantly record, they just
 3        don't save it until the button is pressed.
 4               And so what you will get -- and it
 5        automatically will back up about 30 seconds.  So
 6        if an officer is engaged in something that they
 7        believe should be recorded, they can hit that and
 8        it backs it up 30 seconds.  And so we'll explain
 9        that.
10               But what you're seeing from those video
11        cameras, it really starts right from the moment
12        Officer Malafa pulls up right here and Officer
13        Heaggan-Brown is pulling up right there.  You can
14        see the initial seconds of the encounter right
15        from that moment there.
16               Now, from Officer Malafa's perspective
17        from his body camera -- and again, these are
18        details that I will present through the evidence
19        of witnesses we'll present for you -- but those
20        body cameras, the recording unit is located right
21        around the chest area.  The actual camera is
22        located up here on the right shoulder by the
23        lapel.  So that's the perspective that you're
24        getting from that camera right there.
25               What you're going to observe from
```

| | |
|---|---|
| 1 | Officer Malafa is he actually -- you can actually |
| 2 | see Mr. Smith getting out of his car and starting |
| 3 | to run north right there.  Now, you also will see, |
| 4 | in video footage, you will capture at the same |
| 5 | time, there's an intersection between Officer |
| 6 | Heaggan-Brown and Officer Malafa, so you can |
| 7 | actually see Officer Heaggan-Brown as he's |
| 8 | pointing his weapon at -- in the easterly |
| 9 | direction as Sylville Smith is running to the |
| 10 | north.  You're going to actually be able to see |
| 11 | that. |
| 12 | Officer Malafa follows right behind |
| 13 | Officer Heaggan-Brown.  So what now you have, |
| 14 | you're going to have two body cameras that are |
| 15 | essentially capturing the same event in roughly |
| 16 | the same time, basically taking place at the same |
| 17 | moment.  You're going to see Officer Heaggan-Brown |
| 18 | is the first one in pursuit directly behind |
| 19 | Sylville Smith, and then you have Officer Malafa |
| 20 | right behind him. |
| 21 | Now, what you're going to see depicted |
| 22 | is Sylville Smith, as he runs, he starts taking a |
| 23 | hard right towards the east; you're going to see |
| 24 | his hands go into the air, and you're going to see |
| 25 | him basically wipe out.  He wipes out right here, |

26

SMITH 004025

```
 1              right before this fence, right on the sidewalk.
 2                       He has a pistol.  In fact, Officer
 3              Malafa has actually seen that pistol from the
 4              minute he started getting out of his car.  Officer
 5              Malafa will testify that he saw the pistol, and he
 6              was on his radio calling that out.  So as Officer
 7              Malafa is chasing Mr. Smith, he's aware that he
 8              has a pistol.
 9                       Officer Heaggan-Brown is not initially
10              aware that he's got the pistol.  He becomes aware
11              of that after he's taking the curve after
12              Mr. Smith has already fallen to the ground, and
13              what you'll see on the video footage is that the
14              gun actually comes out of Sylville Smith's hand.
15              As he wipes out, he goes on the ground; that gun
16              hits the ground.
17                       These are now the critical moments.
18              These are absolutely the critical moments.  At
19              this moment what you will capture on -- to some
20              extent on both cameras, but certainly with
21              Mr. Heaggan-Brown's, is you will see Sylville
22              Smith holding onto that fence, just as I am if
23              this were the fence right here, if I'm facing east
24              holding onto that fence, reaching back for the
25              firearm, reaching back for the firearm at that
```

27

```
1          point in time.
2                  Mr. Heaggan-Brown at first looks like
3          he might be going for his taser, and then he
4          switches back to his gun and he draws his gun out
5          at that point in time.  When he sees Mr. Smith
6          with his hand towards the ground and start lifting
7          up, at that moment in time you can see an actual
8          discharge from Officer Heaggan-Brown's firearm.
9                  That's the first shot.  That is the
10         first shot, and we later determine that that's the
11         shot that goes through Mr. Smith's bicep.  It's a
12         through-and-through wound.  You'll hear testimony
13         from the medical examiner that's not a fatal
14         wound.  It's a through-and-through shot at that
15         point in time.
16                 What you will then be able to determine
17         from that body camera footage is a reasonable
18         interpretation of what Mr. Smith was doing.  A
19         reasonable interpretation of what Mr. Smith was
20         doing.  What was he doing?  He was throwing the
21         gun over the fence.  That's what the evidence is
22         going to show, is he's picking that up, he's going
23         to throw it over the fence; and, in fact, he
24         disarms himself by throwing the gun about 30 feet
25         over the fence.
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 29 of 60   Document 43   SM150-004027

```
 1              He then immediately, after having been
 2         shot in the arm -- and keep in mind, nobody -- I
 3         hope nobody's ever had the experience of being
 4         shot.  But the testimony will come in here as well
 5         is these aren't just ordinary weapons that are
 6         used, and most importantly it's not ordinary
 7         ammunition that's used by the police.
 8              The ammunition that's used by the
 9         police is designed to do one thing and one thing
10         only and that is to stop you.  It's not like in
11         the military.  In the military, they're required
12         by the Geneva Convention -- I won't get into that.
13              The bottom line, what the evidence is
14         going to show is that the firearms and the bullets
15         that are used by the Milwaukee Police Department
16         and all law enforcement agencies are designed to
17         do one thing, and that's to stop, and that's how
18         they're designed.
19              That first round strikes Sylville Smith
20         as he's throwing that gun over the fence, and at
21         that point in time you'll see on the body camera
22         Sylville Smith goes to the ground.  As he's going
23         to the ground, he hits the ground fully; he
24         actually falls on his back, his feet come up, and
25         his hands are then up by his head, a full 1.69
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 30 of 60   Document 50-43   SMITH004028

```
 1          seconds after the first shot.

 2                    You can actually see Officer

 3          Heaggan-Brown tracking -- tracking Sylville Smith

 4          down to the ground, and then when you switch over

 5          to Malafa's view, which will be the better one,

 6          you will actually see Heaggan-Brown standing

 7          directly over Sylville Smith about two feet away

 8          and 1.67 seconds after -- 69 seconds after the

 9          first shot, you're going to see the second shot.

10          You're going to see that second shot when Sylville

11          Smith is on the ground, unarmed with his hands up

12          by his head with no place to go.  He's basically

13          in this corner right here.  He's going to have --

14          he's going to have a brick wall to the north; he's

15          got a fence to the east, he's got two police

16          officers within feet of him at the time he's shot.

17                    That second shot, the evidence is going

18          to show, is from essentially within feet, point

19          blank range it strikes him directly in the chest

20          while he's laying on the ground, enters his body,

21          damages his lungs, damages his heart, and

22          ultimately ends up in his lower back.  That is the

23          fatal wound 1.69 seconds after he was shot in the

24          arm and had thrown the gun over the fence.

25                    We're going to continue to hear some of
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 31 of 60   Document 43   SMITH 004029

```
 1          the evidence both from those body cameras and then
 2          certainly from witnesses because the State has an
 3          obligation to investigate these cases very
 4          closely.  The investigative agency in this case,
 5          the majority of the witnesses you're going to hear
 6          from come from the Wisconsin Department of Justice
 7          and the Division of Criminal Investigation.  Why
 8          is that?  Wisconsin laws require that an
 9          independent agency conduct police-related
10          shootings.  Why is it?  It's a measure of
11          accountability.  It's a measure of independence.
12                  We want somebody to come in that is not
13          from the same department to conduct this
14          investigation so they just get the facts.  They
15          get the facts, and they allow those facts to be
16          presented in an objective way.  And that's what
17          you're going to hear from these witnesses, is just
18          the objective facts.  They're going to tell you
19          what they saw, what they recovered.
20                  The short outline of that, I anticipate
21          starting early tomorrow morning, we'll start with
22          what I will call a scene officer, that's Special
23          Agent Martinez; he was the person responsible for
24          actually collecting all the evidence on the scene.
25                  After that I anticipate you're going to
```

31

```
1          hear from Officer Malafa himself, and after that

2          you're going to have a series of witnesses; some

3          of the witnesses will tell you what kind of

4          evidence they collected, how they collected it,

5          what was done with that evidence.

6                    Eventually you're going to also hear

7          then from Special Agent Raymond Gibbs, and he's an

8          essential witness as well.  Why?  Why is he the

9          essential witness?  Well, what I've just

10         described:  First shot, second shot.  You're

11         saying to yourself, 1.69 seconds, boy, it seems

12         like a short time.  Here's what the law requires:

13         The law requires that you only use force when

14         you're faced with an imminent threat of death or

15         great bodily harm.  That's what the law requires,

16         right?

17                    So when we're looking at this, we have

18         to assess that decision to fire that second round.

19         That is ultimately what this case comes down to:

20         Was that second round a justified, appropriate,

21         privileged, self-defensive shot?  Was it

22         reasonable for a person to have believed that they

23         faced death or great bodily harm under those

24         circumstances?  That's the case.

25                    And why I talked about Special Agent
```

32

```
 1          Ray Gibbs, because we talked to Mr. Heaggan-Brown;

 2          he was given an opportunity to explain why he did

 3          what he did.  And let's make it perfectly clear:

 4          Officer Heaggan-Brown is not being charged for

 5          that first shot, even though objectively --

 6          objectively you can make a reasonable

 7          interpretation that the only purpose that

 8          Mr. Smith was reaching for that gun was to throw

 9          it away, that's not the standard that we apply.

10               The standard we apply is would it be

11          reasonable for any person, but certainly would it

12          be reasonable for a police officer with his

13          training and experience, his understanding, his

14          knowledge of the law and past experience to

15          believe that under those circumstances he may have

16          been confronted in a split second with a risk of

17          death or great bodily harm to him or his partner.

18          He's not being charged with that.

19               What he is being charged with is based

20          on both his actions and his statement.  His

21          statement is made on August 15th, two days after

22          the shooting.  He's had an opportunity to reflect

23          on this, to think about it.  It's not like he was

24          just pulled in right away and ordered to make a

25          statement or anything like that.
```

33

SM 004032

1           He was given an opportunity to think

2      about it.  He was able to consult, and then he sat

3      down with the agents and gave a statement.  What

4      his statement does is it basically gives that same

5      version of events up to the first shot.  Up to

6      that first shot it's essentially the same thing.

7           What about the second shot?  How does

8      he explain the second shot?  Well, what he says is

9      that after the first shot was fired he sees that

10     Mr. Smith had thrown the gun away.  He tossed it.

11     You're going to hear him say in the video four or

12     five times shortly after that he tossed it, he

13     tossed it.  So he had the knowledge at that point

14     in time that Sylville Smith was no longer armed.

15          He goes to the ground, and what does he

16     give as the reason for shooting him the second

17     time?  He said that he thinks his hands were going

18     to his waist and that he might have a second gun,

19     that he would then draw that second gun and

20     possibly use that to shoot him or Officer Malafa.

21          That statement the State will provide

22     evidence is not reasonable with all the facts and

23     circumstances in this case that a person doesn't

24     throw a gun -- because the particular gun that

25     Mr. Smith had was a Glock 20 -- Glock 22.  It had

an extended magazine.  Why would a person throw a
gun away only to reach for another one?

The evidence is going to show that that
wasn't the reason because from the videotapes of
the officers' body cameras themselves, Sylville
Smith doesn't go for his waistband.  In fact, he
doesn't go -- I take that back, he does go for his
waistband, but he doesn't go for his waistband
until about nine seconds after he's been shot the
second time.  The first time he goes for his
waistband is about nine seconds after he's been
shot the second time.  And what does Officer
Heaggan-Brown do?  He actually walks up to him and
pushes his hand away.

So if he reasonably believes that
Sylville Smith is armed at that time, well,
according to his statement he should have feared
for his safety and he should have shot him then,
but that's not what happened.

What happens is Sylville Smith goes to
the ground, hands go up by his head, Heaggan-Brown
stands right over him and he shoots him at point
blank range when he doesn't have the gun in his
hands.  That's what the evidence is going to show
you.

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 36 of 60   Document 150-43   SM501304034

My obligation is to look at that
evidence; your obligation is to look at that
evidence and determine whether or not a crime has
occurred.

Now, if I can, I'm just going to
briefly -- and I'll finish -- just run through the
elements of this offense, first-degree reckless
homicide. First-degree reckless homicide, it has
three elements. We try to break it into chunks,
and the State has to prove each one of those
chunks beyond a reasonable doubt.

So there's three elements that the
Court has already instructed you and will instruct
again. When it comes to first-degree reckless
homicide, I call it the three Cs. It's an easy
way to remember. The three Cs are simply this:
You have to show the defendant caused -- he caused
the death of Sylville Smith. Then we have to look
at the conduct, that's the second C. The conduct
created a risk of death or great bodily harm to
another person, the risk of death or great bodily
harm was unreasonable and substantial, and the
defendant was aware that his conduct created the
unreasonable and substantial risk of death or
great bodily harm. And finally, care. Three Cs.

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 37 of 60   Document 150-43   SM504035

```
1          We'll say cause, conduct, and care.

2                    What were his actions before and after

3          that tell you as a jury in determining whether or

4          not the circumstances of the conduct showed utter

5          disregard for human life?

6                    The State will present evidence that

7          any time you shoot an unarmed man on the ground

8          right in the chest causing his death, you're

9          showing utter disregard for that person's life.

10                   Some of this will be difficult --

11         difficult things to see.  You're also going to see

12         that Sylville Smith was still breathing a full

13         minute, minute and a half after that shooting.

14         CPR didn't begin on Sylville Smith until a minute

15         and a half -- roughly over a minute after he was

16         shot in the chest.  Those are things that you can

17         consider when looking at whether there was also

18         conduct consistent with utter disregard for life.

19                   Now, we understand -- we understand

20         that this is going to be a self-defense case.  We

21         embrace that, we acknowledge it, and we have to

22         look at the issue of self-defense.

23                   The issue always comes down to

24         reasonableness.  Anyone, any citizen, anybody is

25         entitled to defend themselves.  If you're at risk
```

37

```
 1              for death or great bodily harm, you are entitled
 2              to defend yourself, but it has to be -- it has to
 3              be a reasonable and substantial threat.  And under
 4              these circumstances, the State believes will show
 5              evidence that will show that just didn't exist at
 6              the time.  I have to demonstrate that the
 7              defendant believed that there was an actual or
 8              imminent unlawful interference with the
 9              defendant's person or the person of Officer
10              Malafa.
11                        First shot, yes.  In fact, we'll break
12              them -- we'll break them both down.  As we go
13              forward, we'll break them both down.  The facts
14              support that in the first shot, yes.  The
15              defendant believed that the amount of force the
16              defendant used was necessary to prevent or
17              terminate the interference.  The evidence is not
18              going to support that.  Mr. Heaggan-Brown's own
19              statement does not support that.  The defendant's
20              belief --
21                        MR. SMITH:  Objection.  Argumentative.
22                        THE COURT:  Rephrase the statement, or
23              opening statement.
24                        MR. CHISHOLM:  Sure.  I anticipate the
25              evidence is going to show you that that does not
```

```
1            support that, the evidence doesn't support that.
2            And that the defendant's beliefs were reasonable.
3            Again, we'll look directly to the defendant's own
4            statement to answer that question.
5                        The defendant may intentionally use
6            force which is intended or likely to cause death
7            or great bodily harm, only if the defendant
8            reasonably believed that the force used was
9            necessary to prevent imminent death or great
10           bodily harm to himself.  We're going to break it
11           down.
12                       We're going to look at both the first
13           shot and second shot, and at the conclusion of all
14           of this evidence, I am confident that you will
15           have sufficient evidence to find Mr. Heaggan-Brown
16           guilty of the offense of first-degree reckless
17           homicide.  Thank you very much.
18                       THE COURT:  Thank you.
19                       Mr. Smith.
20                       MR. SMITH:  Thank you, Your Honor.
21                       Mr. Chisholm, good afternoon, ladies
22           and gentlemen of the jury.  This is one of two
23           times that we get to address you directly.
24           Certainly very appreciative of your time.
25           Everyone has thanked you, and we continue to do
```

1    so.  Mr. Heaggan-Brown is appreciative.  This is

2    really an important part of the process.  The jury

3    system's really sort of the cornerstone of our

4    criminal justice system, so again, we thank you

5    for your time.

6              There are many things that Mr. Chisholm

7    has said that the evidence is going to show that I

8    don't disagree with.  There are some very

9    fundamental disagreements, however, as well.  The

10   scene diagram, as he has laid it out, I don't

11   disagree that that's how the evidence is going to

12   show.

13             The scene is what it is; it's the

14   scene.  But ultimately we believe that the

15   evidence is going to show that Dominique

16   Heaggan-Brown is not guilty of first-degree

17   reckless homicide.

18             The judge has told you that opening

19   statements are not evidence, and indeed, they are

20   not.  And they aren't argument.  Opening

21   statements are just that; it's a statement.  We

22   sometimes refer to it as a road map; what do we

23   think that the evidence is going to show you.  Of

24   course, until we hear the evidence, no one knows

25   for certain, but this is what we believe the

```
 1            evidence is going to show.

 2                      And it is an opportunity, as the judge

 3            has indicated, to alert you to some matters.  So

 4            as you're listening to testimony and observing

 5            evidence, there are some things that you may wish

 6            to -- well, I know you wish to pay attention to

 7            all of it, but just so you are aware of what is

 8            forthcoming.

 9                      This case is not to be decided on

10            sympathy.  The judge has told you that.  It's to

11            be decided on the law; that is proof beyond a

12            reasonable doubt.  That is why we're here.  It's

13            Mr. Chisholm's burden to do so.

14                      And what we believe the evidence is

15            going to show is, indeed, on August the 13th,

16            Dominique Heaggan-Brown, Mr. Heaggan-Brown had

17            been a City of Milwaukee police officer for

18            approximately three years, a little over three

19            years.  He had previously attended the police

20            academy where he received training in the

21            investigative process, the law, police procedures,

22            tactics, and significantly, the use of force

23            including the use of deadly force.  And he used

24            that police training, the evidence will show,

25            during those -- and his experience during those
```

41

```
1       three-plus years, he used that on August the 13th
2       of 2016.
3                    Organizationally, the City of Milwaukee
4       is broken into seven police districts, okay, and
5       Mr. Heaggan-Brown was assigned to the 7th
6       district.  The 7th district includes an area
7       called the Sherman Park neighborhood, Sherman Park
8       area.  Without question, as with a good portion of
9       the city, there are a number of fine, decent,
10      great-quality people who live in that area.  But
11      the evidence will show that area, as other areas
12      of the city, also known to be what they call a
13      high-crime area, be it drug trafficking, guns,
14      other criminal activity, is known as a high-crime
15      area.
16                   On August 13th of last year,
17      Mr. Heaggan-Brown's normal shift, the shift that
18      he would normally work, would be 4 p.m. to
19      midnight; however, there was an initiative by the
20      department to show a greater police presence in
21      the area, sort of a show of force, what have you,
22      in this area, and Mr. Heaggan-Brown worked some
23      overtime.
24                   As a matter of fact, I believe Officers
25      Malafa and Voden were similarly situated, normally
```

42

1          4 to midnight, agreed to work some overtime.

2                    This overtime took place prior to the

3          normal shift.  It began at 2:00.  The evidence

4          will show Mr. Heaggan-Brown was normally assigned

5          to the bicycle patrol during warmer weather and

6          that he would patrol that area and many areas, but

7          he was familiar with that neighborhood area.

8                    They begin their patrol.

9          Mr. Heaggan-Brown is in his own vehicle or a

10         vehicle assigned to him.  Officers Voden and

11         Malafa are in a separate vehicle; that during the

12         course of those two hours they have some

13         interaction with members of the public, and

14         they're really working their way back towards the

15         station because they are to begin their normal,

16         regular shift.  That overtime period is coming to

17         a close.

18                   A decision is made to go through a

19         certain area, and when they do so, they observe a

20         vehicle with out-of-state plates parked more than

21         12 inches from the curb.

22                   You will learn, and the evidence will

23         show you, that it is known to these officers and

24         officers that it is not uncommon for individuals

25         engaged in the trafficking of narcotics to use

43

```
 1          newer vehicles, out-of-state plates in their

 2          pursuits.  And also you'll learn parking more than

 3          12 inches from the curb is an ordinance violation

 4          within the City of Milwaukee.

 5                    And such an infraction, in addition to

 6          other matters, but this infraction is something

 7          that law enforcement will use in order to engage

 8          or have interaction with individuals,

 9          particularly, if they want to conduct what we call

10          a legal investigatory stop.  And that's what was

11          happening here.

12                    Mr. Heaggan-Brown, Officers Malafa and

13          Voden were conducting an investigatory stop, based

14          upon their training and experience because of this

15          vehicle, because of the out-of-state plates,

16          because it was parked more than 12 inches from the

17          curb, and because there was a person on the

18          passenger side of said vehicle sort of leaning in

19          or towards the vehicle as though some type of

20          transaction took place.  That's why they are

21          trying to conduct this stop.

22                    As soon as this investigatory stop

23          begins, before Mr. Heaggan-Brown can even exit his

24          vehicle, a man, later identified as Sylville

25          Smith, begins running.  Sylville Smith was not
```

44

SMITH004043

```
 1          known to Dominique Heaggan-Brown.  But he starts

 2          running, and when he runs, he has a gun in his

 3          hand.  It's a gun with an extended clip or

 4          magazine.  You'll hear testimony about that.  And

 5          Officer Malafa advises he's got a gun.

 6                    Mr. Heaggan-Brown, Mr. Malafa, they

 7          give chase.  Mr. Heaggan-Brown is ahead of Officer

 8          Malafa but trailing behind Mr. Smith.  During that

 9          pursuit, Mr. Smith is being commanded by law

10          enforcement, "Drop the gun, drop the gun," but he

11          does not.  He turns the corner, as this was talked

12          about the evidence is going to show, and the body

13          camera footage that has been referenced will show

14          what appears as that Smith, while holding this

15          weapon, either slips or runs into the fence or

16          attempts to jump the fence or what have you, but

17          he drops the gun.

18                    The evidence will show he's still being

19          commanded, "Drop the gun."  Instead, Mr. Smith

20          picks up that weapon, turns towards Officer

21          Heaggan-Brown and Officer Malafa.  First shot,

22          through the right bicep, it's a

23          through-and-through.

24                    When the shot hits his arm, we believe

25          the evidence will show it either causes him to
```

45

```
 1        lose control of the gun or it is thrown over the
 2        fence by Smith.  We believe the evidence in the
 3        video will show that he attempts to scale that
 4        fence, and as doing so, he falls backwards onto
 5        his back with his whole body going back, his
 6        hands, feet coming back, and then coming forward.
 7               The video will show that it's not only
 8        his feet coming forward.  It will show that his
 9        hands are coming forward, and it's at that time
10        that the second shot is fired, the shot that hits
11        him in the chest.
12               With his hands going forward fearing
13        that he still may have had access to the first
14        gun, fearing that he may be reaching for another
15        gun, fearing for his safety and the safety of
16        Officer Malafa, he fires that second shot.  The
17        time as is mentioned between that first and second
18        shot is less than two seconds, 1.7, 1.69 seconds.
19        These are literally split-second decisions that
20        Dominique Heaggan-Brown is making and making under
21        fast-moving circumstances.
22               You will also see on the video that
23        even after that second shot is fired, Smith is
24        being commanded, "Stop reaching, stop reaching,
25        get your hands away."  The weapons still trained
```

```
 1          on him, still pointed at him when that is being
 2          said.  The evidence will show that he's saying
 3          this because he believed that Smith could have
 4          access to that first weapon or, with the reaching,
 5          the second weapon at the waistband.
 6                    At some point while this is going on or
 7          as he falls, a swarm of bees are stirred up.  At
 8          some point during this process, Officer
 9          Heaggan-Brown is stung by a bee, though at that
10          time he doesn't know if he's stung by a bee or if
11          it's something else; gunpowder residue, what have
12          you, something else, but he feels this burning
13          sensation, and you're going to hear all of this in
14          the tape.
15                    But he and Officer Malafa pull
16          Mr. Smith away from where these bees are, and
17          Dominique Heaggan-Brown begins to perform chest
18          compressions on Mr. Smith, albeit a very short
19          time; he seems to come in contact with blood and
20          there's a question of whether he should have
21          gloves and whatnot.  Ultimately another officer
22          takes over, and notwithstanding those efforts,
23          Mr. Smith dies.
24                    Pursuant to protocol, Mr. Heaggan-Brown
25          is sort of removed of the investigative scene
```

47

1          here.  He's still on scene.  You're going to
2          hear -- what I think you will hear is the
3          conclusion of the body cam footage and stuff, but
4          you'll understand, the evidence will show, that
5          he's sort of removed because he is the officer
6          that is involved in the shooting pursuant to
7          protocol, just as with the outside agency
8          investigating this matter.  There's certain
9          protocol that is followed when there's an
10         officer-involved shooting.
11                   A couple days later -- well, the
12         evidence is going to show that the body cam
13         footage from Officer Malafa and Officer
14         Heaggan-Brown is taken pursuant to these
15         protocols, and the evidence will be that a few
16         days later, Mr. Heaggan-Brown, without having seen
17         his body cam video, without having seen Officer
18         Malafa's body cam video, voluntarily provides a
19         statement to the investigators.
20                   And in that statement you will see,
21         when you are advised of the statement with respect
22         to the video, that he describes really in great
23         detail and confirms what it is that you are going
24         to see on that video.  And in that statement he
25         does say that he was concerned, that he feared for

48

1    his safety, that Mr. Smith, Sylville Smith was
2    reaching for a weapon, and he feared for his
3    safety and the safety of Officer Malafa.
4              You are also going to hear testimony
5    from a gentleman by the name of Robert Willis.
6    Mr. Willis is a former law enforcement officer
7    himself.  He's also had a career in training
8    current and future police officers in amongst, you
9    know, many things; defense and arrest tactics, use
10   of deadly force.  He's trained them all over the
11   State of Wisconsin, and, in fact, has authored a
12   training manual, one of the authors of a training
13   manual that is employed by the various departments
14   throughout the State of Wisconsin in order to
15   instruct individuals, future police officers on
16   these matters.
17             And Mr. Willis is going to provide
18   testimony about weapons, the law in terms of
19   police interaction with individuals, the training
20   that police officers receive.  He has seen the
21   body camera footage, and, in fact, he has broken
22   it down essentially frame by frame into what is
23   about 131, 130 -- 132 of a second.  He's going to
24   discuss the police training regarding the use of
25   force, including deadly force, and when and under

49

what circumstances it can be used.

Mr. Willis will further talk about what he terms -- the nature of what he terms "a gun fight," more specifically, when is gun fight begins and when it is that it ends. He will tell you that police officers are trained with what's called the plus-one rule. They are trained that where a suspect has one weapon they should believe that there is another weapon present. The weapon they see, plus one additional weapon. And he will tell you that gun fight ends when the threat has been stopped. And a threat isn't just a weapon that is seen, but a number of facts and circumstances concerning the entire situation and the suspect's behavior.

You have promised to listen to all of the evidence, and I, again, ask you and remind you to do so. You should do that, that is your job. But about that video, I mentioned that it's been broken down sort of frame by frame, both by Mr. Willis and certainly by the prosecution here. Those frames can be paused and stopped on any particular frame, but that isn't how these events unfold. We are looking at them and you will be looking at them in hindsight, but they unfolded in

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 51 of 60   Document 43   SM50143004049

```
1          real time.
2                  The whole chase from the time
3          Mr. Heaggan-Brown gets out of his vehicle to the
4          time of the second shot being fired, that whole
5          chase, that whole sequence, 12 seconds or less.
6          And the time between that first shot and second
7          shot, 1.69, 1.7 seconds.  That's the real time in
8          which this unfolded.
9                  That, ladies and gentlemen, is what we
10         believe the evidence is going to show in this
11         matter.  The evidence is going to show that
12         Mr. Heaggan-Brown was doing his job on August
13         the 13th, 2016, and that when he fired two shots
14         at Sylville Smith, that he did so fearing for his
15         safety and fearing for the safety of Officer
16         Malafa.  And based upon that and upon and under
17         the law, we believe Mr. Heaggan-Brown is not
18         guilty of this offense, and that is the verdict at
19         the end of this case that we will ask you to
20         return.  Thank you.
21                 THE COURT:  Thank you, Mr. Smith.
22
23
24
25
```

```
 1              All right.  We are going to break for
 2      the evening.  You have your schedules, and the
 3      deputies who are going to be with you will be
 4      giving you your schedules and taking care of you
 5      this evening and into tomorrow morning.  We will
 6      resume tomorrow at 9:00 a.m. with the beginning of
 7      the evidence and work through the evidence all day
 8      tomorrow and then through the rest of the week.
 9              I don't have to remind you what not to
10      do, I've already told you.  Plus, the officers and
11      the deputies that will be with you will be
12      reminding you as to what you can and cannot do.
13      Enjoy your evening, and we'll see everyone
14      tomorrow morning at 9 a.m.
15                  THE BAILIFF:  All rise for the jury.
16                  (The jury left the courtroom.)
17                  THE BAILIFF:  You may be seated.
18                  THE COURT:  All right.  We have a
19      handful of housekeeping matters to take care of so
20      why don't we do that right now so that we don't
21      forget.  So let's start with the strikes for cause
22      that we had decided in chambers, and it was --
23      it's my understanding that all of the strikes for
24      cause that we -- that the Court granted were
25      stipulated to.  I'm not going to go through the
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 53 of 60   Document 43   SM150143004051

```
 1              strikes for cause through the entire list; it will
 2              only be Jurors 1 through 39 that were in the
 3              selection process.  So that would be Jurors No. 8,
 4              10, 11, 12, 15, 16, 18, 19, 23, 26, 32, 35, 37.
 5              Is that correct?
 6                          MR. LINDSAY:  Yes, Your Honor.
 7                          THE COURT:  Is that correct, Mr. Smith?
 8                          MR. SMITH:  It is.
 9                          THE COURT:  All right.  Also, we lost a
10              juror.  We're not going to discuss all the
11              specifics right now, but suffice it to say that
12              Juror No. 36 is no longer going to be with us as
13              far as this trial is concerned.  The Court will
14              take the issues on that up later on.  It was the
15              decision both of the Court, as well as the
16              attorneys, that we were to continue on without
17              that juror.
18                          Is that correct, Mr. Lindsay or
19              Mr. Chisholm, whoever wants to speak?
20                          MR. LINDSAY:  Yes, Your Honor, that's
21              correct.
22                          THE COURT:  Mr. Smith?
23                          MR. SMITH:  It is.
24                          THE COURT:  All right.  And the Court
25              will take that up either later this week or next
```

```
 1          week sometime when we have the time to actually

 2          deal with it.  Is there any other record we need

 3          to make?

 4                    MR. LINDSAY:  There was a defense

 5          motion in chambers.

 6                    THE COURT:  Oh, that's correct.  Do you

 7          want to put that on the record briefly?

 8                    MR. SMITH:  Your Honor, during the

 9          close of my voir dire, and it was sort of the

10          discussion previously about what I would call the

11          catchall question -- I'm sorry, Madam Reporter.

12          Can I have the microphone?  Sort of a catchall

13          question about is there anything that anyone

14          believed that they should volunteer, actually, I

15          think it was in response to a question of any

16          answer somebody would change is really what I

17          think it was.  At that time Juror No. 18 had

18          indicated that in his questionnaire he filled out

19          one answer but subsequent to that point in time he

20          came to realize that he was aware of other cases

21          involving Mr. Heaggan-Brown.

22                    We at the time stopped the questioning

23          of No. 18.  We had a discussion in chambers.  At

24          that time we moved or had Your Honor make a

25          determination about whether this panel should be
```

54

```
 1        dismissed and a new panel employed given the
 2        potential taint that could have or may have
 3        occurred by the statement by Juror No. 18.  That
 4        was made in chambers and the Court denied that
 5        request.
 6                    THE COURT:  Correct.  And just let me
 7        expand on the record a little bit.  Is that --
 8        first of all, is that the understanding of the
 9        State?
10                    MR. LINDSAY:  That's correct.  I think
11        the specific statement by the juror was that he
12        became aware of other cases in which
13        Mr. Heaggan-Brown was involved.
14                    THE COURT:  Well, I don't even know if
15        he went that far.  He said other cases and I think
16        it got cut off pretty close to that.
17                    In any event, I know what the -- the
18        intent and what he meant by that.  It got cut off
19        pretty quickly.  The concern, you know, the Court
20        had obviously was that this issue was to not be
21        considered by the jury or the jury panel and we
22        tried very hard to keep that from being known to
23        the panel, and if it was, then we tried to root it
24        out.  I think it happened in such a quick fashion
25        and the way it was worded in terms of cases was
```

55

1    somewhat middle of the road the way it was

2    explained.  Cases could mean cases of which he may

3    be a defendant or cases in which he was involved

4    as an officer, any number of things.  And it kind

5    of went so quickly that I don't think anyone

6    really picked up on it, or if they did, they

7    really didn't think twice about it.

8            The other thing that we have going for

9    us with regard to this panel here is that this

10   jury panel, in my estimation over the 3 to 400

11   juries that I've had over the years, is a very

12   good jury and a jury that would put things aside

13   if instructed to do so and make a decision based

14   only on the evidence.  I can't guarantee that, but

15   the feeling that the Court had was since this

16   appeared to me to be somewhat de minimis, we could

17   toss out the entire panel and start all over again

18   but that wasn't going to guarantee that somebody

19   else wasn't going to blurt something worse out,

20   ended up we would never get a panel selected in

21   this case.

22           So the long and the short of this is

23   the Court believed that this issue was de minimis,

24   it was not anything that would be prejudicial to

25   the defendant -- or overly prejudicial to the

```
 1              defendant and the Court denied the motion.

 2                      MR. LINDSAY:  Judge, the only other

 3              thing I would note, because I think the record

 4              would be silent, is that at the time that the

 5              question was asked, that juror had already been

 6              stipulated as a strike for cause based on the

 7              hardship question.

 8                      THE COURT:  Correct.  He was no long --

 9              he was not going to be an active, participating

10              juror anyways.  The concern, obviously, was more

11              that it was spoken out in front of the other

12              jurors.  But as I said, it was something that went

13              so quickly and it was shut down so quickly and he

14              was not allowed to expand on that that it was

15              something in my mind that was de minimis and

16              therefore did not require the drastic remedy that

17              was requested.

18                      Anything else?

19                      MR. LINDSAY:  No.

20                      MR. SMITH:  No, sir.

21                      THE COURT:  All right.  Let me talk to

22              the lawyers about scheduling for tomorrow for a

23              few minutes, and then I need to talk to the

24              deputies about tomorrow, and we do need to swear

25              the afternoon deputies, the second shift deputies.
```

```
 1              So that will be just the two of you?

 2                    THE BAILIFF:  Three.

 3                    THE COURT:  We have another one out

 4         here?

 5                    THE BAILIFF:  Yeah, there's three

 6         deputies.  They're right inside.

 7                    THE COURT:  In addition to these guys

 8         or separate?  The second shift guys are out there?

 9                    THE BAILIFF:  Yes.

10                    THE COURT:  Got it.  You should go get

11         them.  All right.  There we go.

12                    THE CLERK:  I'm going to swear you guys

13         in.

14                    (The bailiffs were sworn in.)

15                    THE COURT:  Great.  Thank you.

16                    MR. KOHN:  We are done with our client?

17                    THE COURT:  Yes, we are finished with

18         that today.

19                    Let me start with the sheriff's

20         department since they need to make their

21         arrangements, and then we can talk very briefly

22         about tomorrow and then I think we're done for the

23         evening.

24                    (Proceedings adjourned at 4:48 p.m.)

25
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 59 of 60   Document 143   SM504057

```
 1    STATE OF WISCONSIN    )

 2                          ) ss.

 3    MILWAUKEE COUNTY       )

 4

 5

 6                          I, LAURELL L. BRESLOW-COLLIEN,

 7    Official Court Reporter in and for the Circuit Court of

 8    Milwaukee County, do hereby certify that the foregoing

 9    is a true and correct transcript of all the proceedings

10    had in the above-entitled matter as the same are

11    contained in my original machine shorthand notes on the

12    said trial or proceedings.

13

14    Dated at Milwaukee, Wisconsin on January 12, 2018.

15

16

17

18

19

20    _____
      Electronically signed by:
21    LAURELL L. BRESLOW-COLLIEN, RPR
      OFFICIAL COURT REPORTER
22

23

24

25
```