IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
WISCONSIN

The ESTATE OF SYLVILLE K. SMITH, by )
Personal Representative Mildred Haynes, )     No. 17-cv-862
Patrick Smith, and Mildred Haynes, on her )
own behalf, )
                                        )
        Plaintiffs,                     )     JURY TRIAL DEMANDED
                                        )
        v.                              )
                                        )
CITY OF MILWAUKEE, WISCONSIN            )
and DOMINIQUE HEAGGAN-BROWN,            )
                                        )
        Defendants.                     )


# EXHIBIT 41


Gibbs Trial Testimony


David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St, Third FL
Chicago, IL 60607
(312) 243-5900

STATE OF WISCONSIN    CIRCUIT COURT    MILWAUKEE COUNTY
                          BRANCH 30

---------------------------------------------------------

STATE OF WISCONSIN,

                    Plaintiff,

        vs.                        Case No. 2016-CF-005562

DOMINIQUE L. HEAGGAN-BROWN,

                    Defendant.
---------------------------------------------------------

**JURY TRIAL – ALL DAY**

---------------------------------------------------------

**JUNE 16, 2017**                    **HON. JEFFREY A. CONEN,**
                                     Circuit Court Judge,
LAURELL L. BRESLOW-COLLIEN, RPR      presiding.
Official Court Reporter


**CHARGES:**
Count 1: First-Degree Reckless Homicide




                A P P E A R A N C E S:

JOHN T. CHISHOLM, District Attorney, and BENJAMIN
LINDSAY, Assistant District Attorney, appeared on behalf
of the State of Wisconsin.

STEVEN R. KOHN and JONATHAN C. SMITH, Attorneys at Law,
appeared on behalf of the Defendant.

DOMINIQUE L. HEAGGAN-BROWN, Defendant, was present in
custody.

ALSO PRESENT:  J. Michael Damarco, Investigator

1

I N D E X

WITNESS                                                      PAGE

SPECIAL AGENT RAYMOND GIBBS

    Direct Examination by Mr. Chisholm .............. 8

    Cross-Examination by Mr. Smith ................. 38

    Redirect Examination by Mr. Chisholm ........... 39

JESSICA LELINSKI, M.D.

    Direct Examination by Mr. Lindsay .............. 43

MARK SIMONSON

    Direct Examination by Mr. Lindsay .............. 58

STATE RESTS ....................................... 70

DEFENSE MOTION .................................... 70

NOON RECESS ....................................... 72

COLLOQUY WITH DEFENDANT ........................... 73




                        E X H I B I T S

NO.    DESCRIPTION                            ID'D      RCV'D

53     DCI Report of the Heaggan-Brown
       Interview ....................... 11 ........ 42

54     Autopsy Protocol ................ 46 ........ 56

55     Toxicology Report ............... 55 ........ 56

56     Photograph ...................... 48 ........ 54

57     Photograph ...................... 48 ........ 54

58     Photograph ...................... 48 ........ 54

59     Photograph ...................... 48 ........ 54

2

E X H I B I T S (continued)

| NO. | DESCRIPTION | ID'D | RCV'D |
|-----|-------------|------|-------|
| 60 | Photograph ...................... 49 ....... 54 |
| 61 | Photograph ...................... 51 ....... 54 |
| 62 | Bullet Recovered at Autopsy ...... 53 ....... 56 |
| 63 | Ballistics Report ................ 61 ....... 68 |
| 65 | Box Containing the Test-Fired Cartridge Cases and Bullets ...... 60 ....... 68 |
| 69 | Box Containing Test-Fired Bullets and Cartridge Cases .............. 62 ....... 68 |
| 74 | Photograph ...................... 51 ....... 52 |

3

```
 1                  TRANSCRIPT OF PROCEEDINGS   (9:47 a.m.)

 2                  THE CLERK:  Case No. 16-CF-5562, State

 3        of Wisconsin vs. Dominique L. Heaggan-Brown,

 4        first-degree reckless homicide.  Matter is here

 5        for a jury trial.  Appearances.

 6                  MR. CHISHOLM:  John Chisholm on behalf

 7        of the State; Ben Lindsay assisting.  Good

 8        morning, Your Honor.

 9                  THE COURT:  Good morning.

10                  MR. SMITH:  Good morning, Your Honor.

11        Attorneys Jonathan Smith and Steven Kohn on behalf

12        of Mr. Heaggan-Brown who is present.

13                  THE COURT:  All right.  Good morning.

14        We had a -- excuse me.  I think we have a

15        stipulation on a handful of issues that we are

16        going to try to wrap up with the jury.  Do we want

17        to make a record of that before the jury comes

18        out?

19                  MR. SMITH:  Sure.

20                  MR. LINDSAY:  Sure, Your Honor.  The

21        State is submitting a stipulation signed by

22        Mr. Chisholm, Mr. Smith, and Mr. Heaggan-Brown as

23        Exhibit No. 73.  It reads as follows that:  "The

24        parties agree and stipulate that at or about

25        5 p.m. on August 13th, 2016, forensic investigator
```

4

```
 1          Crystal Green, an employee of the Milwaukee County
 2          Medical Examiner's Office, arrived at 3216 North
 3          44th Street in the city and county of Milwaukee.
 4          There she examined the condition and took custody
 5          of the body of the decedent, Sylville K. Smith.
 6          Investigator Green facilitated the Milwaukee Fire
 7          Department med unit's transportation of
 8          Mr. Smith's body to the medical examiner's office.
 9          The Milwaukee Fire Department med unit was
10          escorted by the Wisconsin Department of Justice,
11          Division of Criminal Investigation, and arrived at
12          the medical office -- medical examiner's office in
13          the same condition."
14                    Pursuant to this stipulation, the State
15          will not be calling additional witnesses to
16          establish either the chain of custody of the
17          decedent's body or the condition of the body when
18          it arrived at the medical examiner's office.
19                    THE COURT:  All right.  And so that is
20          agreed to, Mr. Smith?
21                    MR. SMITH:  It is.
22                    THE COURT:  And Mr. Heaggan-Brown,
23          you're in agreement?
24                    THE DEFENDANT:  Yes.
25                    THE COURT:  All right.  I appreciate
```

5

```
 1          it.  Thank you.

 2                     So are you going to read that to the

 3          jury since that actually goes to your part of the

 4          case?

 5                     MR. LINDSAY:  I will read it.

 6                     THE COURT:  And I will advise the jury

 7          that this will be conclusive proved.

 8                     MR. LINDSAY:  I will read that right

 9          before the medical examiners and formally move it

10          in at that time.

11                     THE COURT:  That's fine.  Perfect.  So

12          the stipulation has the approval of the Court.

13                     And anything else we need to do?

14                     MR. CHISHOLM:  Nothing from the State,

15          Judge.

16                     THE COURT:  All right.  So medical

17          examiner first?

18                     MR. CHISHOLM:  Actually, we're going to

19          start with Special Agent Ray Gibbs who's in court

20          right now.

21                     THE COURT:  Perfect.  And then medical

22          examiner and Mr. Simonson and then you're done?

23                     MR. CHISHOLM:  That's correct.

24                     THE COURT:  Okay, very good.  So we

25          should be done by noon.
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 7 of 43   Document 44   SMC-004338

```
 1                    MR. CHISHOLM:  I believe so.

 2                    THE COURT:  Let's bring them in.

 3                    THE BAILIFF:  All rise for the jury.

 4                    (The jury entered the courtroom.)

 5                    THE BAILIFF:  You may be seated.

 6                    THE COURT:  Everyone's comfortable and

 7         we're all set.  All right.  Good morning, ladies

 8         and gentlemen.  Hope you had a good evening and

 9         everything went well.  We're still very much on

10         track to be done today with a good portion of the

11         trial, and then we have one witness that will be

12         available for testimony on Monday, which will take

13         us into Monday, and then again instructions and

14         argument hopefully by Monday afternoon, and then

15         deliberations until a verdict's reached.  So we're

16         still on track.

17                    Your next witness.

18                    MR. CHISHOLM:  Thank you, Your Honor.

19         Good morning, ladies and gentlemen.  The State's

20         first witness this morning is Special Agent

21         Raymond Gibbs.

22                    THE COURT:  All right.  Could you

23         stand, please?

24                    AGENT GIBBS:  Certainly.

25                    THE COURT:  Raise your right hand.
```

7

```
 1                    SPECIAL AGENT RAYMOND GIBBS, called as
 2         a witness herein, being first duly sworn, was
 3         examined and testified as follows:
 4                    THE COURT:  Have a seat, please.  Tell
 5         us your name; spell your first and last name,
 6         please.
 7                    THE WITNESS:  First name is Raymond,
 8         R-A-Y-M-O-N-D, last name is Gibbs, G-I-B-B-S.
 9                    THE COURT:  All right.  You may
10         proceed.
11                    MR. CHISHOLM:  Thank you.
12                         DIRECT EXAMINATION
13    BY MR. CHISHOLM:
14    Q    What do you do for a living, Agent Gibbs?
15    A    I am a special agent with the Wisconsin Department
16         of Justice, Division of Criminal Investigation.
17    Q    And when did you first start working with the
18         Department of Justice?
19    A    November of 2015.
20    Q    And prior to November of 2015, you had extensive
21         law enforcement experience; is that correct?
22    A    That's correct.
23    Q    Can you describe what that was?
24    A    I was employed for 25 years with the Milwaukee
25         Police Department.  I retired in 2015 as a
```

8

SMITH004340

```
 1              homicide lieutenant.
 2      Q       And in the course of your work, particularly in
 3              the latter years as a homicide lieutenant, you
 4              directly participated in a large number of
 5              homicide investigations and supervised those as
 6              well; is that correct?
 7      A       That's correct.
 8      Q       Were you working with the Department of Justice on
 9              August 13 of 2016?
10      A       Yes, I was.
11      Q       And as part of that assignment, were you asked to
12              assist in the investigation of a police
13              officer-involved shooting that resulted in the
14              death of Sylville Smith?
15      A       Yes, I was.
16      Q       And what was your role?
17      A       I interviewed numerous people to include some
18              officers from the Milwaukee Police Department
19              regarding the incident.
20      Q       And in particular, on August 15 at approximately
21              11:00, did you have the opportunity to interview
22              Mr. Heaggan-Brown?
23      A       Yes, I did.
24      Q       And prior to that occurring, did you have an
25              opportunity to discuss the circumstances or the
```

9

```
1         conditions of Officer Heaggan-Brown talking to you
2         with his attorneys?
3    A    Yes, I did.
4    Q    And do you recall, can you describe to the jury
5         what -- what that conversation or discussion was
6         about?
7    A    Well, the attorneys had been at DCI Milwaukee
8         office the day after the incident, I think that
9         was on the 14th, with Officer Voden, who was on
10        scene at the time, and we had -- we had spoken
11        with Officer Voden, and afterwards we had
12        discussed whether or not Officer Heaggan-Brown was
13        going to give a statement, and if the attorneys
14        were going to be allowed to look at the body cam
15        video that Officer Heaggan-Brown and Officer
16        Malafa were wearing at the time of the incident.
17   Q    Then after that discussion did you allow them an
18        opportunity to review the body cam videos from
19        both Officer Heaggan-Brown and from Officer
20        Malafa?
21   A    They were allowed to, yes.
22   Q    And describe those circumstances.
23   A    Myself and my partner Special Agent Ricardo
24        Tijerino accompanied them into a room, and we
25        basically set the videos up on a computer, and we
```

10

```
 1            were in the room with them and they watched each
 2            of the videos.
 3    Q       How often did they watch them?
 4    A       I believe twice each one.
 5    Q       And then after that, you had an opportunity to
 6            meet them again on the 15th; is that correct?
 7    A       That's correct.
 8    Q       And at that time, you had the opportunity then to
 9            discuss the case with Officer Heaggan-Brown?
10    A       Yes, I did.
11    Q       I'm going to show you what has been marked as
12            Exhibit No. 53, and ask if you recognize this
13            exhibit.
14                    MR. CHISHOLM:  May I approach, Judge?
15                    THE COURT:  You may.
16                    MR. CHISHOLM:  I've already shown this
17            to counsel.
18                    THE COURT:  Okay.
19    BY MR. CHISHOLM:
20    Q       Agent Gibbs, do you recognize that document, and
21            if you need, you can take some time to look at it?
22    A       I do recognize this.
23    Q       And what is that?
24    A       This is a report, a DCI report regarding the
25            interview that we took with Officer Heaggan-Brown.
```

```
 1   Q    So this would have been approximately 48 hours
 2        roughly, a little bit under 48 hours after the
 3        incident occurred?
 4   A    I believe so.
 5   Q    And the -- the circumstance of that interview took
 6        place in your offices; is that correct?
 7   A    That's correct.  We have a conference room, so we
 8        were able to sit everyone comfortably and discuss
 9        the incident.
10   Q    And approximately how long did the interview take?
11   A    Roughly two hours.
12   Q    And would that have included some breaks at any
13        point in time?
14   A    Yes.
15   Q    At the conclusion of that interview, you
16        summarized the conversation.  I assume you would
17        have taken notes during that, and at some point in
18        time, you summarized the conversation that you had
19        with Officer Heaggan-Brown and his attorneys and
20        then put that into a Word document of some form;
21        is that correct?
22   A    That's correct.
23   Q    And is that what you're looking at with this
24        exhibit?
25   A    Yes.
```

12

SNISDH004344

| | | |
|---|---|---|
| 1 | Q | In addition to that, on a follow-up date a week or |
| 2 | | so later, you again met with Officer Heaggan-Brown |
| 3 | | and his attorneys; is that correct? |
| 4 | A | Yes, we did. |
| 5 | Q | And what did you do at that time? |
| 6 | A | We showed him the report and had him look at |
| 7 | | everything to make sure that the report was what |
| 8 | | we had discussed at the initial interview. |
| 9 | Q | And what was his response to that? |
| 10 | A | Looked it over and said the report was correct. |
| 11 | Q | Thank you. And based on that, again you -- if he |
| 12 | | had made any changes, you would have modified the |
| 13 | | document and allowed him to look at it again; is |
| 14 | | that correct? |
| 15 | A | Correct. |
| 16 | Q | But he didn't do so; so what you have before you |
| 17 | | is an accurate summary of the conversation that |
| 18 | | you had with Officer Heaggan-Brown on the 15th? |
| 19 | A | Yes, sir. |
| 20 | Q | Thank you. I'm going to ask for you to go through |
| 21 | | that document and do it line by line, paragraph by |
| 22 | | paragraph and just inform the jury of your |
| 23 | | discussion with Officer Heaggan-Brown. |
| 24 | A | Okay. "SA Gibbs and SA Taylor began the interview |
| 25 | | by identifying themselves as special agents with |

13

```
 1        the Department of Justice, Division of Criminal
 2        Investigation, DCI, to Officer Heaggan-Brown and
 3        displayed their credentials and badges to him.
 4        Heaggan-Brown was advised that his giving a
 5        statement to the special agents was completely
 6        voluntary on his part.  Heaggan-Brown was told by
 7        SA Gibbs that he was not required to give a
 8        statement and was further advised by Gibbs that he
 9        could stop answering questions at any time he
10        desired as well as confer with his attorneys prior
11        to answering any question directed at him by the
12        DCI agents.
13             "SA Gibbs asked Heaggan-Brown if he
14        understood that he was not required to give DCI a
15        statement, and he stated that he understood.  SA
16        Gibbs asked Heaggan-Brown if he wished to make a
17        statement to SA Gibbs and SA Taylor and
18        Heaggan-Brown stated that he wished to make a
19        statement.  SA Taylor advised Heaggan-Brown that
20        DCI had the ability to audio and/or video record
21        his statement.  Heaggan-Brown stated that he did
22        not want the statement to be recorded."
23   Q    If I could stop just briefly there.  There's a
24        mandate on any criminal investigation in the state
25        of Wisconsin that suspects are allowed the right
```

14

SN150404346

```
1              to have their statement recorded, but it's not --
2              it's not mandatory if they don't want to, and
3              particularly if their attorneys are present at
4              that time; is that correct?
5    A         Correct.
6    Q         Thank you.  Please continue.
7    A         "Police Officer Dominique Heaggan-Brown stated he
8              was appointed to the Milwaukee Police Department
9              as a police aide July 26th of 2010.  Police
10             Aide [sic] Heaggan-Brown stated that he was
11             appointed to the rank of Milwaukee police officer
12             on August 13th, 2013, and was assigned to the
13             early shift at District 7, with regular hours of
14             duty from 4 p.m. to 12 a.m.  Heaggan-Brown was a
15             member of the bicycle patrol unit for almost one
16             year and successfully completed a training course
17             put on by the Milwaukee Police Training Academy to
18             become part of the bicycle unit.  Heaggan-Brown
19             also held certification to carry a taser and
20             attended an FBI-conducted training course on the
21             characteristics of an armed gunman.
22                       "On Saturday, August 13th, 2016,
23             Heaggan-Brown was attired in his full Milwaukee
24             police bicycle uniform, which consisted of dark
25             blue bicycle shorts and a dark blue polo-style
```

15

```
 1        short sleeve shirt.  The shirt had a Milwaukee

 2        Police Department patch on the left sleeve,

 3        embroidered Milwaukee police badge on the left

 4        chest, and his last name sewn onto a Velcro strip

 5        which was attached to the right chest of the

 6        shirt.  He also wore a ballistic vest underneath

 7        the uniform shirt.

 8               "Heaggan-Brown was equipped for duty on

 9        August 13th, 2016, with his full complement of

10        Milwaukee police equipment, which included his

11        duty belt.  On the duty belt Heaggan-Brown carried

12        the following equipment:  A double magazine am" --

13        I'm sorry -- "ammunition pouch containing two

14        handgun magazines.  Each magazine was loaded with

15        14 unfired .40 caliber cartridges; a taser carried

16        in a holster; a medium-sized flashlight carried in

17        a pouch; an empty baton holster; a two-way radio

18        with holder.  The radio was equipped with an

19        extended cord and microphone, which was attached

20        to the left shoulder of Heaggan-Brown's uniform

21        shirt.  A pair of handcuffs in a pouch; a second

22        pair of handcuffs in a holder; a Smith & Wesson

23        M&P .40 caliber pistol loaded with 14 unfired .40

24        caliber cartridges and a magazine seated in the

25        magazine well of the pistol, and an additional
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 17 of 43   Document 44   SN150144004348

```
 1          unfired .40 caliber cartridge in the chamber of
 2          the pistol; an extra flashlight in a pouch; OC
 3          spray in a pouch.  In addition to the
 4          aforementioned equipment, P.O. Heaggan-Brown wore
 5          a body camera with a collar mount.
 6                    "P.O. Heaggan-Brown was asked by SA
 7          Gibbs why there were only 14 cartridges in his
 8          magazines.  P.O. Heaggan-Brown responded that the
 9          Milwaukee police officers were told at the
10          training academy to not force the 15th cartridge
11          into the magazine because it would potentially
12          damage the magazine and lead to a malfunction of
13          the pistol.  Officers were instructed to insert
14          the magazine with 14 cartridges into the magazine
15          well of the pistol and charge the pistol, placing
16          a cartridge into the chamber.  An additional round
17          would then be placed into the magazine after
18          removing it from the magazine well of the pistol.
19          After placing the 14th cartridge into the
20          magazine, the magazine would be replaced into the
21          magazine well of the pistol.  P.O. Heaggan-Brown
22          loaded his pistol in this fashion."
23   Q      If I could just ask you to take a short break from
24          relaying this information.
25   A      Could I -- could I cut in real quick?  Could I get
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 18 of 43   Document 144   SM50H4004349

| | | |
|---|---|---|
| 1 | | a glass of water? |
| 2 | Q | Sure. |
| 3 | A | Dry mouth. |
| 4 | Q | Bottle of water? |
| 5 | A | Yeah, that will work.  Thank you.  Thank you. |
| 6 | Q | Because I was just going to show you something |
| 7 | | briefly.  If you would just briefly take a look at |
| 8 | | what's been marked as Exhibits 41 and 40. |
| 9 | | MR. CHISHOLM:  Can I approach, Your |
| 10 | | Honor? |
| 11 | | THE COURT:  You may. |
| 12 | | THE WITNESS:  Okay. |
| 13 | BY MR. CHISHOLM: | |
| 14 | Q | Do you recognize those items? |
| 15 | A | I know what they are.  They are magazines with |
| 16 | | unfired .40 caliber cartridges. |
| 17 | Q | And evidence has already been presented that |
| 18 | | indicates that those are the extra magazines of |
| 19 | | Officer Heaggan-Brown on August 13, and there's 14 |
| 20 | | rounds that are outside of the magazine at this |
| 21 | | point in time. |
| 22 | | The point I want to discuss with you is |
| 23 | | that -- is that even though the magazines -- the |
| 24 | | extra magazines have 14 rounds, the weapon itself |
| 25 | | that would have been in the officer's holster |

18

```
 1          would have contained 15 rounds; is that correct?
 2     A    Correct.
 3     Q    And again, would this have been consistent even
 4          with your previous experience as a Milwaukee
 5          police detective, a Milwaukee police lieutenant?
 6     A    Yes.
 7     Q    And that's consistent with the training that's
 8          received?
 9     A    That's correct.
10     Q    And so -- so any discharge from the weapon
11          itself -- and what's the purpose of asking these
12          questions, I guess, is what I would like to know.
13     A    We want to know how the weapon is loaded because
14          it's going to help explain what was found at the
15          scene, and if we know how many unfired cartridges
16          are in the pistol before he fires, it will explain
17          how many are now in there, you know, when we
18          recover the pistol.
19     Q    Thank you very much.  Please continue.
20     A    Okay.  I should have marked my spot, but I found
21          it.  Okay.  "On August 13th, 2016, P.O.
22          Heaggan-Brown reported to work at District 7 at 2
23          p.m. to work an overtime funded traffic detail for
24          two hours prior to his shift.  Prior to coming to
25          work, P.O. Heaggan-Brown got six to seven hours of
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 20 of 43   Document 50-4SM004351

```
 1          sleep the previous night, which was more than his

 2          usual amount.  He took no medications prior to

 3          this shift and had not had any alcohol for two

 4          weeks prior to this shift.  He was well rested and

 5          felt good when he arrived at work on August 13th,

 6          2016, at 2 p.m."

 7      Q   And again, if I could just ask, What is the

 8          purpose of a question like that in the context of

 9          an officer-involved shooting?

10      A   Just to kind of establish the condition of the

11          officer, did he work 25 straight hours, was he

12          suffering from exhaustion, did he have court, was

13          he on medications that may have possibly caused

14          issues.

15      Q   Thank you.

16      A   "P.O. Heaggan-Brown explained that the

17          instructions for the overtime detail was to

18          target" -- I'm sorry -- "to target high crime and

19          drug areas and to perform traffic stops and be

20          highly visible.  He was scheduled to ride with a

21          partner during this detail but his partner did not

22          come in for the detail.

23              "P.O. Heaggan-Brown signed out MPD

24          marked squad 124, a fully marked Tahoe with red

25          and blue emergency lights, a siren, and a dash
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 21 of 43   Document 44   SM50144004352

```
 1          camera.  P.O. Heaggan-Brown noted that two other

 2          bicycle officers, P.O. Malafa and P.O. Voden, were

 3          also signed up for the detail, so the three

 4          officers decided to participate in the detail

 5          together but in two separate squad cars.  P.O.

 6          Heaggan-Brown stated that P.O. Malafa and P.O.

 7          Voden drove a gray unmarked squad car, and both

 8          were also in Milwaukee Police Department bicycle

 9          officer uniforms.

10                  "P.O. Heaggan-Brown was unable to log

11          onto the squad computer on Squad 124.  He asked

12          P.O. Voden to try and log onto the computer of

13          Squad 124 as well, and P.O. Voden could not do so

14          either.  P.O. Heaggan-Brown decided that he would

15          put the two-way radio on the squad on channel

16          OPS 3 and his handheld two-way radio on the

17          District 7 channel."

18    Q     If I could again just take a brief break.

19          Evidence has been presented from both Officer

20          Malafa and Mr. Heaggan-Brown's body cameras but no

21          evidence has been received with respect to squad

22          videos.  Is there -- Does this explain that in any

23          fashion to you?

24    A     It could because when you log into the squad, you

25          have to log onto -- there's an on-board computer
```

21

|    |   | inside the squad car, and when you log on, it |
|----|---|-----------------------------------------------|

```
 1        inside the squad car, and when you log on, it
 2        basically identifies you through the computer into
 3        the telecommunicator and a lot of stuff that works
 4        on the squad works through the computer, on the
 5        on-board computer.
 6   Q    So on that day if he was unable to log on, then
 7        it's likely that the on-board dash camera would
 8        not have been operating as well?
 9   A    It's possible.  I'm not -- I'm not great with
10        the --
11   Q    You don't have personal knowledge about that but
12        that's -- that's --
13   A    Yeah.
14   Q    -- a possible explanation?
15   A    It's possible, yes.
16   Q    Thank you.  Please continue, I think starting the
17        third paragraph on page 3.
18   A    Okay.  "P.O. Heaggan-Brown stated that he, along
19        with P.O. Malafa and P.O. Voden, performed
20        approximately eight or nine traffic stops during
21        the detail and kept in constant radio contact with
22        each other.  They concentrated on the area of 76th
23        Street from Center to Capitol Drive and issued
24        numerous warnings to the people they stopped.
25        P.O. Heaggan-Brown stated that the orders for the
```

22

1    detail were to show a police presence in the areas
2    they worked, not just to write people tickets.
3              "At approximately 3:15 p.m. P.O.
4    Heaggan-Brown and P.O. Malafa and P.O. Voden
5    decided to start driving towards the District 7
6    station to be there in time for roll call at 3:48
7    p.m.  P.O. Heaggan-Brown stated while driving
8    towards District 7, P.O. Malafa got on the radio
9    and suggested they drive through the area of North
10   Sherman Boulevard and West Burleigh Street.  P.O.
11   Heaggan-Brown explained this area was known by the
12   three officers as an area of high crime and drug
13   activity.  P.O. Heaggan-Brown stated they had made
14   numerous arrests resulting in drugs and weapon
15   recoveries in the area.  P.O. Heaggan-Brown stated
16   the area was a regular part of their bicycle
17   patrol route due to the high amount of drug
18   activity, shootings, and other felony incidents.
19             "P.O. Heaggan-Brown drove his squad car
20   east on Burleigh Street, and as he approached
21   North 49th Street, he broadcast on OPS 3 that he
22   wanted to check the area of 44th Street and West
23   Burleigh.  P.O. Malafa responded on OPS 3 that he
24   and P.O. Voden were directly behind him.  P.O.
25   Heaggan-Brown explained that North 44th Street and

23

SM50144004355

1    West Burleigh was also an area with numerous drug

2    dealing complaints.  Heaggan-Brown recalled being

3    approached by residents on that block in the past

4    who complained of vehicles with out-of-state

5    plates coming into the area to buy drugs.  The

6    area was a residential area with numerous elderly

7    residents, and P.O. Heaggan-Brown stated that he

8    had the opportunity to speak with several

9    individuals who lived in the area and he was

10   familiar with who lived on the block and who did

11   not.

12           "P.O. Heaggan-Brown went on to explain

13   that as bicycle officers, their assignment was to

14   get to know the people in the neighborhoods they

15   patrol.  P.O. Heaggan-Brown stated if the officers

16   saw people on the street, they were to make

17   contact with them and let the citizens know they

18   were in the area.  P.O. Heaggan-Brown stated they

19   would attempt to find out from the residents what

20   things were occurring in their neighborhoods and

21   try to address them.

22           "P.O. Heaggan-Brown stated he, P.O.

23   Malafa, and P.O. Voden had made numerous field

24   interviews and arrests for drug possession in the

25   area of 44th Street and Burleigh, and many of the

24

```
 1        people stopped told them that the drug dealers on
 2        North 44th Street drove rental cars with
 3        out-of-state plates and sold drugs from the rented
 4        vehicles.
 5                  "P.O. Heaggan-Brown stated based on his
 6        training and experience, he knew that rental cars
 7        were usually newer model vehicles, often with
 8        out-of-state registration plates.  Heaggan-Brown
 9        added that approximately one week earlier he, P.O.
10        Malafa, P.O. Voden, and P.O. Wellman had made a
11        foot pursuit of a suspect in the area of 3109
12        North 44th Street.  P.O. Heaggan-Brown added" --
13        I'm sorry -- "stated during the course of the foot
14        pursuit an arrest was made and a handgun was
15        recovered.
16                  "P.O. Heaggan-Brown stated he turned
17        his squad north on North 44th Street from West
18        Burleigh, and as he approached the intersection of
19        North 44th Street at West Auer, he saw a black or
20        dark blue newer car with Minnesota or Iowa plates
21        parked north of Auer on the east side of North
22        44th Street.  P.O. Heaggan-Brown could not say
23        what state the registration plates were from with
24        certainty, but knew that they were not Wisconsin
25        plates because of the light blue border at the top
```

25

SH-504-004357

1   of the plate.  P.O. Heaggan-Brown knew Wisconsin

2   registration plates did not have that feature.

3          "P.O. Heaggan-Brown stated he was still

4   south of Auer, approaching the stop sign when he

5   saw the dark vehicle.  Heaggan-Brown noted the car

6   was parked too far from the curb and believed the

7   vehicle to be approximately 15 inches from the

8   curb.  P.O. Heaggan-Brown stated that he knew the

9   maximum distance a vehicle could be parked from

10  the curb was 12 inches.  Heaggan-Brown radioed

11  P.O. Malafa and P.O. Voden on OPS 3.  He told them

12  of the illegally parked vehicle with the

13  out-of-state registration plates.  P.O.

14  Heaggan-Brown stated there were no cars parked

15  behind the dark vehicle, and he believed the

16  vehicle was parked three houses north of Auer.

17         "P.O. Heaggan-Brown continued to watch

18  the dark vehicle, and saw a heavyset black male

19  wearing a white shirt exit the front passenger

20  seat.  Heaggan-Brown stated that the black male

21  appeared to be leaning into the car with his body

22  between the open front passenger door and the

23  passenger compartment of the vehicle.  P.O.

24  Heaggan-Brown stated the black male's head was

25  above the roof line of the car.  Heaggan-Brown saw

1            the man look at his marked MPD police squad, then
2            quickly duck under the roof line of the vehicle.
3            The man leaned into the passenger compartment,
4            then quickly turned and began to briskly walk away
5            from the dark vehicle.
6                       "P.O. Heaggan-Brown stated that the
7            heavyset black male's actions were indicative of
8            someone secreting drugs or weapons inside of the
9            vehicle and preparing to run from the police.
10           P.O. Heaggan-Brown suspected the black male could
11           be alerting other drug dealers that the police
12           were nearby.  Heaggan-Brown added that he, Malafa,
13           and Voden were often involved in foot pursuits
14           with people who behaved in the same manner that
15           the heavyset black male behaved.  P.O.
16           Heaggan-Brown stated that he expected the heavyset
17           black male to run from the officers.
18                       "P.O. Heaggan-Brown proceeded through
19           the intersection of North 44th Street and Auer and
20           tried to approach the dark vehicle and the
21           heavyset black male quickly in the hopes they
22           could reach him before he ran away from them.
23                       "Heaggan-Brown believed he activated
24           the emergency red and blue lights of his squad car
25           and pulled alongside the dark vehicle.  He parked

```
 1          the squad approximately three feet to the west of
 2          the dark vehicle and had the front of his squad a
 3          few feet in front of the front of the dark
 4          vehicle.  P.O. Heaggan-Brown noted that he left
 5          room for the dark vehicle to pull away and he did
 6          not block it in.
 7                    "Heaggan-Brown stated as he pulled
 8          alongside of the dark vehicle, he saw that someone
 9          was seated in the driver seat.  Heaggan-Brown knew
10          that Malafa and Voden stopped their squad car
11          behind his squad.  P.O. Heaggan-Brown tapped his
12          body camera to activate it as he exited his squad
13          car.  He moved quickly to the front of his squad
14          car and turned to the east and heard P.O. Malafa
15          yell, quote, He's running, end quote, and heard a
16          car door slam to the south of his location at the
17          front of the squad.  P.O. Heaggan-Brown stated
18          that he believed someone hit the emergency on
19          their radio at this time."
20     Q    Now, if I could stop you just briefly.  Go ahead
21          and take a drink.
22     A    Thanks.
23     Q    At this time in your interview with Officer
24          Heaggan-Brown, did he indicate that he had drawn
25          his weapon at the time that he got out of his
```

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 29 of 43   Document 50-14
SM 004360

| | | |
|---|---|---|
| 1 | | vehicle? |
| 2 | A | No. |
| 3 | Q | Thank you.  Please continue. |
| 4 | A | "P.O. Heaggan-Brown stated as he was crossing the |
| 5 | | front of his squad car, he saw a black male run |
| 6 | | north between his squad car and the dark vehicle. |
| 7 | | P.O. Heaggan-Brown described the black male as |
| 8 | | having a caramel complexion, braided hair, and a |
| 9 | | thin build." |
| 10 | Q | If I can stop you at this moment as well. |
| 11 | | Throughout this report there is the description of |
| 12 | | individuals as black male, as heavyset black male. |
| 13 | | Are we making a distinction at this point in time; |
| 14 | | is he talking about a separate individual? |
| 15 | A | Yes. |
| 16 | Q | And just since this description is used throughout |
| 17 | | the remainder of the report, can you explain when |
| 18 | | you're writing down this description, are you |
| 19 | | intending to depersonalize or dehumanize Sylville |
| 20 | | Smith in this report, or explain why that |
| 21 | | terminology is used throughout this report. |
| 22 | A | Certainly.  I'm -- I'm in no way trying to |
| 23 | | dehumanize anyone.  What I was trying to do was |
| 24 | | ensure that whoever looks at and reads this report |
| 25 | | knows exactly who's being talked about.  I'm -- I |

29

SMITH004361

```
 1            refer to P.O. Heaggan-Brown probably 100 times in
 2            this report, and it's actually very repetitive and
 3            I normally wouldn't write that way, but I want to
 4            make sure that that reader knows that if it's P.O.
 5            Heaggan-Brown saying something, that that's who's
 6            saying it.  The same with I mention Malafa and
 7            everyone else.  I'm very specific how I mention
 8            them.  How P.O. Heaggan-Brown was familiar with
 9            this person in terms of this incident was his
10            description of him as being the black male that he
11            pursued, or the black male with the caramel
12            complexion that had braids.  At no time did he say
13            the person's name.  So for me to specify as you
14            read this report, to know which person everyone's
15            talking about, that's how I refer to it.  So no,
16            in no way am I trying to dehumanize anyone.
17    Q     Thank you.  Please continue if you remember where
18            you left off.  I believe it was after the first
19            sentence in Paragraph 4.
20    A     Okay.  "P.O. Heaggan-Brown described the black
21            male as having a caramel complexion, braided hair,
22            and thin build.  P.O. Heaggan-Brown stated the
23            black male ran north, then cut to the east towards
24            the sidewalk on the east side of North 44th
25            Street.  P.O. Heaggan-Brown stated that he ran
```

30

after the black male and as he drew closer, he
began to bring his taser out of its holster.  P.O.
Heaggan-Brown stated before he could get the taser
out of the holster, he heard P.O. Malafa yell from
behind him, quote, He has a gun, end quote.  P.O.
Heaggan-Brown pushed the taser back into the
holster and made sure it clicked indicating that
it was locked in the holster.  P.O. Heaggan-Brown
stated that he continued to pursue the black male
and pulled his pistol from the holster.

      "P.O. Heaggan-Brown believed that P.O.
Malafa broadcast the description of the foot
pursuit of the black male.  P.O. Heaggan-Brown
stated that the black male continued to cut east
and run toward the gangway between 3218 North 44th
Street and the house directly south.  P.O.
Heaggan-Brown noted that he was gaining ground on
the black male and was approximately six or seven
feet behind and to the west of the black male.
P.O. Heaggan-Brown continued to gain on the black
male as the black male came to the gate of a
fence.  P.O. Heaggan-Brown was yelling at the
black male but could not remember what he was
saying to him.  P.O. Heaggan-Brown began to slow
down and was trying to stop his momentum towards

```
1          the black male.

2                    "P.O. Heaggan-Brown stated that the

3          black male was stopped at the gate and did not

4          jump over the fence.  P.O. Heaggan-Brown stated

5          that the top of the fence was even with the black

6          male's chest.  P.O. Heaggan-Brown stated that P.O.

7          Malafa was positioned to the southwest of him and

8          he screamed, quote, Drop the gun, end quote.  P.O.

9          Heaggan-Brown stated the black male had his back

10         to him, and his hands were resting on top of the

11         fence.  P.O. Heaggan-Brown stated at this point he

12         could see the extended magazine of the pistol

13         protruding from the bottom of the black male's

14         right hand.  P.O. Heaggan-Brown stated that he

15         could see also the slide of the pistol protruding

16         from the top of the black male's right hand.  P.O.

17         Heaggan-Brown thought to himself that the black

18         male could have easily hopped the fence and

19         continued running if he would have dropped the gun

20         and emptied his right hand.

21                    "P.O. Heaggan-Brown stated that P.O.

22         Malafa was on his right side and screamed, quote,

23         Drop the gun, put your hands up, end quote.  P.O.

24         Heaggan-Brown stated the black male turned his

25         head to the right and looked at P.O.
```

                                      32

SM504364

1   Heaggan-Brown.  P.O. Heaggan-Brown noted the black
2   male had a strange look on his face which reminded
3   him of numerous interviews he conducted of people
4   who were under the influence of drugs.  P.O.
5   Heaggan-Brown stated that it seemed to him that
6   P.O. Malafa's commands to the black male to drop
7   the gun were not registering.
8           "P.O. Heaggan-Brown stated as the black
9   male turned his head and looked at P.O.
10  Heaggan-Brown, the black male's torso also moved
11  to the right in Heaggan-Brown's direction.
12  Heaggan-Brown believed the black male's right hand
13  was still holding the pistol and it was following
14  the same path as the male's head and torso,
15  towards P.O. Heaggan-Brown.
16          "P.O. Heaggan-Brown stated that he saw
17  the black male's right arm was bent at the elbow
18  and the pistol was at the black male's chest
19  level.  P.O. Heaggan-Brown thought that the black
20  male was going to shoot him and P.O. Malafa since
21  he did not put the gun down and continued to run
22  but instead turns -- turned towards them with the
23  gun in his hand.  P.O. Heaggan-Brown feared that
24  he or Officer Malafa would be killed or seriously
25  injured if the black male fired the gun at them.

33

```
 1          P.O. Heaggan-Brown was approximately four to five

 2          feet from the black male when he raised his duty

 3          weapon and he fired it one time at the black

 4          male's torso.

 5                    P.O. Heaggan-Brown stated that he aimed

 6          at the black male's torso, or center mass, adding

 7          that the black male had an extended magazine on

 8          his weapon and was armed with more ammunition than

 9          P.O. Heaggan-Brown.  P.O. Heaggan-Brown stated

10          that he has never received training to shoot guns

11          out of people's hands or to shoot them in the arm

12          or leg.  P.O. Heaggan-Brown further added that to

13          do so probably would not have kept the black male

14          from firing his weapon.  P.O. Heaggan-Brown's

15          intention when he fired his duty weapon at the

16          black male was to stop his actions and prevent him

17          from shooting him and P.O. Malafa.  P.O.

18          Heaggan-Brown stated that there was no one

19          standing behind the black male when P.O.

20          Heaggan-Brown fired his duty weapon at the black

21          male.

22                    "P.O. Heaggan-Brown stated after he

23          fired his weapon the black male fell onto the

24          fence, and he believed the black male threw the

25          pistol over the fence with his right hand.  The
```

34

black male stumbled and fell to the ground in a
supine position. P.O. Heaggan-Brown stated that
he was screaming for the black male to show his
hands but the black male moved his right hand
towards his waistband while still looking at P.O.
Heaggan-Brown. P.O. Heaggan-Brown feared that the
black male was reaching for a second gun hidden in
his waistband and he feared that the black male
would use it to shoot him or P.O. Malafa. P.O.
Heaggan-Brown stated that he fired his duty weapon
again at the black male's chest or center mass.

"P.O. Heaggan-Brown believed that the
amount of time that elapsed between his first and
second shots was less than three seconds.

"P.O. Heaggan-Brown stated after the
second shot, the black male laid his hands on the
ground by his sides. P.O. Heaggan-Brown stated
the black male was lying near a bee hive and his
face was getting covered by bees, so P.O.
Heaggan-Brown pulled him away from the bees.
Heaggan-Brown checked the black male's vital signs
and was unable to feel a pulse, so without waiting
for gloves, he began performing CPR on the black
male. P.O. Heaggan-Brown stated that he got stung
four or five times by bees so he yelled for

35

```
 1        someone else to continue CPR.  P.O. Heaggan-Brown
 2        rose from the black male's side and saw a lady
 3        walking to the back door of the house carrying
 4        bags of groceries.  P.O. Heaggan-Brown knew the
 5        pistol was lying in the backyard near where she
 6        was standing, so he yelled for her to get inside
 7        her house.  P.O. Heaggan-Brown then stated he told
 8        P.O. Malafa to go stand by the pistol the black
 9        male threw in the backyard.
10              "P.O. Heaggan-Brown radioed for medical
11        assistance for the black male and was standing in
12        the gangway when P.O. Tetzloff approached him and
13        walked him away from the scene to Tetzloff's
14        squad.  P.O. Heaggan-Brown stayed there until he
15        was approached by Sergeant Pratchet, who escorted
16        him to Sergeant Pratchet's squad car.  P.O.
17        Heaggan-Brown gave Sergeant Pratchet a public
18        safety statement.
19              "P.O. Heaggan-Brown stated that he had
20        no previous contacts with the dark vehicle.  P.O.
21        Heaggan-Brown added that he did not know the black
22        male, and did not remember any previous contacts
23        with him.  Prior to this incident, P.O. Brown" --
24        I'm sorry -- "P.O. Heaggan-Brown stated that he
25        had not been involved in any other
```

36

SM504368

```
 1            officer-involved shootings."
 2      Q     And just stop right at the moment.  In those last
 3            three paragraphs, did Officer Heaggan-Brown ever
 4            indicate to you to your recollection whether he
 5            had ever patted Mr. Sylville Smith down or whether
 6            he had ever handcuffed him?
 7      A     No.
 8      Q     Thank you.
 9      A     "P.O. Heaggan-Brown had no further information
10            regarding this incident.  This interview was
11            completed at 1:04 p.m."
12      Q     And again, to the best of your recollection, so
13            it's about a two-hour period, it's obviously the
14            summary of this discussion is -- is shorter than
15            two hours, but this is -- this is in the context
16            of asking questions and allowing time for you to
17            make notes, and were there any breaks that were
18            taken that you recall?
19      A     If there were, I don't recall, and if there were,
20            they weren't for very long.
21      Q     And again, you had the opportunity to summarize
22            that, show that to Officer Heaggan-Brown, and he
23            had no additions or corrections to the information
24            that you've just provided?
25      A     None.
```

37

```
 1                    MR. CHISHOLM:  Thank you.  I have no
 2          other questions at this time.
 3                    THE COURT:  Cross-examination.
 4                    MR. SMITH:  Just briefly.
 5                    CROSS-EXAMINATION
 6   BY MR. SMITH:
 7   Q    Good morning, Agent Gibbs.
 8   A    Good morning, sir.
 9   Q    This statement took place on August the 15th of
10        2016; is that correct?
11   A    That's correct.
12   Q    Two days after the event?
13   A    That's correct.
14   Q    And you had mentioned that the day prior to that,
15        on the 14th, that you had met with Officer Voden
16        and Officer Voden's attorneys; is that correct?
17   A    That's correct.
18   Q    And those attorneys were Attorneys Matthews and
19        Schwartz; is that right?
20   A    Yes, sir, they were.
21   Q    And as you understand it, those attorneys were
22        provided to the police officers, both Voden and
23        Heaggan-Brown, by the police union, correct?
24   A    I believe so.
25   Q    You did play the video twice for the attorneys,
```

38

```
1            correct?

2     A      That's correct.

3     Q      Each video twice for the attorneys, right?

4     A      Yes, sir.

5     Q      But that video was not shown to Mr. Heaggan-Brown

6            prior to him giving his statement?

7     A      It was not.

8     Q      With respect to the giving and the recording of

9            the statement, whether it was or was not, it was

10           the union lawyers, Attorneys Matthews and

11           Schwartz, that had indicated that they did not

12           want that statement recorded pursuant to their

13           practice concerning their union representation,

14           true?

15    A      That's correct.

16    Q      And finally, Mr. Heaggan-Brown answered your

17           questions that you posed to him, correct?

18    A      Yes, he did.

19    Q      And he was cooperative with you, true?

20    A      Yes, he was.

21                   MR. SMITH:  Nothing further.

22                   THE COURT:  Redirect, please.

23                   MR. CHISHOLM:  Just briefly.

24                   **REDIRECT EXAMINATION**

25    BY MR. CHISHOLM:
```

39

```
 1    Q      In your experience as a City of Milwaukee homicide
 2           detective, as a lieutenant who was responsible for
 3           homicide investigations, is it a routine practice
 4           to allow suspects in a homicide to review evidence
 5           from the police department, that the police
 6           department's collected prior to allowing them or
 7           having them make a statement?
 8    A      No.
 9    Q      And so this is -- this is an exception to that
10           practice in the context of an officer-involved
11           shooting?
12    A      Yes.
13                   MR. CHISHOLM:  I don't have any other
14           questions.  Thank you.
15                   THE COURT:  Anything else?
16                   MR. SMITH:  Nothing.
17                   THE COURT:  All right.  Thank you.  You
18           may step down.
19                   (Witness excused.)
20                   THE COURT:  Next witness.
21                   MR. LINDSAY:  Your Honor, the State's
22           next witness will be Dr. Jessica Lelinski.  Prior
23           to calling that witness, the State would move into
24           evidence Exhibit No. 73 which is a stipulation
25           signed by Mr. Chisholm, Mr. Smith, and
```

40

SMITH004372

```
 1          Mr. Heaggan-Brown.  That stipulation reads as

 2          follows:  "The State of Wisconsin, by District

 3          Attorney John T. Chisholm, and the defendant,

 4          personally and by his attorney, Jonathan Smith,

 5          hereby agree and stipulate that at or about 5 p.m.

 6          on August 13th, 2016, Forensic Investigator

 7          Crystal Green, an employee of the Milwaukee County

 8          Medical Examiner's Office, arrived at 3216 North

 9          44th Street in the city and county of Milwaukee.

10          There she examined the condition and took custody

11          of the body of the decedent, Sylville K. Smith.

12          Investigator Green facilitated the Milwaukee Fire

13          Department med unit's transportation of

14          Mr. Smith's body to the medical examiner's office.

15          The Milwaukee Fire Department's med unit was

16          escorted by the Wisconsin Department of Justice

17          Division of Criminal Investigation and arrived at

18          the medical examiner's office in the same

19          condition."

20                  Dated today and signed by Mr. Chisholm,

21          Mr. Smith, and Mr. Heaggan-Brown.

22                  THE COURT:  All right.  And is the

23          defense in agreement with this?

24                  MR. SMITH:  Yes, sir.

25                  THE COURT:  All right.  Ladies and
```

41

```
 1          gentlemen, this is agreed facts -- excuse me, and
 2          you're to view those facts as conclusively proved.
 3                    MR. CHISHOLM:  I'm sorry, just one
 4          cleanup matter, Your Honor, and that would be if I
 5          could move for Exhibit --
 6                    THE COURT:  53?
 7                    MR. CHISHOLM:  -- 53.
 8                    THE COURT:  Any objection?
 9                    MR. SMITH:  No.
10                    MR. CHISHOLM:  Thank you.
11                    (Exhibit 53 was received.)
12                    THE COURT:  Tanyia, now you get it.
13                    THE CLERK:  Thank you.
14                    THE COURT:  Is Dr. Lelinski ready to
15          go?
16                    MR. LINDSAY:  Dr. Lelinski is ready to
17          go and I call her to the stand.
18                    THE COURT:  All right.  Raise your
19          right hand.
20                    **JESSICA LELINSKI, M.D.**, called as a
21          witness herein, being first duly sworn, was
22          examined and testified as follows:
23                    THE COURT:  Have a seat, please.  Tell
24          us your name; spell your first and last name.
25                    THE WITNESS:  Jessica Lelinski,
```

42

Case 2:17-cv-00862-LA   Filed 06/14/19   Page 43 of 43   Document 44-4004374