IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| The ESTATE of SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf. | ) ) ) ) | No. 2:17 cv 862-LA |
| | ) | Hon. Lynn Adelman, presiding |
| Plaintiffs, | ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED |
| CITY OF MILWAUKEE, WISCONSIN AND DOMINIQUE HEAGGAN-BROWN, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT HEAGGAN-BROWN
AND DEFENDANT CITY OF MILWAUKEE'S SUMMARY JUDGMENT MOTION**

David B. Owens
Danielle Hamilton
LOEVY & LOEVY
311 N. Aberdeen St., Ste. 300
Chicago, IL 60607
(312) 243-5900
hamilton@loevy.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION ........................................................................1

UNDISPUTED FACTS PRECLUDING SUMMARY JUDGMENT ...........................................3

ARGUMENT ..............................................................................3

I.    Plaintiff's Facts Must Be Accepted and All Reasonable Inferences From the Evidence Must Be Made In Their Favor ................................................................3

II.   Summary Judgment Is Particularly Inappropriate in a Deadly Force Case Where the Victim of That Force Is Deceased ................................................................4

III.  Officer Heaggan-Brown's Use of Deadly Force was Unconstitutional........................7

    A. Deadly Force is Not Justified Without a Significant, Imminent Threat of Death or Serious Bodily Harm ...............................................................7

    B. Heaggen-Brown Unnecessarily Escalated the Situation By Jumping Out of His Car, Gun Drawn ....................................................................10

    C. The First Shot Was Unjustified .......................................................12

        1. Heaggan-Brown Cannot Obtain Summary Judgment for Shooting a Fleeing Individual ...............................................................13

        2. Heaggan-Brown Cannot Obtain Summary Judgment for Shooting an Individual Just Because Smith Had a Firearm........................................15

    D. The Second Lethal Shot Was Unjustified ............................................19

    E. The Second Shot Shocks The Conscience ...........................................23

    F. Defendants' Alternative Factual Scenarios Must Be Presented To A Jury, and Otherwise Do Not Support Defendants' Position ..................................25

        1. Dispute Concerning Whether Smith Reached for his Waistband Contrary to Commands .........................................................26

        2. Dispute Concerning Whether Smith Had a Second Weapon.................27

    G. The Cases Cited By Defendants Are Inapposite ....................................31

i

**IV.** Defendant Heaggan-Brown Is Not Entitled To Qualified Immunity...........................34
   **A.** Legal Standard .................................................................................................34

   **B.** In The Context Here, The Right to Free from Excessive Deadly Force was Clearly Established ........................................................................................................35

   **C.** At Minimum, Factual Disputes Concerning The Incident Preclude Summary Judgment on Qualified Immunity Grounds As Well ...............................................38

   **D.** Heaggan-Brown's Arguments to the Contrary Fail ...............................................40

**V.** A Trial Is Necessary On Plaintiffs' *Monell* Theories ...................................................41

   **A.** Trial On Plaintiffs' *Monell* Claim Is Not Obviated Even In The Event Of Officer Heaggan-Brown's Qualified Immunity or Non-Liability .....................................42

   **B.** A Reasonable Jury Could Find That Milwaukee's Failure to Train, Supervise, and Discipline Caused Heaggan-Brown's Excessive Use of Force ...................................................................................................................45

**VI.** A Trial Is Necessary On Plaintiffs' State-Law Claims................................................47

CONCLUSION.......................................................................................................................47

ii

# TABLE OF AUTHORITIES

*A.D. v. Ca. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) ...........................................................25

*Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706 (7th Cir. 2013) ...............................8, 11, 22, 37, 38

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ........................................4, 5, 6, 22, 40

*Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999) ........................................................................9, 29

*Adickes v. S.H. Kress & Co*., 398 U.S. 144 (1970) ........................................................................3

*Anderson v. Creighton*, 483 U.S. 635 (1987) ..................................................................34, 35, 36

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 242 (1986) ....................................................................3

*Ashcroft v. al–Kidd*, 563 U.S. 731 (2011) ...................................................................................35

*Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) .......................................................................10

*Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481 (5th Cir. 2001) .............................................29

*Becker v. Elfreich*, 821 F.3d 920 (7th Cir. 2016) .........................................................................37

*Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788 (7th Cir.1989)............................45

*Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007) ...................................................................10

*Breithaupt v. Abram*, 352 U.S. 432 (1957) ...................................................................................24

*Bridges v. Wilson,* 718 F. App'x 636 (10th Cir. 2017)...................................................................29

*Brosseau v. Haugen*, 543 U.S. 194 (2004) ...............................................................................3, 31

*Brown v. City of Milwaukee*, 288 F. Supp. 2d 962 (E.D. Wis. 2003) ............................................9

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) .......................................................................47

*Canton v. Harris*, 489 U.S. 378 (1989)........................................................................................41

*Carter v. Tennant Co.*, 383 F.3d 673 (7th Cir. 2004) ...................................................................45

*Castro v. Devry University, Inc.*, 786 F.3d 559 (7th Cir. 2015) .....................................................6

*Catlin v. City of Wheaton*, 574 F.3d 361 (7th Cir. 2009).................................................................5

*Cf. United States v. Lomprez*, 472 F.2d 860 (7th Cir. 1972) ........................................................30

iii

*City of Los Angeles v. Heller,* 475 U.S. 796 (1986).................................................................42

*Conley-Eaglebear v. Miller*, 2017 WL 7116973 (7th Cir. Sept. 26, 2017) .............................33, 34

*Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013) ..........................................................9

*Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005)..........................................................37

*Cruz v. City of Anaheim*,765 F.3d 1076 (9th Cir. 2014)....................................................6

*Curnow v. Ridgecrest Police,* 952 F.2d 321 (9th Cir. 1991) ...............................................16

*Cyrus v. Town of Mukowonago,* 624 F.3d 856 (7th Cir. 2010) .............................................5

*Deering v. Reich*, 183 F.3d at 650 (7th Cir.1999) ..........................................................9

*DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008 (7th Cir. 2006)................................................31

*DeShaney v. Winnebago County Dept. of Social Serv.*, 489 U.S. 189 (1989) .............................23

*Devereaux* v. *Abbey*, 263 F.3d 1070 (9th Cir. 2001) .......................................................35

*Dixon v. Cook County*, 819 F.3d 343 (7th Cir. 2016)........................................................41

*Dockery v. Blackburn*, 911 F.3d 458 (7th Cir. 2018) ........................................................9

*Doerle v. Rutherford,* 272 F.3d 1272 (9th Cir. 2001) ......................................................18

*Dufour-Dowell v. Cogger*, 152 F.3d 678 (7th Cir. 1998) ....................................................39

*E.E.O.C. v. United Parcel Serv.*, 94 F.3d 314 (7th Cir. 1996) ...............................................3

*Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012) .......................................................24

*Estate of Brown v. Thomas,* 7 F.Supp.3d 906, 914, 2014 WL 1053320 (E.D. Wis. 2014) ...........11

*Estate of DiPiazza v. City of Madison*, 2017 WL 1337313, at *7 (W.D. Wis. Apr. 11, 2017) ....19

*Estate of Heenan ex rel. Heenan v. City of Madison*, 111 F. Supp. 3d 929 (W.D. Wis. 2015) ......8

*Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993) ....................................................11

*Flythe v. District of Columbia*, 791 F.3d 13 (D.C. Cir. 2015) ................................................6

*Frazell v. Flanigan*, 102 F.3d 877 (7th Cir. 1996) ..........................................................6

iv

*Gonzalez v. City of Elgin*, 578 F.3d 526 (7th Cir. 2009) ...............................................39

*Gooden v. Howard County, Md.*, 954 F.2d 960 (4th Cir. 1992) .........................................30

*Graham v. Connor*, 490 U.S. 286 (1989) .......................................................................7

*Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008)..............................................5

*Gutierrez v. Kermon*, 722 F.3d 1003 (7th Cir. 2013) .....................................................39

*Harris v. Clark*, 2009 WL 2408724, (E.D. Wis. July 31, 2009) .......................................19

*Harris v. Roderick,* 126 F.3d 1189 (9th Cir. 1997) .........................................................9

*Heenan v. Madison*, 111 F.Supp.3d 929 (W.D. Wis. 2015) ...........................................47

*Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998).................................3

*Henning v. O'Leary*, 2006 WL 995223 (W.D. Wis. Apr. 14, 2006) ...............................8

*Hernandez v. City of Goshen, Indiana*, 324 F.3d 535 (7th Cir. 2003) ...........................25

*Hope v. Pelzer*, 536 U.S. 730 (2002)........................................................................35, 41

*Horton v. Pobjecky*, 883 F.3d 94 (7th Cir. 2018) ..........................................................33

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) ...........................................8, 10

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) .............................................24

*Ledbetter v. Good Samaritan Ministries*, 777 F.3d 955 (7th Cir. 2015).........................47

*Liebenstein v. Crowe*, 826 F. Supp. 1174 (E.D. Wis. 1992)...........................................7

*Marshbanks v. City of Calumet City*, 2015 WL 1234930 (N.D. Ill. Mar. 16, 2015) ...................43

*McAllister v. Price*, 615 F.3d 877 (7th Cir. 2010) .........................................................39

*McDonald v. Chicago*, 561 U.S. 742 (2010) ...............................................................15

*McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992) .....................................................10

*Mercado v. City of Orlando,* 407 F.3d 1152 (11th Cir. 2005).........................................36

*Miller v. Gonzalez*, 761 F.3d 822 (7th Cir. 2014).........................................................38

Case 2:17-cv-00862-LA   Filed 06/16/19   Page 6 of 56   Document 55

*Monterey v. Del Monte Dunes*, 526 U.S. 687 (1999) ........................................................44

*Mordi v. Zeigler*, 770 F.3d 1161 (7th Cir. 2014) ...........................................................41

*Murrell v. Frank*, 332 F.3d 1102 (7th Cir. 2003) ............................................................6

*Omdahl v. Lindholm,* 170 F.3d 730 (7th Cir. 1999) ......................................................39

*Owen v. City of Independence*, 445 U.S. 622 (1980)......................................................44

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003)...............................................................4

*Pearson v. Callahan*, 555 U.S. 223 (2009) ...................................................................38

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016).....................................................9

*Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012) ..............................................5

*Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994) ............................................................5

*Robinson v. Solano County,* 278 F.3d 1007 (9th Cir. 2002)............................................10

*Rochin v. California*, 342 U.S. 165 (1952) ....................................................................23

*Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847 (7th Cir. 2016) ........3

*Safford Unified School Dist. #1 v. Redding*, 129 S.Ct. 2633 (2009) ...............................43

*Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007) ....................................................7, 18

*Sallie v. Thiel*, 23 F. App'x 586 (7th Cir. 2001) ............................................................5

*Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002) ..............................................................4

*Saucier v. Katz*, 533 U.S. 194 (2001) ..........................................................................31

*Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014) .....................11

*Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) .............................................................8

*Starks v. City of Waukegan, et al.*, 5 F.3d 230 (2013) ...................................................11

*Steen v. Myers,* 486 F.3d 1017 (7th Cir. 2007) .............................................................25

*Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018)......................................................8, 11

Case 2:17-cv-00862-LA   Filed 06/16/19   Page 7 of 56   Document 55

*Swanigan v. City of Chicago,* 775 F.3d 953 (7th Cir.2015) ........................................................42

*Tennessee v. Garner,* 471 U.S. 1 (1985) ...........................................................................................7

*Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293 (7th Cir.2010) ..........................................42

*Thomas v. Great Atl. & Pac. Tea Co.,* 233 F.3d 326 (5th Cir. 2000)...........................................30

*Tolan v. Cotton,* 134 S. Ct. 1861 (2014)...........................................................................................3

*Tolliver v. City of Chicago,* 820 F.3d 237 (7th Cir. 2016) ............................................................8

*Tom v. Voida,* 963 F.2d 952 (7th Cir. 1992) ....................................................................................9

*Tun v. Whitticker,* 398 F.3d 899 (7th Cir. 2005)..........................................................................24

*Turner v. Rataczak,* 28 F.Supp.3d 818 (W.D. Wis. 2014) .............................................................5

*United States v. Hackett,* 638 F.2d 1179 (9th Cir. 1980) ............................................................30

*United States v. Lanier,* 520 U.S. 259 (1997)................................................................................35

*Walker v. City of Orem,* 451 F.3d 1139 (10th Cir. 2006) ......................................................10, 18

*Wehrs v. Wells,* 688 F.3d 886 (7th Cir. 2012) ...............................................................................45

*Weinman v. McClone,* 787 F.3d 444 (7th Cir 2015) .......................................................4, 9, 18, 39

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012) ............................................................35

*Wolff v. McDonnell,* 418 U.S. 539 (1974) ......................................................................................23

*Wyatt v. Cole,* 504 U.S. 158 (1992) ................................................................................................44

*Ellis v. Wynalda,* 999 F.2d 247*(1993)* ..........................................................................................37

*Zaya v. Sood,* 836 F.3d 800 (7th Cir. 2016)......................................................................................3

*Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017) .......................................................................................35

Case 2:17-cv-00862-LA   Filed 06/16/19   Page 8 of 56   Document 55

## INTRODUCTION

This is not a summary judgment case. On August 13, 2016, Sylville Smith was shot and killed by then-Milwaukee Police Officer Dominique Heaggan-Brown.[1] On that day, Heaggan-Brown—an already aggressive officer working an overtime shift where he was encouraged to act aggressively—was looking to chase a suspect. He settled on car allegedly parked a couple inches too far from the curb, where Sylville Smith occupied the driver's seat. Though Smith committed no crime and there was no probable cause to suspect him of even a misdemeanor, let alone a violent felony, Defendant Heaggan-Brown jumped out of his car with his weapon drawn, an unnecessarily escalation and precursor to his uses of deadly force. When Smith took off running, Heaggan-Brown followed and cornered Smith in a gangway where he had no ability to escape and presented no threat to anyone. Heaggan-Brown then shot Smith in the arm as Smith threw a firearm over a fence and far away from himself and Heaggan-Brown. Having been shot, Smith fell hard to the ground and landed on his back with his hands near his head. Heaggan-Brown re-positioned himself as a result of the fall, and then stood over Smith—who was unarmed and incapacitated—took aim, and shot Smith a second time. This shot killed Sylville Smith.

Heaggan-Brown's disregard for Smith's life is palpable. While Smith was lying on the ground, writing in pain, and taking in the last breaths of his life, Heaggan-Brown complained of, and even joked about, being stung by a bee. That second, fatal shot was so shocking Heaggan-Brown was actually charged with murder, a rarity for officers who use deadly force. The disregard for the unconscionable end to Smith's life continues with the Defendants' motion.

Sylville Smith's parents, Mildred Haynes and Patrick Smith, bring this suit to hold Defendants Heaggan-Brown and the City of Milwaukee accountable for killing their son and to

---

[1] Heaggan-Brown was fired from the MPD and pleaded guilty to sexual misconduct, including acts committed the day after he killed Smith. Plaintiffs' Statement of Facts (PSOF), ¶¶ 85-86.

1

vindicate his constitutional rights. Defendants' summary judgment motion contains lengthy and abstract recitations of the legal standards applicable to summary judgment and qualified immunity, but provides little explanation of why they are entitled to either qualified immunity or otherwise to judgment as a matter of law. What little argument Defendants make presumes Heaggan-Brown's version of events, which is implausible, internally inconsistent, and contradicted by other evidence. The Court cannot credit such an account at this stage, and particularly given that Smith cannot testify.

Importantly, this tragedy could have been prevented. Plaintiffs maintain that the Milwaukee Police Department ignored obvious red flags in making Heaggan-Brown an officer in the first place, knowing before he was hired that he displayed poor judgment and decision-making skills and exhibited aggressive behavior that should be monitored. But, they did not heed this warning. In his three short years as an MPD officer, Heaggan-Brown was subject to a dizzying array of complaints and internal affairs reviews, identified as an outlier for excessive uses of force, and placed in the Department's Early Intervention Program. Yet he was never meaningfully trained, supervised, or disciplined for his numerous misdeeds. To this day, the City of Milwaukee refuses to acknowledge that Heaggan-Brown's killing of Sylville Smith was problematic in any way, a sign of its continued deliberate indifference to the systemic failures within its customs, practices, and policies that were the moving force behind Heaggan-Brown's opportunity and decision to fatally shoot Sylville Smith.

There are deep, contentious disputes at the core of this suit. But they cannot be decided at summary judgment; the task must be left to the jury. Defendants' motion should be denied.

2

# UNDISPUTED FACTS PRECLUDING SUMMARY JUDGMENT

Given Defendants' failure to present the facts of this case in the light most favorable to Plaintiffs, Plaintiffs have set out in detail the version of events, which control at this juncture and are incorporated by reference. *See* Dkt. 51, Plaintiffs' Statement of Facts ("PSOF").

# ARGUMENT

## VII.     Plaintiff's Facts Must Be Accepted and All Reasonable Inferences From the Evidence Must Be Made In Their Favor

Rule 56's familiar standard provides that summary judgment is only warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Zaya v. Sood*, 836 F.3d 800 (7th Cir. 2016). To do so, the court does not make credibility determinations. *E.E.O.C. v. United Parcel Serv.*, 94 F.3d 314, 319 (7th Cir. 1996). A court must view the evidence '"in the light most favorable to the opposing party."' *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

This Rule also requires the Court to "construe all inferences in favor of the party against whom the motion under consideration is made." *Rupcich v. United Food & Commercial Workers Int'l Union*, 833 F.3d 847, 853 (7th Cir. 2016) (quoting *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

These rules apply even where officers invoke the defense of qualified immunity. In *Tolan v. Cotton*, the Supreme Court explained that under either immunity prong, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." 134 S. Ct. at 1866 (citing *Brosseau v. Haugen*, 543 U.S. 194, 195 n. 2 (2004)). There, the Court emphasized the "importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly established prong of the [qualified immunity] standard." *Id. Tolan* dealt with an

3

excessive force claim and reversed the grant of summary judgment because the Fifth Circuit had "failed to view the evidence at summary judgment in the light most favorable to Tolan with respect to the central facts" of the case. *Id.*

Accordingly, for present purposes the truth of Plaintiffs' well-supported material facts must be assumed. Then, the Court asks whether—on *those* facts—Heaggan-Brown or the City of Milwaukee are entitled to judgment as a matter of law. *See, e.g., Weinmann v. McClone,* 787 F.3d 444, 449 (7th Cir. 2015) ("Our task is to determine, under [Plaintiff's] version of the facts, if [the Defendant Officer] was objectively reasonable in his belief that his life was in danger."); *see also Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (must assume non-movant's facts in assessing summary judgment motion).

Defendants' arguments for summary judgment depend on crediting their own version of events—even though they well know that many of the core facts are hotly disputed. Defendants further ignore and misconstrue the federal constitutional standards that apply in this case. Properly construed, the record unambiguously supports each of Plaintiffs' claims. The disputed facts cannot be resolved by this Court. A jury trial is necessary.

## VIII.   Summary Judgment Is Particularly Inappropriate in a Deadly Force Case Where the Victim of That Force Is Deceased

The Seventh Circuit has directed that summary judgment be used sparingly in excessive force cases where, as here, the parties' versions of the facts differ sharply. *See Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (holding that "since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002))). Courts consistently adhere to this rule. *See, e.g.*, *Phillips v.*

4

*Cmty. Ins. Corp.*, 678 F.3d 513, 520 n. 4 (7th Cir. 2012) ("We certainly agree that summary judgment is frequently inappropriate in excessive force cases."); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (quoting the *Abdullahi* passage above and explaining: the "*reason that summary judgment is often inappropriate in excessive force cases is that the parties typically tell different stories about what happened*") (emphasis in original); *Turner v. Rataczak,* 28 F.Supp.3d 818 (W.D. Wis. 2014) (citing *Sallie v. Thiel*, 23 F. App'x 586, 589 (7th Cir. 2001)).

The Seventh Circuit has further held that summary judgment should be especially rare, and a request for such disposition evaluated critically, where the victim of such force is deceased. For example, *Cyrus v. Town of Mukowonago,* 624 F.3d 856 (7th Cir. 2010), reversed a grant of summary judgment because the facts were disputed. *Cyrus* explained:

> [W]e have recognized that summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations. This principle is particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify.

*Id.* at 862 (citing *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009), and *Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008)); *see also Abdullahi* 423 F.3d at 772 n.7 ("'The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify.'") (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)).

Accordingly, this Court must "examine all the evidence to determine whether the officers' story is consistent with other known facts." *Cyrus*, 624 F.3d at 862. Put differently, this Court "must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial," particularly given the fact Smith cannot provide evidence, and

5

Heaggan-Brown knows that person most likely to be able to "contradict him . . . is beyond reach." *Abdullahi*, 423 F.3d at 772 n.7.

Indeed, other Circuits have recognized the significance of the situation presented in the context of cases like this and , "every circuit to have confronted this situation," *Flythe v. District of Columbia*, 791 F.3d 13, 18-82 (D.C. Cir. 2015) (citations omitted), requires a critical examination of the officer's account versus other evidence. As the Ninth Circuit has explained:

> Nobody likes a game of 'he said, she said,' but far worse is the game of 'we said, he's dead.' Sadly, this is too often what we face in police shooting cases like this one. . . . . But in the deadly force context, we cannot simply accept what may be a self-serving account by the police officer. Because the person most likely to rebut the officers' version of events—the one killed—can't testify, the judge must carefully examine all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts. This includes circumstantial evidence that, if believed, would tend to discredit the police officer's story.

*Cruz v. City of Anaheim*,765 F.3d 1076, 1077-80 (9th Cir. 2014) (quotes and citations omitted)).

Finally, as noted in *Cruz*, it is important to appreciate that "inferences are often necessary when the plaintiff's sole eyewitness is dead," and keep in mind that a plaintiff may always prove her case "by circumstantial evidence where direct evidence is unavailable." *Abdullahi* 423 F.3d at 772 (citing *Murrell v. Frank*, 332 F.3d 1102, 1117 (7th Cir. 2003) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable."); *see id.* ("We have previously held that medical evidence and other circumstantial evidence can be sufficient to create triable issues of fact in excessive force cases." (citing *Frazell v. Flanigan*, 102 F.3d 877, 884 (7th Cir. 1996)); *Castro v. Devry University, Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) (nonmovant can rely upon circumstantial evidence to preclude summary judgment).

These principles apply in full to this case, where there are few objective, disinterested eyewitnesses to the shooting. Sylville Smith is not here to tell his story, and Officer Heaggan-

Brown has attempted to advance inadequate, inconsistent, and implausible rationales in an effort to justify his actions. Established law provides that the totality of other evidence must be carefully scrutinized to assess whether this matter should proceed to trial. As set forth below, because the evidence presents obvious and innumerable challenges to Heaggan-Brown's story (which is insufficient in its own right) the motion for summary judgment should be denied.

## IX. Officer Heaggan-Brown's Use of Deadly Force was Unconstitutional

### A. Deadly Force is Not Justified Without a Significant, Imminent Threat of Death or Serious Bodily Harm

In *Graham v. Connor*, 490 U.S. 286, 395 (1989), the Supreme Court articulated the general excessive-force test; where courts consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers, and whether the suspect was actively resisting or trying to escape. That test is not the one at issue here.

Instead, a narrower standard applies to Heaggan-Brown's uses of deadly force. Under *Tennessee v. Garner*, because "[t]he intrusiveness of ... deadly force is unmatched," it may *only* be used when an "officer has probable cause to believe that the suspect poses a *significant threat* of death or serious physical injury to the officer or others." 471 U.S. 1, 3, 9 (1985) (emphasis added); *see also Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) (explaining that deadly force is a subset of excessive force and "is unreasonable *unless* 'the suspect threatens the officers with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm'" (quoting *Garner*, 471 U.S. at 11); *Liebenstein v. Crowe*, 826 F. Supp. 1174, 1181 (E.D. Wis. 1992) (noting deadly force is only "permissible under certain circumstances: '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." (quoting

7

*Gardner*, 471 U.S. at 11); *Henning v. O'Leary*, 2006 WL 995223, at *4 (W.D. Wis. Apr. 14, 2006) ("Deadly force is justified *only* where the officer has probable cause to believe that the suspect poses a threat of serious physical harm. . . .") (emphasis added).

Thus the core constitutional question on the deadly-force claim is whether Smith's actions placed Heaggan-Brown "or those in those in the immediate vicinity in *imminent* danger of death or serious bodily injury." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (emphasis added); *Jacobs v. City of Chicago*, 215 F.3d 758, 774 (7th Cir. 2000) (holding an officer's use of deadly is unreasonable "absent probable cause that [a] suspect is dangerous or has committed a violent crime.") (internal citation omitted); *see also Strand v. Minchuk*, 910 F.3d 909, 917 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1629 (2019) ("[T]he record at this stage does not answer whether Strand continued to pose a threat when Minchuk fired. And this is the hurdle—the unresolved material question of fact—that Officer Minchuk cannot clear on summary judgment); *Estate of Heenan ex rel. Heenan v. City of Madison*, 111 F. Supp. 3d 929, 943 (W.D. Wis. 2015) (noting the defendants' summary judgment motion on deadly force claim "turns on whether plaintiff has come forward with sufficient evidence to create a genuine issue of material fact as to the objective reasonableness of [officer's] belief that Heenan posed an imminent danger of death or serious bodily injury to himself or others at the time he fired his weapon.").

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 396; *Tolliver v. City of Chicago*, 820 F.3d 237, 245 (7th Cir. 2016). Thus, the excessive-force inquiry is confined to the "facts and circumstances known to the officer at the time the force is applied." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013) (emphasis added). In other words, information relevant to assessing deadly force "includes information which the officer

8

had at the time of his actions, but not information uncovered later." *Deering*, 183 F.3d at 650 (7th Cir.1999) (citing *Sherrod*, 856 F.2d at 802).

When assessing whether deadly force is justified, each use of force must be independently constitutional on its own right. *Deering*, 183 F.3d at 652 (holding in determining reasonableness, "we carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."); *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (holding "[e]ach use of force must be separately justified) (citing *Deering*)); *Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992) (ruling when there are multiple uses of force, the objective reasonableness standard must be applied to each separate use).

Finally, the mere presence of a weapon—knife, gun, etc.—does not permit an officer to presume that the person poses an imminent threat of substantial bodily harm or death. *See e.g., Weinmann v. McClone*, 787 F.3d 444, 449–50 (7th Cir. 2015) (fact that plaintiff was holding a weapon was not enough to justify the use of deadly force); *see also Brown v. City of Milwaukee*, 288 F. Supp. 2d 962, 972 (E.D. Wis. 2003) (use of force unjustified when officer "had no reason to suspect that plaintiff had done anything more serious than possess a weapon"). This proposition is beyond well established. *See, e.g.*, *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit."); *Cooper v. Sheehan*, 735 F.3d 153, 158-60 (4th Cir. 2013) ("[A]n officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may only be used by a police officer when based on a reasonable assessment, the officer or another person is *threatened* with the weapon.") (citation omitted) (emphasis in original); *Harris v. Roderick,* 126 F.3d 1189, 1202 (9th Cir. 1997) (holding that possession of a weapon by a suspect

is not alone enough to justify deadly force); *Bouggess v. Mattingly*, 482 F.3d 886, 891 (6th Cir. 2007) (same); *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (same).

## B. Heaggen-Brown Unnecessarily Escalated the Situation By Jumping Out of His Car, Gun Drawn

Heaggan-Brown was not an officer who exercised good judgment. PSOF, ¶16. That bore out on August 13, 2016. That day, Heaggan-Brown, Malafa, and Voden arrived to the situation looking to get into a "foot chase," *id.* ¶¶ 21-22. That is precisely what happened. *Id.* ¶ 26. Heaggan-Brown saw a car with Michigan plates that he claims was parked a few inches too far from the curb. *Id.* ¶¶22-23. He did not see a crime in progress, let alone a crime involving any sort of violence of threat of harm to anyone. *Id.* ¶¶ 28-29, 31. Nonetheless, with at most the authority to possibly write a parking ticket,  Heaggan-Brown immediately exited his squad car and  pointed his firearm directly at Smith—a precursor to the use of deadly force that was also illustrative of Heaggan-Brown's (aggressive, force-presumptive) mindset. *Id.* ¶¶ 26-27, 32.

Heaggan-Brown's decision to draw a firearm and point it a civilian for, at most, a parking infraction is a display of force that was unreasonable and unjustified. Police officers are "not allowed to point their guns at persons who are compliant and present no threat of danger to the police." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009). The Fourth Amendment protects against this type of behavior by the police, because pointing guns at persons who have not personally exhibited danger is unreasonable. *See Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000) (unreasonable to point a gun at an individual who is not a threat); *McDonald v. Haskins*, 966 F.2d 292, 294-95 (7th Cir. 1992) (threatening to shoot someone who poses no threat to officers or the community violates the Fourth Amendment). This proposition is well established. *See*, *e.g.,*  *Robinson v. Solano County,* 278 F.3d 1007, 1015–16 (9th Cir. 2002) (*en banc*) (pointing a gun at suspect who poses no danger constitutes excessive force).

10

As a corollary, where officer's own unreasonable conduct creates the very danger used to justify deadly force, there is no governmental interest in the use of deadly force and the exercise of that force is unreasonable under the Fourth Amendment. *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."); *Estate of Brown v. Thomas,* 7 F.Supp.3d 906, 914, 2014 WL 1053320, *7 (E.D. Wis. 2014) (under *Starks*, "police cannot escape liability if *their actions* turn a nonviolent fleeing suspect" into a situation where an officer feels threatened) (emphasis in original). For example, *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), held: "We must also consider whether the shooting was reasonable when the events leading up to the shooting are taken into account. As previously discussed, where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, he may be held liable for his otherwise defensive use of deadly force." *Id.* at 1230.

Independently, Heaggan-Brown's unnecessary escalation is probative of the reasonableness of his uses of deadly force. *See Strand v. Minchuk*, 910 F.3d 909 (7th Cir. 2018), *cert. denied,* 139 S. Ct. 1629 (2019). In determining a reasonable jury could find that an officer used excessive deadly force, as with other cases, *Strand* held:

> Recall, too, the broader circumstances that led to the shooting. The police were not in hot pursuit of an individual known to be armed and dangerous. Nor had the police responded to a report of violent crime or otherwise arrived at a location only to find an individual engaged in violent or menacing conduct or acting so unpredictably as to convey a threat to anyone present. To the contrary, the entire fracas leading to Officer Minchuk's use of deadly force began with his issuance of parking tickets.

*Id.* at 916; *cf. Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 731 (7th Cir. 2013) (noting importance of the fact that the victim of force "had not been arrested for a violent crime" but had been "acting foolishly").

11

Here too, the events leading up to the shooting are illustrative of Heaggan-Brown's state of mind. He was not responding to a violent crime or an individual engaged in violent conduct; he did not see Smith engaging in "violent or menacing conduct" or being a threat to others; and at most could have written a parking ticket. PSOF, ¶¶23, 29, & 31-32. In fact, it is worse: Heaggan-Brown and the others were seeking a foot chase and Heaggan-Brown pointed his gun at Smith for allegedly being parked a couple inches too far from the curb. *Id.* ¶¶21-22, 26. Defendants admit drawing a firearm and pointing it at a civilian is a precursor to deadly force, and that police officers cannot point their gun at someone for a parking infraction. *Id.* ¶¶27, 32. Heaggan-Brown was without any legitimate reason to believe that the driver of the car he claims was a little too far from the curb posed a substantial threat of serious bodily harm to anyone that would have justified immediate resort to the precursor to deadly force. *Id.* ¶¶28-31.

### C. The First Shot Was Unjustified

As detailed above, after jumping out on Smith, Heaggan-Brown and Malafa got the foot chase they had been seeking. *Id.* ¶¶21-22, 26. Smith took off running; he did not say anything, let alone anything threatening to the officers. *Id.* ¶42. Like typical foot chases, he was trying to get rid of contraband. *Id.* ¶37. As he ran, Smith slipped and fell as he rounded the corner into an alley, and came upon a chain-link fence. *Id.* ¶39. As Smith attempted to resume his efforts to escape and get up, he also disarmed himself by picking up the gun backwards (e.g., by the muzzle) and throwing it over the fence. *Id.* ¶¶40, 43. Heaggan-Brown knew that Smith was trying to get away and was throwing the gun over the fence. *Id.* ¶44. He nonetheless shot Smith as he threw the gun. *Id.* ¶ 45.

On Plaintiffs' facts, and in making inferences in their favor, this first shot was unjustified and violated the Fourth Amendment: Heaggan-Brown never threatened the officers or did

12

anything that would amount to a threat of serious bodily harm to anyone. He was a non-violent, fleeing suspect, as in *Garner*. 471 U.S. at 11-12. That should end the matter.

Given Defendants' arguments to the contrary, however, further elaboration is provided:

### 1. Heaggan-Brown Cannot Obtain Summary Judgment for Shooting a Fleeing Individual

Heaggan-Brown shot a person obviously fleeing and attempting to rid himself of contraband and who did not pose any threat to the officer or others. The Supreme Court long ago held: "[w]here [a fleeing] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11. Put simply, the Supreme Court has counseled: "it is not better that all felony suspects die than that they escape." *Id.*

In addition, Smith was fleeing following Defendant Heaggan-Brown's completely unjustified decision to point a gun at him for allegedly being parked too far from the curb.

As a review of the video and the sill images of the encounter confirm, every action Smith took was obviously related to one goal: evading the police. *See* PSOF, ¶¶26-49.[2] A reasonable jury would have no trouble concluding that Smith's actions were consistent with this goal, alone, and that he did nothing that a reasonable officer would view as any sort of aggression to the officer or others. In fact, a reasonable jury would have no problem concluding that, based upon his actions and facial expression, Smith was absolutely terrified. *Id.* ¶48. (Recall, examination of

---

[2] The quality of the *camera* makes events appear shakier than the officer viewed things in real time, as Defendants' themselves seem to concede (albeit vaguely). *See* Defendants Proposed Statement of Fact (DSOF), ¶35. To Plaintiffs, the videos of the shooting—particularly when the still shots are viewed and appropriate inferences are made—illustrate, and a jury could so conclude, that Smith had an obvious goal the entire time: to evade the police and get rid of the gun. Defendants apparently disagree with this interpretation of the video, which is why they cannot obtain summary judgment. *Cf. Cyrus*, 624 F.3d at 862 (summary judgment inappropriate in excessive force situations because the "the evidence surrounding the officer's use of force is often susceptible of different interpretations").

the circumstantial evidence and inferences therefrom is necessary at this juncture because we do not have direct evidence from Smith, who is deceased.)

Moreover, while fleeing the police may not be considered laudable to some, it did not justify being shot. Indeed, a wealth of empirical data, credited by courts, illustrates that fleeing the police is, in some communities, an entirely reasonable response to seeing police officers, regardless whether those running are guilty of something or completely innocent.[3]

An officer may use deadly force "only to seize a fleeing felon who has *committed a violent crime* or who presents an immediate danger to the officer or others." *Starks*, 5 F.3d at 230 (emphasis added). That is certainly not the case, where the underlying offense was an alleged parking ticket or would remain the case, as in *Starks*, even if the officers knew there was an actual crime afoot and that "underlying crime was not accomplished violently." *Id.* at 233.

The facts of this case are far stronger than *Starks:* There was no "underlying crime" that Heaggan-Brown was responding to, PSOF, ¶29; instead, he was attempting to get a foot chase and can only cite a possible parking ticket for the (pre-textual) basis for attempting to seize

---

[3] Empirical data illustrates that fleeing the police is a perfectly reasonable and expected response to the sudden presence of police officers, particularly in communities—like the one where this occurred—where young black men are subject to frequent, aggressive, and even violent treatment by police officers for even the most trivial reason (like parking too from the curb). *See, e.g.*, *Commonwealth. v. Warren*, 475 Mass. 530, 540 (2016) (holding given the racial bias in Boston, black men had legitimate reasons to flee the police: "Such an individual, when approached by the police, might just as easily be motivated by the desire to avoid the recurring indignity of being racially profiled as by the desire to hide criminal activity."); *United States v. Brown*, ___ F.3d___, 2019 WL 2364504, at *5–6 (9th Cir. June 5, 2019) (in evaluating flight as a basis for reasonable suspicion, recognizing "the issue of race" and holding that "racial dynamics in our society—along with a simple desire not to interact with police—offer an 'innocent' explanation of flight"); Boston Police Commissioner Announces Field Interrogation and Observation (FIO) Study Results, https://bpdnews.com/news/2014/10/8/boston-police-commissioner-announces-field-interrogation-and-observation-fio-study-results (documenting a pattern of racial profiling of black males in the city of Boston); ACLU, Stop and Frisk Report Summary, https://www.aclum.org/sites/all/files/images/education/stopandfrisk/stop_and_frisk_summary.pdf (finding 63% of Boston police-civilian encounters from 2007 to 2010 black people, even though they make up less than 25% of the Boston population); *cf. Illinois v. Wardlow*, 528 U.S. 119, 126-140 (2000) (Stevens, J., concurring in part and dissenting in part) (recognizing that flight can be a problematic factor in the reasonable suspicion analysis because some citizens may flee from police for their safety).

14

Smith at all. *Id.* ¶¶21-22, 31-32. Indeed, Defendant Heaggan-Brown admits he did not observe Smith committing any crime, let alone a violent one. *Id.* ¶ 31. Instead, the only facts that Heaggan-Brown had to rely upon is that Smith had a gun, was fleeing, and refused to stop fleeing. *Id.* ¶50. That is insufficient to justify deadly force under the Fourth Amendment.[4]

### 2. Heaggan-Brown Cannot Obtain Summary Judgment for Shooting an Individual Just Because Smith Had a Firearm

Defendants contend that Heaggan-Brown reasonably believed that Smith's actions— attempting to escape, tripping and dropping a gun, and throwing the gun over a fence from a backwards grip—constituted an immediate threat to Heaggan-Brown or others in order to justify firing the first shot. But, their analysis rests on interpreting the facts in a light most favorable to themselves, rather than Plaintiffs, which is forbidden at this juncture.

Defendants' overreliance on the fact Smith had a gun contradicts the law, which permits gun ownership and possession. U.S. CONST. AMD. II (Right to Bear Arms); *McDonald v. Chicago*, 561 U.S. 742 (2010) (Second Amendment applies to the states); WIS. STAT. § 66.0409(6) (authorizing Open Carry in Wisconsin and prohibiting it criminalization).

Given that backdrop, the Seventh and other circuits have consistently held that the possession of a firearm by a suspect does not entitle a police officer to use deadly force. *See Weinmann*, 787 F.3d at 449-50; *Perez*, 809 F.3d at 1220; *Cooper,* 735 F.3d at 159. Indeed, "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon," as "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Cooper*, 735 F.3d. at 159.

---

[4] To the Defendants contend Smith was moving toward Heaggan-Brown, rather than fleeing; that Smith doing anything other than trying to throw the gun away; or that Smith "re-armed" himself, these are disputed facts, precluding summary judgment. *E.g.* Response to DSOF, Dkt. 52, ¶¶45, 54-56 & 58-60.

Smith never threatened the officers with his firearm, and he never acted aggressively with it. Smith never said anything to the officers, let alone anything that could be constituted as a threat of violence. The video, and still images therefrom, are indicative of a consistent set of actions from Mr. Smith: he was afraid, attempting to flee, and to disarm himself in the process. This, in fact, is what Heaggan-Brown and other officers expect to happen when engaging in foot chases, even where suspects have guns. *See* PSOF, ¶¶37-38. Here, as confirmed by the fact that Heaggan-Brown *began* the entire encounter with his firearm drawn despite not having a justification for doing so, a reasonable jury would have no trouble concluding that it was plain Smith was trying to flee throughout the entirety of his actions leading up to the first time he was shot.

Holding a weapon in a non-threatening position "fail[s] to support the proposition that a reasonable officer would have had probable cause to feel threatened." *Cooper,* 735 F.3d at 159; *see also Curnow v. Ridgecrest Police,* 952 F.2d 321, 324-25 (9th Cir. 1991) (holding that deadly force was unreasonable where the suspect possessed a semi-automatic rifle but was not pointing it at the officers and was not facing the officers when they shot). This is exactly the case here.

*Weinmann* is instructive. There, the Seventh Circuit affirmed the denial of summary judgment to Officer McClone who, immediately upon encountering Jerome Weinmann holding a shotgun, shot him on sight. *Weinmann v. McClone*, 787 F.3d at 447. McClone argued that he did not violate Jerome's right to be free from unjustified deadly force because he believed he was in imminent danger based on the way Jerome was holding the gun. *Id.* at 448. The court rejected that argument, stating "The critical problem with that argument . . . is that the way in which Jerome was holding the gun *is* disputed." *Id.* Under Jerome's version of the facts, Jerome never pointed the gun at McClone, and he never did anything whatsoever to make McClone reasonably

believe that the officer or anyone else was in threat of harm. *Id.* at 449. The court determined those facts were insufficient to justify the instant use of deadly force, and stated unequivocally: "It does not matter for purposes of the Fourth Amendment that McClone subjectively believed that his life was in danger. The test is an objective one, and taking the facts as Jerome presents them, it is not met." *Id.*

Here, the record evidence above establishes that Smith was continuously fleeing and moving away from the officers, including when he threw the gun over the fence and holding it backwards (*i.e.* by the muzzle); he never threatened anyone, or did anything threatening, with it. PSOF ¶¶ 41-43, 47. Smith had also fallen while attempting to run and was still moving toward the fence when he got shot. *Id.* ¶¶44-48; Plaintiffs' Response to DSOF, ¶58 ("Smith's torso moved away from the officers in one movement as he was rising and throwing the gun over the fence."). Smith was obviously afraid, and trying to evade; not attack anyone. *See* PSOF, ¶¶40-49.

This evidence contradicts Defendants' contention at summary judgment, *see* Dkt. 46 at ¶¶ 45-50, that deadly force was justified by a speculative risk that Smith might charge or attack the officers. In other words, this is just another way in which the facts are disputed, that Defendants' have failed to accept Plaintiffs' facts, and why summary judgment cannot be granted.[5]

Crediting Plaintiffs' facts, a reasonable officer would not have "probable cause to believe that [Smith] pose[d] a significant threat of death or serious physical injury to the officer or

---

[5] To the extent Defendants argue that Heaggan-Brown's belief that Smith was a threat was based on speculation about Smith being from the Sherman Park neighborhood, which Defendants claim had "high levels of criminal activity, including drug activity, shootings and other felonies," Dkt. 46 at ¶ 13, courts have rejected that the notion that such speculation justifies the use of deadly force. The Fourth Amendment requires a particularized showing of a specific, personal threat to justify deadly force. *Garner*, 471 U.S. at 11-12; *see also, e.g., Bouggess*, 482 F.3d at 891 ("Mattingly contends that trained police officers know that drug dealers, especially crack cocaine dealers, usually carry guns. Mattingly seems to imply that a general notion that crack dealers are dangerous, rather than a particularized and supported sense of serious danger about a particular confrontation, justifies the use of deadly force. The Supreme Court [has] never accepted such a sweeping generalization…We will not do so today.").

17

others." *Garner,* 471 U.S. at 3. Plaintiffs' facts depict a non-threatening, fleeing individual throwing a gun backwards by the muzzle over a fence, a continuation of prior flight and indicative of an individual trying to get rid of possible contraband. This provided no indication that Smith was in any way likely to harm anyone. Put differently: the constitutional prerequisites set forth in *Garner* and other authorities—a threat to the officers or probable cause to believe the suspect has "committed a crime involving the infliction or threatened infliction of serious physical harm"—are not satisfied here. 471 U.S. at 11-12; *cf. Sallenger*, 473 F.3d 731, 740 (7th Cir. 2007) (affirming *Garner* requirement as a necessary limitation on deadly force); *Sherrod*, 856 F.2d 805 (articulating the requirement of "imminent danger of death or serious bodily injury"); *Jacobs*, 215 F.3d at 774 (same).

That fact is not changed by the fact that Heaggan-Brown subjectively claims that he was in fear for his life. On Plaintiff's facts, that fear was an objectively unreasonable basis to shoot Smith. In addition, a reasonable jury could readily find that Heaggan-Brown's claim he thought his life was in danger is simply untrue or unreasonable. *See Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."); *Weinman*, 787 F.3d 444 at 451 (affirming denial of summary judgment where there was a genuine issue of material fact as to whether police officer reasonably believed his life was in danger when he shot the victim); *Doerle v. Rutherford,* 272 F.3d 1272, 1281 (9th Cir. 2001) ("a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern"); *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (denying summary judgment on Fourth Amendment excessive force claim explaining, "[while] Officer Peterson stated that he

18

believed David was pointing a gun at him, this belief was not reasonable, if plaintiff's version of events is accepted, and she is given the benefit of every reasonable inference."); *Estate of DiPiazza v. City of Madison*, 2017 WL 1337313, at *7 (W.D. Wis. Apr. 11, 2017) ("In reviewing an officer's decision to employ deadly force, what matters is not the officer's subjective beliefs or intentions, but the objective reasonableness of the officer's threat assessment and response." (citing *Graham*, 490 U.S. at 388, 396-99); *Harris v. Clark*, 2009 WL 2408724, at *2 n.1 (E.D. Wis. July 31, 2009) (Adelman, J.) (recognizing that the Fourth Amendment presents an objective test; that the absence of a threat would make a use of force unreasonable and, that the "jury is entitled to consider whether [the officer] is lying about what he perceived").

### D. The Second Lethal Shot Was Unjustified

Smith's damages would have been substantial had Heaggan-Brown stopped at the first shot. But, he did not. Instead, he fired a second fatal round, ultimately killing Smith. That shot was both unreasonable under the Fourth Amendment and also unconscionable.[6] The record viewed in Plaintiffs' favor reflects that after Heaggan-Brown fired the first shot, Smith fell hard to the ground, hit the back of his head on the dirt, and that his legs flung upward. *See* PSOF, ¶51. Heaggan-Brown saw Smith fall to the ground and saw him lying there, writhing in pain. At that point, it is undisputed that Smith was unarmed *Id.* ¶¶53-54, 83. Smith's hands were also above his head. *Id.* at ¶¶55-56; *see also* Plaintiffs' Response to DSOF, ¶67 (disputing Defendants' characterization otherwise).

---

[6] Defendants do not address Plaintiffs' substantive due process claim, which alleges that Heaggan-Brown's second shot shocks the conscious and was truly egregious. Dkt. 1 at ¶¶ 108-113. They have waived any argument for summary judgment on this claim by failing to raise it in their motion. *Wehrs*, 688 F.3d at 891 n.2; *Bob Willow Motors, Inc.*, 872 F.2d at 795.

19

Defendant Heaggan-Brown then positioned himself over Smith, with the muzzle of his gun just feet away from Smith's chest, and shot him dead. PSOF ¶¶58-59. The following stills from Heaggan-Brown's body camera depict the second shot:





*Id.* ¶60.

Officer Malafa's body camera provides a chilling view of the second shot as well:



SMITH DA MALAFA 0389



SMITH DA MALAFA 0390



*Id.* ¶¶62.

These images and other evidence confirm Heaggan-Brown made a conscious, independent decision to fire the second shot, tracking Smith from semi-standing to laying on his back. *Id.* ¶61. Defendants admit that Heaggan-Brown make an independent to shoot a second time, even emphasizing that he aimed when he did it. *See id.*; DSOF, ¶69.

Killing Smith by firing this shot was must be independently justified, regardless of the first shot. *Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706, 724 (7th Cir. 2013) (court must analyze each discrete use of force to determine "the reasonableness of the force used ... at the time the force [was] applied."); *Abdullahi*, 423 F.3d at769 (*citing Garner*, 471 U.S. at 11 (similar)); *Wynalda*, 999 F.2d at 247 (requiring an independent justification for each exercise of force, on the basis that circumstances can change from one where some force may be justified but may not be at a later moment); *see also Cyrus*, 624 F.3d at 863 ("Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times.").

22

But, the shooting was not justified. There was no justification for shooting a fleeing and unarmed non-violent suspect who had committed no crime more serious than an alleged (and disputed) parking ticket dead. Put differently, as above, the requirements of *Garner* were unsatisfied: no reasonable officer would believe that Sylville Smith—cornered, on the ground, hands in a surrender position—posed an imminent threat of death or severe bodily harm to anyone that would justify executing him on the street for merely running away from the police officers who had already agreed they would try to get into a "foot chase."

In short: no facts support shooting Smith a second time, and killing him. At the point Heaggan-Brown repositioned himself and stood over Smith to kill him, Smith was incapacitated from Heaggan-Brown's first shot, having struck his head on the ground. Like the first, Heaggan-Brown's second shot was unconstitutional under the Fourth Amendment. Just as in *Garner* and other authorities it was unreasonable for Heaggan-Brown to "seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11; *Phillips*, 678 F.3d at 517.

### E. The Second Shot Shocks The Conscience

The due process clause of the Fourteenth Amendment protects against certain abuses of power by government officials which result in the deprivation of life and liberty. *DeShaney v. Winnebago County Dept. of Social Serv.*, 489 U.S. 189, 196 (1989). The Supreme Court has long recognized that the due process clause includes the "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

To establish a substantive due process violation, Plaintiffs must show that the use of power at issue is one which "shocks the conscience" and violates the "decencies of civilized conduct." *Rochin v. California*, 342 U.S. 165, 172-73 (1952). The "shocks the conscience" test is frequently put in terms of conduct which is so "offensive" that it "does not comport with

23

traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

Properly construed, the record demonstrates that Heaggan-Brown made a conscious, independent, and intentional decision to shoot Smith a second time, and fired at Smith's chest while Smith was on the ground, his hands were above his head, he was unarmed, and he was obviously helpless. PSOF ¶¶ 61; *id.* ¶¶60, 62-66. No legitimate purpose could justify shooting and killing Smith in this manner, which also departed from training and established standards of policing—a factor relevant to the egregiousness of the actions. *See id.* ¶66. Plaintiff's expert testimony further illustrates that a reasonable jury can conclude the second shot shocked the conscience, because "expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful" due to the fact that it "can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct" *Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013); *cf. Mays v. Springborn,* 575 F.3d 643, 650 (7th Cir. 2009) ("[A]lthough violation of the prison's rule against public searches was not, by itself, a violation of the constitution, it was relevant evidence on which the jury could have relied to conclude that the searches were done with an intent to harass.").

Accordingly, a reasonable jury could conclude that this extreme exercise of deadly force, particularly by an officer who had started the event hoping to encourage a foot chase, shocks the conscience. *See Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) ("Substantive due process involves the exercise of governmental power without reasonable justification."); *Edwards v. Shanley*, 666 F.3d 1289, 1296 (11th Cir. 2012) (because Edwards was not a threat, Officer Shanley's "further infliction of pain was gratuitous and sadistic.").

24

To illustrate the point another way: even if the jury were to conclude—contrary to what the summary judgment record shows—that Heaggan-Brown was not liable for the first shot, established authorities illustrate the egregiousness of his actions *after* Smith had already been shot once. Indeed, even when "an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity" *Wynalda*, 999 F.2d at 247. That was the upshot of *Phillips*, which held that firing three additional shots after the plaintiff had been incapacitated was unjustified and unreasonable. 678 F.3d at 517-18.

On these facts, and given this record, a reasonable jury could easily conclude that Defendant Heaggan-Brown's fatal shot constitutes the sort of shocking conduct that violates Due Process. *See e.g.*, *Steen v. Myers,* 486 F.3d 1017, 1024 (7th Cir. 2007) (when pursuing a vehicle to make a stop, an officer can violate the Fourteenth Amendment if the officer intends deadly harm not justified by the stop or the pursuit); *A.D. v. Ca. Highway Patrol,* 712 F.3d 446, 450–51, 458 (9th Cir. 2013) (affirming jury verdict on substantive due-process claim against officer for shooting at driver who was no longer fleeing and trapped in a dead-end); *Hernandez v. City of Goshen, Indiana*, 324 F.3d 535, 538 (7th Cir. 2003) (recognizing that a state actor violates the Fourteenth Amendment when his or her conduct created or exacerbated the danger faced by the victim); *see also Edwards*, 666 F.3d at 1296 (holding officer's increased the force applied at the same time the threat presented by Edwards decreased *"was gratuitous and sadistic.").

### F. Defendants' Alternative Factual Scenarios Must Be Presented To A Jury, and Otherwise Do Not Support Defendants' Position

Properly construed, the evidence establishes that Defendant Heaggan-Brown's uses of deadly force were objectively unreasonable, and that a reasonable jury could easily conclude Heaggan-Brown violated Smith's rights. Faced with that reality, Defendants focus on an argument that they hope will change the equation—contending that Heaggan-Brown was in fear

25

for his life because Smith reached for his waistband and might have be reaching for a second weapon. This argument is based on factual disputes and must be rejected at summary judgment.

### 1. Dispute Concerning Whether Smith Reached for his Waistband Contrary to Commands

Defendants argue that Heaggan-Brown was justified in shooting Smith a second time while Smith was unarmed on the ground with his hands over his head because Smith did not comply with Heaggan-Brown's command to "stop reaching." Dkt. 45 at 15, 18. That cannot support summary judgment for myriad reasons.

First, the evidence—the videos of the shooting and Heaggan Brown and Malafa's own contemporaneous actions—illustrate that Smith was not reaching for his waistband at all. His hands were above his head when he was shot and killed by Heaggan-Brown. Thus, this is a disputed fact of which Defendants may not avail themselves at this juncture.

Second, it is a disputed fact whether Heaggan-Brown actually gave any orders, and whether Smith "refused to comply" with Heaggan-Brown. There is no audio of the lead-up to the shooting (because neither Heaggan-Brown nor Malafa activated their body cameras) In addition, Heaggan-Brown did not give Smith any *opportunity* to comply with any order. Instead, while Smith's hands were by his head and he was laying unarmed on the ground, Heaggan-Brown shot him. It is difficult to understand what Defendants believe Smith should (or even could) have done to prevent being killed by Heaggan-Brown after the first shot was fired; he was on the ground with his hands up near his head.

*Cyrus* is instructive. There, an officer tased the plaintiff twice, causing the plaintiff to land face down with his hands under his stomach. 624 F.3d at 859-60. The officer attempted to justify several more uses of the taser by saying that the plaintiff did not put his hands behind his back to be handcuffed. *Id.* at 860. The Seventh Circuit reversed the district court's grant of

summary judgment, explaining that the initial shocks may have left the plaintiff unable to move his hands. *Id.* Accordingly, the dispute about Smith's compliance precludes summary judgment.

Third, even Heaggan-Brown gave the commands, the second shot would not be justified. Merely not complying with an order does not justify the use of deadly force, particularly by someone on the ground who has already been shot. Using deadly force in the face of a non-resisting or passively resisting individual is objectively unreasonable. *Phillips*, 678 F.3d at 524–25 (holding passive noncompliance of individual did not warrant escalation of force).

### 2. Dispute Concerning Whether Smith Had a Second Weapon

Defendants also advance the notion that Smith may have had a second weapon and this apparent threat supported Heaggan-Brown firing a second fatal shot. Dkt. 45 at 12, 17. But, Plaintiffs' facts are to the opposite: Heaggan-Brown did *not* believe, or have reason to believe, that there was a second weapon. *See* PSOF, ¶¶77-82. And, Heaggan-Brown's post-hoc claims contradict his contemporaneous actions at the time and undermine the "second gun" theory. *Id.* ¶67-76. Plaintiffs' facts are supported by a wealth of competent evidence that, if credited by a reasonable jury, illustrate that the "second gun" theory is a thinly-veiled attempt to make up an excuse in an effort justify these unjustified acts, including:

The video evidence from the body cameras worn by Officers Malafa and Heaggan-Brown establishes that at no point in the aftermath of the shooting did any officer search or pat down Smith in search for a weapon. PSOF ¶¶ 67. Officer Malafa testified that Officer Heaggan-Brown never mentioned a concern that Mr. Smith had a second weapon and never requested that Mr. Smith be searched. *Id.* ¶80-81. In addition, despite giving specific instructions to Officer Malafa about locating and protecting the gun that Smith threw over the fence, Heaggan-Brown did not express a similar concern about locating and protecting a second firearm supposedly possessed

by Smith. *Id.* Likewise, Heaggan-Brown never mentioned a second firearm in the public safety statement he gave to Sgt. Pratchet (who testified that one of the purposes of the public safety statement is to determine where the evidence is). *Id.* As is no surprise, there is no documentation that MPD officers on the scene took any measures to look for a second firearm. Now, it appears Heaggan-Brown is trying to have it both ways: affirm his DCI statement where the second gun came up, but also move himself away from it. PSOF, ¶83-88. He cannot obtain summary judgment on this record.

Moreover, the fact that Smith was actually unarmed—and there is nothing in the record supporting the notion he was armed (like a "bulge" or something else)—during the second shot is relevant to assessing the credibility of Heaggan-Brown's story. The fact that Smith did not in fact possess a second weapon is circumstantial evidence undermining Heaggan-Brown's account. *See Sherrod,* 856 F.3d at 802 (Further, "impeachment by contradiction is a technique well recognized in the federal courts by which specific errors in the witness's testimony are brought to the attention of the trier of fact." For example, if an officer testifies that "I saw a shiny, metallic object similar to a gun or a dangerous weapon in the suspect's hand," then proof that the suspect had neither gun nor knife would be material and admissible to the officer's credibility on the question of whether the officer saw any such thing (and therefore had a reasonable belief of imminent harm."). In addition, *Cruz* explained:

> In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish—but not wholly implausible—for him to have tried to fast-draw his weapon in an attempt to shoot his way out. But for him to make such a gesture when no gun is there makes no sense whatsoever. A jury may doubt that Cruz did this. Of course, a jury could reach the opposite conclusion. It might believe that Cruz thought he had the gun there, or maybe he had a death wish, or perhaps his pants were falling

28

down at the worst possible moment. But the jury could also reasonably conclude that the officers lied.

765 F.3d at 1079-80; *see also Bridges v. Wilson,* 718 F. App'x 636, 641–42 (10th Cir. 2017) ("Since a jury could discount Wilson's credibility—in part, because there was "circumstantial evidence" that could discredit Wilson's version of the events— the district court concluded there were genuine issues of material fact.").

Here, in keeping in mind that "we cannot 'simply accept what may be a self-serving account by the police officer.' and "must carefully examine all the evidence in the record  . . . to determine whether the officer's story is internally consistent and consistent with other known facts," the "second gun" theory has been thoroughly discredited, most significantly because it contradicts with the wealth of contemporaneous, objective, circumstantial evidence showing that it was not a concern of the officers at the time. *Cruz*, 765 F.3d at 1079. Had Heaggan-Brown actually been concerned about a second weapon, he would have *searched for*, rather than moving Smith and never conducting even a pat-down. Had Heaggan-brown actually been concerned about a second weapon, he would have *mentioned it*, rather than repeatedly telling Malafa and others *the* (singular) gun was over the fence, and that was the only firearm that needed to be recovered. All of that is on the objective video, not subject to dispute, and supports an inference (and finding) that the second gun claim was made up after the fact as an attempted "cover" story, which must be criticized. *Id.* Summary judgment cannot be granted in this context. *Id.*; *cf Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 492 (5th Cir. 2001); (affirming the denial of summary judgment in a deadly force case; scrutinizing the officers account against the physical evidence (e.g., an autopsy report); and noting skepticism in the fact that "the evidence the Trooper claims is uncontradicted and unimpeached comes for the most part, if not exclusively, from an interested witness—Trooper Vargas" (citing *Abraham v. Raso*, 183 F.3d 279, 287 (3d

29

Cir. 1999) ("Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment."), and *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992) (Phillips, J., dissenting) ("[B]ecause inevitably—liability being disputed—the officer's account will be favorable to himself, the credibility of that account is crucial.")).

To put a finer point on it: Plaintiffs' position is that Heaggan-Brown made up the idea that Smith had a second weapon in an attempt to justify the second shot because it was obviously unjustified. He knew, going into the DCI interview, that he was going to be questioned about that shot, and had to have a story to tell. Nothing about that eventual story—the phantom second gun "rationale"—did not surface until after Heaggan-Brown had the opportunity to consult with his attorneys, after they demanded to view the body camera before Heaggan-Brown would be interviewed. Just as the District Attorney recognized in charging Heaggan-Brown when it was clear this story was bogus, PSOF, ¶¶83-88, this Court must view Heaggan-Brown's statements in their context. *Cf. United States v. Lomprez*, 472 F.2d 860, 863 (7th Cir. 1972) (false exculpatory statements admissible to show consciousness of guilt); *United States v. Hackett*, 638 F.2d 1179, 1186–87 (9th Cir. 1980) (same); *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir. 2000) ("[W]hen the circumstances are conducive to lying, well-supported suspicion of mendacity may serve as a legitimate basis for the factfinder's reasonable inferences concerning the ultimate facts at issue.").

In the end, on Plaintiffs' facts, Heaggan-Brown's claim that he believed there was a second gun is simply untrue. So much so that Heaggan-Brown has himself been subsequently inconsistent about, and apparently abandoned, this "second gun" theory, too. *Id.* ¶¶ 83-88. This factual dispute—the heart of Heaggan-Brown's purported justification for his fatal shot—

completely precludes summary judgment as it relates to the second shot. It will be for the jury to decide whether it believes whatever story Heaggann-Brown decides to tell at trial. *Id.* ¶78.

### G. The Cases Cited By Defendants Are Inapposite

Defendants argue that Heaggan-Brown's conduct falls within the "hazy border between excessive and acceptable force." Dkt. 45 at 19 (*citing Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Not so. Heaggan-Brown's conduct was unjustified. Indeed, the conduct was so shocking that he was actually charged with a crime for the second shot, a rarity for officers using deadly force. Heaggan Brown's decision departed from his training as well as accepted standards of policing.

In support of their assertion, Defendants point to several cases which are wholly distinguishable from the present case and thus inapplicable. For example, the "hazy border" described in *Brosseau* occurred when an officer confronted the question "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004). This case does not involve a "disturbed felon;" Smith was not "avoiding capture through vehicular flight," which could place "persons in the immediate area [] at risk from that flight[.]" By contrast, this was a foot chase (like *Garner*), Smith was allegedly parked too far from the curb, Heaggan-Brown had already indicated an intention to use deadly force by unjustifiably pointing his weapon at Smith, and Smith's mere running away from the police officers did not amount to a danger, let alone a substantial danger of immediate bodily harm to anyone.

Defendants repeatedly assert that *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1012 (7th Cir. 2006), is controlling. Dkt. 45 at 10-12. But, *DeLuna* is a far cry from what happened here. For one, the facts conceded by the plaintiff established liability, which is not the case here;

Plaintiff disputes Heaggan-Brown's facts offered to justify both shots. *See generally* P's

Response DSOF, Dkt. 51, The disputed facts, as explained above, preclude summary judgment.

Moreover, the facts themselves are significantly and materially different. *DeLuna*

involved a situation by a person (DeLuna) known to the shooting officer to be violent and in the

midst of an incident that was so serious DeLuna's wife called the police. Responding to the 911

"domestic disturbance" call, *id.* at 1010, was not the first time the officer had been called to that

residence for a similar reason. In a prior arrest, just the week before the shooting, the officer was

told by the complaining witness that DeLuna was "known to be very violent," and saw DeLuna

drunk and yelling. *Id.* at 1011. The officer learned additional information about DeLuna that he

knew when responding to the 911 call: that after the prior arrest DeLuna had been violent in the

jail, that DeLuna was known to both carry and sell guns. *Id.* at 1011-12. The shooting itself was

preceded by an actual threat against the officer ("I've got something for you. You are going to

have to kill me."), while the officer and DeLuna were in a standoff, making their way through

the yard with DeLuna moving toward the officer and the officer backing up some 40-50 feet. *Id.*

The standoff ended when, after telling the officer he should shoot him in the chest, DeLuna

lunged at the officer, a fact confirmed by forensic evidence. *Id.*

In affirming summary judgment, *DeLuna* emphasized that "the action of DeLuna lunging

towards [the officer] after the threats and bizarre conduct, established the real danger of

imminent serious bodily injury." *Id*. at 1013. To be sure, dispositive in *DeLuna* was that the

potential danger of the situation was escalated by verbal threats made by DeLuna, including that

he "had something for" the officer and that the officer should shoot him in the chest." *Id.* at

1012. These statements were, in *DeLuna*, an indication that "this was a dangerous situation, both

in [their] anticipation of violence and in [their] implication that the shot had better be fatal." *Id.*

By contrast, Heaggan-Brown had no prior interactions with Smith and did not know anything about him, and certainly could not say that Smith was violent or likely to hurt anyone. PSOF ¶¶30-32. Heaggan-Brown was not responding to any call from 911 or other witnesses about a dangerous individual. *Id.* ¶¶28-29. Instead, Heaggan-Brown sought out a "foot chase" and found Smith. *Id.* ¶¶ 21-22. The differences do not stop there. Smith never made any threats of any kind to Heaggan-Brown. *Id.* ¶¶41-42, & 47. He did nothing aggressive toward the officers or anyone. *Id.* Smith never lunged at Heaggan-Brown; he was running away from Heaggan-Brown attempting to escape. *Id. DeLuna* lends no support to Heaggan-Brown.

Defendants also point to, *Horton v. Pobjecky*, 883 F.3d 94 (7th Cir. 2018), and *Conley-Eaglebear v. Miller*, 2017 WL 7116973 (7th Cir. Sept. 26, 2017), but they are also inapposite. In *Horton*, the defendant officer witnessed the commission of a dangerous felony, an armed robbery, and was out-numbered by the perpetrators, four to one, all of whom he reasonably thought might be armed due to what he had witnessed. *Id.* at 951. Using deadly force was reasonable there because four assailants committed armed robbery; there was a struggle for a loaded gun; and the deceased plaintiff approached the defendant officer from behind. *Id.* None of these factors were present to justify the use of force here: Heaggan-Brown was not outnumbered (in fact it was Smith who was outnumbered); no crime was being committed; there was no struggle for a gun; as mentioned above, Heaggan-Brown had no reason to believe Smith had a second weapon; and Smith never approached Heaggan-Brown from behind (the opposite is true—it was Heaggan-Brown who jumped out on Smith and chased him).

An unpublished decision, *Conley-Eaglebear*, is unpersuasive here. There, the Court's reasonableness inquiry hinged on the *undisputed* facts that: 1) police were dispatched to the scene to investigate a man intimidating people by flashing a gun at them; 2) Conley-Eaglebear,

while running away from the shooting, *drew* a gun from his waistband and looked back over his shoulder toward the officer; and 3) the officer *then* saw the gun's barrel moving in his direction before shooting Conley–Eaglebear. 2017 WL 7116973 at *2. In other words, it looked like a fleeing suspect was withdrawing a firearm and about to turn and possibly shoot at the officers. *Id.* Plaintiffs' facts here are to the contrary—Smith never stopped fleeing and never posed a threat, particularly after he fell. In addition, the police here were not dispatched to or investigating a violent or threatening act; Smith never *drew* a gun during the chase (the officers claim they knew about it the whole time), and, most significantly, Smith was plainly trying to get rid of it the entire time, which is what Heaggan-Brown and the other officers to be the typical intent of those who flee upon seeing police officers. *Conley-Eaglebear* also says nothing about the second, fatal shot here—because it was an independent decision apart from the first.[7]

## X.    Defendant Heaggan-Brown Is Not Entitled To Qualified Immunity

### A.  Legal Standard

Defendants spend much time discussing the qualified immunity standard in the abstract, or as if it were simply a question of finding a case with the exact same facts as this one. But, that is not the standard. Analysis of whether a right was "clearly established" must occur in the context of a particular case, not in the abstract or at too high a level of generality. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). And, in considering the clearly established law in context,

---

[7] Defendants also discuss a Ninth Circuit case where police shot a mentally ill man in a ski mask trying to enter a house with a sword after walking through the neighborhood, raising the sword above his head, and growling. *See Blanford v. Sacramento County*, 406 F. 3d 1110, 1111 (9th Cir. 2005). Critical to the court's finding that the officers' actions were objectively reasonable—and curiously omitted from Defendants' brief—were the facts that Blanford ignored repeated warnings that he would be shot unless he dropped his sword and that the officers were not able to surround Blanford to ensure he had no avenue of escape. *Id.* at 1117-18. Here, there were no warnings to Smith whatsoever, and Smith was surrounded by Officer Heaggan-Brown and a chain-link fence and could not escape. Defendants' PFOF ¶¶ 39, 46-47, 52-53, 72. In these circumstances, unlike Blanford, Smith did not pose a serious and immediate threat.

the core issue is notice; *i.e.,* the "'salient question . . . is whether the state of the law' at the time

of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was

unconstitutional.'" *Tolan*, 572 U.S. at 656 (quoting *Hope v. Pelzer*, 536 U.S. 730 (2002)).

For this reason, the Supreme Court has consistently rejected the notion that qualified

immunity is confined to determining whether there is a case exactly on point; "officials can still

be on notice that their conduct violates established law even in novel factual circumstances."

*Hope*, 536 U.S. at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see Ziglar v.*

*Abbasi,* 137 S. Ct. 1843, 1866-67 (2017) ("It is not necessary, of course, that 'the very action in

question has previously been held unlawful.' That is, an officer might lose qualified immunity

even if there is no reported case "directly on point."' (quoting, respectively, *Anderson*, 483 U.S.

at 640, and *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)); *see also Whitlock v. Brueggemann*,

682 F.3d 567, 586 (7th Cir. 2012) ("It is of no moment that the Supreme Court has never

expressly held that this conduct violates the Constitution; it is enough that officials have "fair

and clear warning" that their conduct is prohibited under earlier precedents." (citing *United*

*States v. Lanier,* 520 U.S. 259, 271 (1997), and *Devereaux* v. *Abbey*, 263 F.3d 1070, 1075 (9th

Cir. 2001) (en banc) ("[A] right can be clearly established on the basis of common sense.").

Heaggan-Brown had more than adequate notice here.

### B. In The Context Here, The Right to Free from Excessive Deadly Force was Clearly Established

It is clearly established under the law that Defendant Heaggan-Brown's firing of two

shots at Smith would be unconstitutional under Plaintiffs' facts. In this case, Heaggan-Brown

manufactured and then escalated a foot pursuit of an individual, shot him while he was

disarming himself, and where there was never any threat or other indication that Smith intended

or was about to harm someone else. Heaggan-Brown then shot Smith a second time, while Smith

35

was unarmed, laying on his back with his hands near his head, and incapacitated from the first shot. The unconstitutionality of using deadly force in this specific context is apparent.

Decades ago, the Supreme Court set forth the requirement that police officers limit deadly force to situations where "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" exists. *Garner,* 471 U.S. at 3. And the Seventh Circuit has since held that officers who commit a violation "manifestly included within" the "core constitutional principle" announced in *Garner* are not entitled to qualified immunity. *Starks*, 5 F.3d at 233 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Heaggan-Brown's violation with respect to both shots fit within that principle. As for the first shot, no reasonable officer could think that an individual running away from an officer and attempting to throw a gun pointed away from the officer over a fence and otherwise acting in a nonthreatening manner presents justification to deviate from *Garner's* bright-line proscription. *See Weinmann,* 787 F.3d at 451 (holding that *Garner* (and *Graham*) provided adequate clearly established law to guide an officer's conduct when he encountered an armed person "who is neither resisting arrest nor threatening anyone save himself" even where no circuit precedent was more directly analogous); *see also Mercado v. City of Orlando,* 407 F.3d 1152, 1160 (11th Cir. 2005) (where officers found an individual with a kitchen knife not pointed at them, holding the decision to use deadly force was "so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution [based on *Garner* and other broadly stated excessive force articulations] even without caselaw on point.'") (alterations omitted).

There is also existing Seventh Circuit precedent concerning the use of force against an armed, but nonthreatening individual. For example, *Weinmann* held that officers who acted in

2015 were not entitled to qualified immunity after deploying deadly force against an individual who "was sitting in a lawn chair with a shotgun" but otherwise doing nothing "to make [the officer] reasonably believe that [he] or anyone else was in threat of harm." *Weinmann*, 787 F.3d at 446-47. Accepting Plaintiffs' version of events, as the Court must, Heaggan-Brown, acting in 2016, had no less notice that deadly force was clearly unlawful when he fired as Smith picked up the gun by the muzzle and threw it over the fence, but otherwise did nothing to support the conclusion that he posed an immediate threat to anyone's safety. *Cf. Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (denying qualified immunity when an officer shot an individual holding a gun when testimony diverged as to whether the gun was pointed upward or at the officer).

As for the second shot, *Garner* clearly established the right of an unarmed, incapacitated suspect to be free from deadly force. There the Supreme Court stated succinctly: "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. In denying qualified immunity months before the shooting here as it relates to a force incident that took place in 2011, the Seventh Circuit emphasized that it is "well-established that police officers cannot continue to use force once a suspect is subdued." *Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) (quoting *Abbott*, 705 F.3d at 732).[8]

On Plaintiffs' facts, and taking all inferences from those facts in Plaintiffs' favor, Defendants cannot reasonably contend that it was justified, as a matter law, for Heaggan-Brown to have fired a second at Smith, who was then unarmed, non-resisting, and nonthreatening whatsoever. It is well-established that police cannot use deadly force on such individuals. *See Abbott*, 705 F.3d at 733 (objectively unreasonable for officer to fire second taser shot after

---

[8] *Abbott* cited a wealth of authority. *See id.* (citing *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) ("shooting a disarmed and passive suspect is a clear example of excessive force"), *Henderson v. Munn*, 439 F.3d 497, 502-03 (7th Cir. 2006), *Vinyard v. Wilson*, 311 F.3d 1340, 1347-49 (7th Cir. 2002), and *Ellis*, 999 F.2d at 247.

plaintiff had been incapacitated by the first); *Cyrus*, 624 F.3d at 863 (7th Cir. 2010) (once

suspect was on the ground and unarmed, subsequent uses of force were unreasonable); *Wynalda*,

999 F.2d at 247 (concluding that an officer was not entitled to qualified immunity where he shot

a fleeing suspect did not present any immediate threat, noting "[w]hen an officer faces a situation

in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter

with impunity"); *see also Becker*, 821 F.3d at 929 (upholding a denial of qualified immunity

where an officer used force on a suspect who was not fleeing, was out in the open, and had

surrendered ); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (holding that an officer was

not entitled to qualified immunity at the summary judgment stage where, at the point the officer

used force, the officer witnessed that the suspect was subdued at gunpoint).[9]

### C. At Minimum, Factual Disputes Concerning The Incident Preclude Summary Judgment on Qualified Immunity Grounds As Well

For the reasons already discussed, summary judgment must be denied on the second part

of the qualified immunity analysis—namely, whether Smith's constitutional rights were violated.

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (courts ask whether the facts alleged describe the

violation of a protected right). To the extent Defendant Heaggan-Brown argues that he is entitled

to immunity because of the absence of material disputes of fact, Plaintiffs refer the Court to their

explanation above of why there are disputed issues of material fact precluding summary

judgment with respect to Plaintiffs' constitutional claims against Defendant Heaggan-Brown. *See*

*supra* Section III.

Defendants' assertion that the Court can decide the issue of qualified immunity even

when facts are in dispute, *see* Dkt. 45 at 4, is an incorrect statement of the law. It is well-

---

[9] To the extent Defendants' argument is that Sylville Smith was not subdued at the time of the second shot, they cannot obtain summary judgment. Their assertion turns on disputed facts and, quintessentially, a factual determination for the jury. *E.g.*, *Abbott*, 705 F.3d at 730 (collecting authorities holding whether officer should have recognized suspect was subdued is a question for the jury, not summary judgment).

38

established that a police officer is not entitled to qualified immunity where material facts governing the underlying constitutional violation are disputed. *See, e.g. Gutierrez v. Kermon*, 722 F.3d 1003, 1011 (7th Cir. 2013) (in answering whether a police officer is entitled to qualified immunity as a matter of law, court must avoid resolving contested factual matters); *Dufour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity. Raising a defense of qualified immunity in the face of disputed facts that control the answer to the question is a waste of everybody's time."); *Omdahl v. Lindholm,* 170 F.3d 730, 734 (7th Cir. 1999) ("[W]hether the [plaintiffs] can establish the existence of a constitutional violation turns on how a fact-finder resolves the question of fact regarding deadly force. The existence of a factual dispute prevents us from resolving the issue."). The Seventh Circuit has emphasized this point repeatedly. *See Weinman v. McClone*, 787 F.3d 444, 451 (7th Cir 2015) (affirming denial of qualified immunity where there was a genuine issue of material fact as to whether police officer reasonably believed his life was in danger when he shot the victim); *DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998) (disputed facts bearing on whether force was reasonable precluded qualified immunity); *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009) (no qualified immunity where there are disputed facts as to force used).

Indeed, the unavailability of qualified immunity in circumstances like this one— an excessive force claim where the facts are disputed, where the primary witness to, and victim of, the shooting is dead, and where the officer's account conflicts with the video of the shooting as well as other contemporaneous evidence of the officers' actions and mental state— cannot be seriously contested. *See Cyrus*, 624 F.3d at 862; *McAllister v. Price*, 615 F.3d 877, 884 (7th Cir.

2010); *Abdullahi*, 423 F.3d at 773; *Sallenger*, 473 F.3d at 742 (affirming denial of qualified immunity where parties disputed the extent and justification for blows administered to the head).

### D. Heaggan-Brown's Arguments to the Contrary Fail

The cases relied on by Defendants in support of their argument that Heaggan-Brown did not violate clearly established law in using deadly force have no bearing on the analysis here because they are factually dissimilar. *See Strand*, 910 F.3d at 917–18 (rejecting *Johnson* case relied on by officer in clearly established inquiry because "[f]acts matter, and the facts of *Johnson* were quite different.").

In *Brosseau*, the Supreme Court reversed the appellate court's denial of immunity to the officer holding that it was not clearly established in 2004 that the officer's conduct—shooting the driver of a car during a car chase—violated the Fourth Amendment. *Id.* at 200. In analyzing whether the law was clearly established, the Court laid out the situation with which the officer confronted: "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* As mentioned above, the situation Heaggan-Brown was confronted with has no resemblance to the situation in *Brosseau*. As the Supreme Court acknowledged, the clearly established inquiry "is one in which the result depends very much on the facts of each case." *Id.* at 201. Because the facts of this case are so dissimilar, *Brosseau* has no bearing here.

In *DeLuna* and *Blanford*, neither defendant officer asserted a qualified immunity defense. Critical to each court's reasonableness inquiry was the immediate threat posed by the suspects because of factors not present in this case: a known history of violence; repeated ignoring of warnings that shots would be fired; and the ability to escape and inflict injuries on others. These cases are inapposite. .

40

Finally, Defendant Heaggan-Brown's heavy reliance on *Horton* and *Conley-Eaglebear* to support his assertion of qualified immunity is misplaced. For starters, these cases postdate the conduct in question, *i.e.,* Heaggan-Brown's August 13, 2016, shooting of Smith. The inquiry focuses on the status of the law—and notice to the officers—at the time. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). These decisions could not have given fair notice to Heaggan-Brown and are of no use in the clearly established inquiry. What's more, in both cases, as detailed above, the facts are distinguishable and were resolved based upon the undisputed factual record in those cases. By contrast, the facts related to the underlying constitutional violation are disputed, and Plaintiffs' version of events does illustrate a constitutional violation; Heaggan-Brown is not entitled to qualified immunity. *See Mordi v. Zeigler*, 770 F.3d 1161, 1164 (7th Cir. 2014) (courts cannot resolve disputed issues of fact related to qualified immunity).

In conclusion, summary judgment in Heaggan-Brown's favor is precluded at both steps of the qualified immunity analysis. The facts viewed in Plaintiffs' favor for purposes of summary judgment, are be sufficient to support a reasonable jury's finding that shooting Smith amounted to excessive force. Moreover, under clearly established law, a reasonable officer would know that both shots fired at Smith were unlawful under *Garner* and its clear progeny. [10]

## XI. A Trial Is Necessary On Plaintiffs' *Monell* Theories

Defendants do not dispute that the City of Milwaukee would be liable if an "official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind [Smith's] constitutional injury." *Dixon v. Cook County*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Canton v. Harris*, 489 U.S. 378, 379, (1989)). The City's lone argument

---

[10] Defendants have waived any qualified immunity defense on Plaintiffs' substantive due process claim. But, there is no serious dispute *Rochin* made clear, decades ago, that government officials can be held liable for due process violations where their actions shock the conscience. Any reasonable police officer would know that shooting an unarmed individual lying on the ground, with his hands above his head at point-blank range is inconsistent with ordered liberty. Qualified immunity is unavailable.

41

with respect to *Monell* is that because Plaintiffs' underlying constitutional claims against the individual defendant cannot prevail then no *Monell* liability exists. But, the City is mistaken. As explained, Plaintiff's Fourth Amendment claim on each use of deadly force must go to the jury. *See* Part III, *supra*. Accordingly, the motion should be denied.

But, even assuming Heaggan-Brown were not liable, the City does not get a "free pass."

### A. Trial On Plaintiffs' *Monell* Claim Is Not Obviated Even In The Event Of Officer Heaggan-Brown's Qualified Immunity or Non-Liability

It is well-settled in the Seventh Circuit that there can be municipal liability in the absence of any underlying individual liability. In *Thomas v. Cook County Sheriff's Department,* the Seventh Circuit rejected exactly the argument the City makes here, explaining there is no hard and fast rule that individual officer liability is always required in order to find liability under *Monell*. 604 F.3d 293, 305 (7th Cir. 2010). Instead, *Thomas* held "a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas,* 604 F.3d at 305; *see also Swanigan v. City of Chicago,* 775 F.3d 953, 962 (7th Cir. 2015).

The City of Milwaukee's reliance on *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986), which states a municipality cannot be held liable for a constitutional harm if its individual officers have not committed any constitutional violation, is misplaced. *Thomas* specifically states that a rule requiring individual officer liability before a municipality can ever be held liable for damages under *Monell* is an "unreasonable" extension of *Heller. Id.* at 305.

It is also well-established in the Seventh Circuit that any concern of inconsistent verdicts is abated in cases where, as here, the defendant officer asserts qualified immunity. The Seventh Circuit explained in *Thomas* that even if the individual officers are granted qualified immunity, a municipality may be liable if its customs, policies, or practices may have caused a violation of a

plaintiff's constitutional rights. *Id.* at 304–05; *see also Marshbanks v. City of Calumet City*, 2015 WL 1234930, at *4 (N.D. Ill. Mar. 16, 2015) (explaining that because defendant officers asserted qualified immunity, there was a possibility that holding the municipality liable "would not create an inconsistent verdict with a jury finding that [the officers] are not liable").

In this case, Plaintiffs' claims that Defendant Heaggan-Brown used excessive, deadly force that resulted in the death of Smith, in violation of his constitutional rights. Plaintiffs' *Monell* claim alleges that the excessive force used against Smith was pursuant to, and the result of, the policies, practices, and customs of the City of Milwaukee, making the City independently liable. The underlying claims are premised on the actions of the individual defendant and distinct from the *Monell* allegations that the presence of policies, practices and customs which include the failure to properly train, supervise, and discipline Heaggan-Brown, caused Smith's constitutional rights to be violated.

It is entirely plausible to understand a situation in which differing verdicts on these claims would be compatible, particularly given Plaintiffs' position that Heaggan-Brown should not have been on the street as an MPD officer on August 13, 2016. *See, e.g.*, *Safford Unified School Dist. #1 v. Redding*, 129 S. Ct. 2633, 2644 (2009) ("The strip search of Savana Redding was unreasonable and a violation of the Fourth Amendment, but petitioners Wilson, Romero, and Schwallier are nevertheless protected from liability through qualified immunity. Our conclusions here do not resolve, however, the question of the liability of the petitioner Safford United School District #1 under *Monell*. . .); *Thomas*, 588 F.3d at 455 ("If, for instance, the officer had pled an affirmative defense such as good faith, then the jury might have found that the plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable. In that

43

case, one can still argue that the City's policies caused the harm, even if the officer was not individually culpable.").[11]

Importantly, the Seventh Circuit has recognized civil-rights actions have remedial import beyond the plaintiff's claim for monetary damages, and § 1983 provides a vehicle for obtaining other judicial relief against governmental policies that violate constitutional rights. *See generally* David F. Hamilton, *The Importance and Overuse of Policy and Custom Claims: A View From One Trench,* 48 DEPAUL L. REV. 723, 734–35 (1999). Here, Plaintiffs have strong non-economic interest in preventing future constitutional violations, particularly use of excessive, deadly force by police officers against civilians. Deterrence of constitutional misconduct is a fundamental purpose of § 1983. *Owen v. City of Independence*, 445 U.S. 622, 627 (1980) ("[Section 1983] was intended not only to provide compensation to victims of past abuses, but to serve as a deterrent against future constitutional deprivations[.]"); *see also Monterey v. Del Monte Dunes*, 526 U.S. 687, 727 (1999); *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). As explained below, Plaintiffs have amassed sufficient evidence to prove that the City of Milwaukee should be held accountable for the death of Sylville Smith, and they are entitled to present their *Monell* claim to a jury.

---

[11] Other circuits have reached the same conclusion. *See, e.g.*, *Christenson v. Park City Mun. Corp.*, 554 F.3d 1271, 1278-79 (10th Cir. 2009) (finding that the individual officers were entitled to qualified immunity for enforcing a policy that violated plaintiff's First Amendment rights but that the plaintiff had stated a viable claim under *Monell*); *Cooper v. Dillon*, 403 F.3d 1208, 1223 (11th Cir. 2005) ("Because the statute's unconstitutionality was not clearly established prior to its enforcement, Dillon is entitled to qualified immunity and therefore is shielded from liability under § 1983 in his individual capacity. However, as a municipal official with final policymaking authority as to law enforcement matters, Dillon did expose the City of Key West to § 1983 liability by choosing to enforce the statute against Cooper."); *Fletcher v. Town of Clinton*, 196 F.3d 41, 55-56 (1st Cir. 1999) ("The Magistrate Judge's resolution of the officers' request for qualified immunity did not dispose of the Town's motion for summary judgment . . . the municipality enjoys no immunity from damages liability under § 1983."); *Myers v. Oklahoma Bd. of County Com'rs*, 151 F.3d 1313, 1317 (10th Cir. 1998) (same).

44

### B. A Reasonable Jury Could Find That Milwaukee's Failure to Train, Supervise, and Discipline Caused Heaggan-Brown's Excessive Use of Force

Defendant City of Milwaukee hangs its hat on the single argument above with respect to Plaintiffs' *Monell* claim. By failing to raise any other arguments in its opening brief, the City has waived all other arguments with respect to Plaintiffs' *Monell* claim. *See Wehrs v. Wells*, 688 F.3d 886, 891 n.2 (7th Cir. 2012) (deeming an argument waived where it was cursorily raised in one sentence in the summary of argument and once again in the conclusion of the brief); ); *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 795 (7th Cir.1989) (concluding that an argument that was raised summarily was waived). The City should therefore be barred from raising any arguments related to any other elements of Plaintiffs' *Monell* claim in its reply brief. *See, e.g.*, *Carter v. Tennant Co.*, 383 F.3d673, 679 (7th Cir. 2004) (arguments presented for the first time in a reply brief are considered waived).

Waiver aside, Plaintiffs' evidence establishes widespread failures in the City's policies and practices, which are actionable under *Monell*. In particular, the City of Milwaukee is liable for its failure to adequately train, supervise, and discipline officers if its failure to do so represents deliberate indifference to likely constitutional violations. *Harris*, 489 U.S. at 388.

The record evidence shows the City knew before they hired Heaggan-Brown had poor learning skills and reading ability, and "low emotional self-control and high aggressiveness," warranting monitoring. PSOF ¶ 5. He had also associated with gang members and posted for photos with illegal drug paraphernalia. *Id.* ¶6. Nevertheless, he became a sworn officer.

During his short time as an officer, Heaggan-Brown amassed an unfathomable number of complaints, internal affairs reviews, uses of force multiple standard deviations about the norm (placing him on the Department's "outliers" list); was subject being in the Department's Early

Intervention Program; and failed to acknowledge nearly 90 changes to the MPD Standard Operating Procedures, including the use of force policy. *Id.* ¶8.

In 2016 alone, Heaggan Brown was involved in possible criminal behavior and accused of sexual misconduct; subject to an excessive force complaint from Ronnie Martin, who subsequently brought a §1983 action due to the use of force (which settled on the eve of trial); *Id.* ¶14. In the first 6 months of 2016, Heaggan Brown was Number 1 on the Outliers list, but no corrective action was ever taken. *Id.* Just five days before the shooting of Smith, the Department held a "Use of Force" Committee meeting, where it was discussed that Heaggan-Brown used force "most often" that year, and reported that part of the problem with these uses of force is due to "officers immediately approaching vehicles suspect of containing armed subjects and engaging subjects at close proximity." *Id.* ¶15.

Despite all this, Heaggan-Brown was never provided re-training, discipline, or supervision. *Id.* ¶¶14-15. Nothing was done to stem the obvious pattern of excessive force by Heaggan-Brown; to the contrary, the Department emboldened him. In response to being involved in an extraordinary number of "use of force" incidents, the Department allowed Heaggan-Brown to work an overtime detail where the express purpose of where he was to be aggressive and conduct traffic stops for the most trivial of infractions. *Id.* ¶17. The City of Milwaukee's encouragement of Heaggan-Brown's excessive force and continued defense of Heaggan-Brown is evidence that the Department remains indifferent to the systemic flaws, gaps, and failure within its customs, practices, and policies which allowed Heaggan-Brown to become and remain a police officer, and fatally shoot Smith. Ex. 16-2, Waller Report, at 8-9.

Properly construed, the summary judgment record is more than sufficient to allow a reasonable jury to conclude that MPD failed to train, supervise, and discipline Heaggan-Brown;

that it had notice of his actions (indeed, the MPD *approved* those actions); that MPD's failure to act was the moving force behind the shooting in this case;[12] and that MPD was deliberately indifferent to this problem (again, because it approved of the uses of force and continues to do so to this day). *See Heenan v. Madison*, 111 F.Supp.3d 929, 960-61 (W.D. Wis. 2015) (denying summary judgment in similar circumstances). In short: "[i]f the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible . . . to infer that there is a policy at work." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

## XII. A Trial Is Necessary On Plaintiffs' State-Law Claims

Defendants lastly argue that this Court should decline to exercise supplemental jurisdiction over the state law claims if it dismisses the federal claims. But, for the reasons stated above, the federal claims must go to trial, and Defendants have waived any substantive argument for summary judgment on Plaintiffs' claims by failing to raise it in this motion. *Wehrs*, 688 F.3d at 891 n.2; *Bob Willow Motors, Inc.*, 872 F.2d at 795.

## CONCLUSION

The Seventh Circuit has warned repeatedly that courts should be cautious about granting summary judgment in cases where there are simply too many "loose ends" with respect to material facts. *Ledbetter v. Good Samaritan Ministries*, 777 F.3d 955, 959 (7th Cir. 2015). This case is one in which nearly all of the material facts are disputed. The motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

BY: /s/ Danielle Hamilton
      *One of Plaintiffs' Attorneys*

---

[12] *Ortiz v. Chicago*, 656 F.3d 523 (7th Cir. 2011) ("Proximate cause is a question to be decided by a jury, and only in the rare instance . . . should summary judgment be granted on the issue of causation.").

47

## <u>CERTIFICATE OF SERVICE</u>

I, Danielle Hamilton, an attorney, certify that on June 14, 2019, the foregoing motion was sent via CM/ECF to all counsel of record.

/s/ Danielle Hamilton