# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**The ESTATE of SYLVILLE K. SMITH, by Personal Representative Mildred Haynes, Patrick Smith, and Mildred Haynes, on her own behalf,**

        Plaintiffs,

    v.                                          Case No. 17-C-862

**CITY OF MILWAUKEE, WISCONSIN and DOMINIQUE HEAGGAN-BROWN,**

        Defendants.

## DECISION AND ORDER

Plaintiffs have sued the Defendants under 42 U.S.C. § 1983 and state common law, alleging Fourth and Fourteenth Amendment violations, assault and battery, wrongful death, and intentional and negligent infliction of emotional distress. *See* ECF No. 1 at 17-25. On April 30, 2019, the defendants moved for summary judgment based on qualified immunity. ECF No. 44. The motion is fully briefed and ready for disposition. For the reasons given below, the defendants' motion for summary judgment is **DENIED**.

## I. BACKGROUND

On the afternoon of August 13, 2016, Officer Dominique Heaggan-Brown of the Milwaukee Police Department shot (twice) and killed Sylville Smith while pursuing Smith in a brief foot chase that ended at 3218 N. 44th Street in Milwaukee. ECF No. 52 at ¶ 1. Heaggan-Brown was an on-duty, uniformed police officer of the City of Milwaukee, operating a black and white Chevy Tahoe SUV squad car. *Id.* at ¶ 2. Heaggan-Brown was in the Tahoe by himself. *Id.* at ¶ 4. Heaggan-Brown was near the end of an

overtime assignment that started at 2:00 p.m. and would run until 4:00 p.m., at which point he would start his regular shift that would run from 4:00 p.m. to 12:00 a.m. *Id.* at ¶ 5. Heaggan-Brown had experience working this area. *Id.* at ¶ 7. During this assignment, Heaggan-Brown was working in concert with two other Milwaukee PD officers in a separate car, Ndiva Malafa and Richard Voden. *Id.* at ¶ 9. Officers Malafa and Voden were operating a grey, unmarked Ford Crown Victoria. *Id.* at ¶ 10. The three officers, conversing over radio, decided at around 3:15 p.m. to drive back to the appropriate station to attend roll call prior to their regular shifts. *Id.* at ¶ 11.

The circumstances of the officers' initial engagement with Smith are disputed. The defendants claim that the three officers decided via radio to drive back to their station through the Sherman Park area, a regular patrol area for the officers due to high levels of criminal activity. ECF No. 46 at ¶¶ 11-13. Heaggan-Brown radioed the other two officers that he wanted to check the area of North 44th Street and West Burleigh Street, an area known by Heaggan-Brown for numerous drug-dealing complaints. *Id.* at ¶¶ 15-16. The plaintiffs contend that the officers were looking for an opportunity to get in a foot chase.[1] ECF No. 52 at ¶¶ 14-15. Defendants counter by saying the officers' communication reflects mere anticipation of a foot chase. ECF No. 58 at ¶¶ 21-22.

Upon arriving in the 44th Street area, just north of 44th Street and West Auer Avenue, Heaggan-Brown claims that he observed a vehicle illegally parked too far from the curb in front of 3216 N. 44th Street. ECF No. 46 at ¶¶ 17-18; *Cf.* ECF No. 51 at ¶ 23 ("The only *allegedly* unlawful act Heaggan-Brown witnessed was a car *he thought* was

---

[1] In an audio clip filed with the court of the officers' radio communications prior to the incident, the officers explicitly say they are trying to "be nosy" and to "see if we can get another foot chase." ECF No. 50-26 (near 1:30).

parked too far from the curb.") (emphasis added); ECF No. 52 at ¶¶ 17-18. Whether Heaggan-Brown observed an individual (1) exit the vehicle on the passenger side, (2) see the marked police vehicle driven by Heaggan-Brown, and (3) quickly walk away from the parked vehicle is disputed, as is the significance of such. *See* ECF No. 46 at ¶¶ 20-25; ECF No. 52 at ¶¶ 20-25. What is clear is that Heaggan-Brown parked his vehicle alongside the subject vehicle, partially in front of and parallel to, about three feet from the driver's side of that vehicle, and observed someone in the driver's seat. ECF No. 52 at ¶ 26; ECF No. 58 at ¶ 25. Smith, the driver of the parked vehicle, then exited the vehicle and began to run.[2] Heaggan-Brown pursued Smith; Officer Malafa joined the pursuit, with Heaggan-Brown in the lead. ECF No. 52 at ¶ 30. Smith possessed a handgun as he fled. *Id.* at ¶ 38. The brief chase saw Smith run toward 3218 N. 44th Street, where Smith lost his footing and fell as he came upon a chain-link fence on the side of the house. ECF No. 58 at ¶ 39. Smith's fall placed him in front of the fence, which was about four feet tall. ECF No. 52 at ¶¶ 47-48. Smith had dropped the handgun. *Id.* at ¶ 45. Smith got up after falling, grabbed the gun[3] he had dropped, and, while glancing back at Heaggan-Brown, threw it over the fence, having picked up the gun by the muzzle. ECF No. 58 at ¶ 43, ¶ 45.

---

[2] Defendants claim that Heaggan-Brown got out of the car, activated his body camera, and, as Heaggan-Brown was considering approaching the vehicle, Smith quickly exited his vehicle and began to run. ECF No. 46 at ¶¶ 28-29. Plaintiffs, on the other hand, claim that Heaggan-Brown jumped out of his squad car, immediately unholstered his firearm and pointed it directly at Smith, tracking Smith with his pistol as Smith fled. ECF No. 51 at ¶ 26.
[3] Defendants claim Smith picked up the gun and held on to it before throwing it over the fence, ECF No. 46 at ¶ 45, while plaintiffs say Smith picked up the gun and tossed it over the fence, away from the officers, in a single, fluid motion. ECF No. 52 at ¶ 45. Plaintiffs also characterize the gun as contraband that Smith was trying to rid himself of. ECF No. 51 at ¶¶ 37-38.

Heaggan-Brown had drawn his service pistol and had it at a ready position as he was approaching[4] Smith near the fence. ECF No. 52 at ¶ 51. Smith's precise physical movements, from falling near the fence to Heaggan-Brown firing the first shot, are disputed. Defendants say that either Officer Malafa or Heaggan-Brown screamed, "Drop the gun!" and "Put your hands up!" ECF No. 46 at ¶ 53. Defendants further claim that Heaggan-Brown saw the pistol in Smith's hand as Smith was getting up from his fall and, given the movement and position of the pistol, the movement of Smith's head and torso, Smith's failure to drop the gun, and his continued flight, Heaggan-Brown thought Smith was going to shoot the two officers. *Id.* at ¶¶ 54-60. Plaintiffs emphasize that Smith, in getting up, was attempting to resume his flight from the officers and generally was non-threatening; Heaggan-Brown knew this, but still shot him anyways. ECF No. 51 at ¶¶ 41-46. Plaintiffs also dispute that *any* verbal warning was given by officers prior to Smith being shot. ECF No. 52 at ¶¶ 31, 39. What is agreed upon is that Heaggan-Brown subsequently shot Smith, leaving a wound in Smith's bicep. ECF No. 52 at ¶¶ 61, 65.

This caused Smith to fall to the ground. Both sides contest the precise mechanics of the fall and moments before the second shot. Defendants claim Heaggan-Brown screamed for Smith to show his hands[5] and perceived that Smith then moved his right hand towards his waistband, while looking at Heaggan-Brown, as if he was reaching for a second weapon with which to shoot the officers. ECF No. 46 at ¶¶ 67-68. Plaintiffs' description is that Smith fell on his back, face-up, hit his head on the ground in doing so, and had his hands near his head before being shot a second time; Smith was

---

[4] Defendants also claim, which the plaintiffs dispute, that one of the officers screamed "Drop the gun!" and "Put your hands up!" ECF No. 52 at ¶ 53. Video evidence does not resolve this question.
[5] Plaintiffs again dispute that any such verbal instruction was given by Heaggan-Brown. ECF No. 52 at ¶ 67.

thus "incapacitated" at this point. ECF No. 51 at ¶¶ 55-57, 62-63. What is clear is that Smith was on his back, his feet raised in the air, his hands above his head, and was located in a corner of the yard between the fence and a house, when Heaggan-Brown fired a second shot, this one into Smith's upper left chest.[6] *See* ECF No. 52 at ¶ 70; ECF No. 58 at ¶ 60. The second gunshot was fatal. ECF No. 52 at ¶ 71; ECF No. 58 at ¶ 65. Heaggan-Brown fired the second shot into Smith approximately 1.69 seconds after firing the first shot. ECF No. 52 at ¶ 70. The entire incident, from initial engagement to the use of deadly force, took thirty seconds or less. *Id.* at ¶ 72. Officer Malafa did not fire his weapon during this interaction.[7] *Id.* at ¶ 66.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the evidence and all inferences that reasonably can be drawn from the evidence are construed in the light most favorable to the non-moving party, here, the plaintiff. *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (citing *Leaf v. Shelnutt*, 400 F.3d 1070, 1078 (7th Cir. 2005)). I must grant the motion only if no reasonable juror could find for the non-moving party.

---

[6] Both parties submitted video files with body camera footage (real-time and slow-motion) and photo stills from Heaggan-Brown and Malafa's body cameras. ECF No. 50-35, 50-36, 50-28, 50-29; ECF No. 47-3. Although on summary judgment we generally view the facts in the light most favorable to the nonmovant, in rare circumstances when video footage clearly contradicts the nonmovant's claims, I may consider that video footage without favoring the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). When video footage firmly settles a factual issue, there is no genuine dispute about it; however, videos are sometimes unclear, incomplete, and may fairly be open to varying interpretations. *Id.*

[7] Nor did Officer Malafa unholster his firearm, TASER, pepper spray, or any other means of using force, withdrawing his firearm only after shots were fired. ECF No. 58 at ¶ 49. There is dispute amongst the parties as to *why* he did not fire or unholster a weapon. Defendants claim that Malafa did not have a clear shot, while plaintiffs claim that Smith did not pose an immediate threat.

5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). These summary judgment principles still apply where defendants invoke qualified immunity. *See Tolan v. Cotton*, 572 U.S. 650, 656–57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). *See also Weinnmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2015) (in qualified immunity context, court's "task is to determine, under [plaintiff's] version of the facts, if [the defendant-officer] was objectively reasonable in his belief that his life was in danger.").

**B. Qualified Immunity**

The defendants base their summary judgment argument on qualified immunity; because Heaggan-Brown is entitled to qualified immunity based on the facts at hand, plaintiffs' federal claims against the City of Milwaukee cannot be maintained and I should relinquish jurisdiction of the remaining state law claims. Plaintiffs counter that summary judgment is inappropriate because Heaggan-Brown is not entitled to qualified immunity; Heaggan-Brown's conduct was unconstitutional in depriving Smith of his right to be free from excessive deadly force and Heaggan-Brown knew this. Plaintiffs further argue that too many material factual disputes remain to warrant summary judgment. In determining whether a defendant is entitled to qualified immunity, courts must "undertake a two-part analysis, asking: (1) whether the facts alleged, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right'; and (2) whether the right was clearly established at the time of its alleged violation." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016) (quoting *Board v. Farnham,* 394 F.3d 469, 477 (7th Cir. 2005)).

**1. Whether the alleged facts show the violation of a constitutional right**

The first prong of the inquiry, whether Heaggan-Brown used excessive deadly force and thereby violated Smith's Fourth Amendment[8] rights, is governed by the Supreme Court's decisions in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) and *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *Strand v. Minchuk*, 910 F.3d 909, 914–15 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 1629, 203 L. Ed. 2d 900 (2019). The law requires an assessment of the totality of the facts and circumstances, which includes consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). Where an officer uses excessive force that is deadly, that officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. 1, 105 S.Ct. 1694. When a suspect is fleeing, deadly force may be used, if necessary, to prevent escape if the officer has probable cause to believe that the suspect has "committed a crime involving the infliction or threatened infliction of serious physical harm" and, where feasible, the officer has given a warning. *Id.* at 11, 105 S.Ct. 1694.

The proper inquiry is one of "objective" reasonableness without regard to the subjective "intent or motivation" of the officer. *Strand*, 910 F.3d at 915-16 (citing *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). While this "reasonableness" must take into

---

[8] Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985).

7

consideration the fact that police officers are often forced to make split-second judgments in tense and rapidly-evolving circumstances, an officer facing a situation in which he could justifiably shoot does not retain the right to shoot at any time thereafter with impunity because circumstances may materially change. *Id.* at 916 (quotations omitted). What matters in determining whether the officer used an appropriate level of force is the amount and quality of the information known to the officer at the time he fired the weapon. *Horton*, 883 F.3d at 950 (quotations omitted).

Considering the totality of the circumstances in the light most favorable to plaintiffs', I find that the plaintiffs' version of events, as supported by undisputed facts in the record, shows an unreasonable use of force by Heaggan-Brown in violation of Smith's rights under the Fourth Amendment. The officers did not engage Smith in response to reports of a serious crime, as is common where courts grant police officers qualified immunity. Indeed, under plaintiff's version of events, there was *no* illegal conduct on Smith's part that would have warranted *any* police scrutiny, much less a crime involving the infliction (or threatened infliction) of *serious physical harm* necessary to justify deadly force. In fact, the officers, as captured over police radio, discuss trying to "be nosy" and to "see if we can get another foot chase," in the moments immediately prior to encountering Smith. While defendants assert that this merely reflected anticipation of a foot chase, it is more than reasonable to interpret the statement as meaning the officers were looking to *provoke* an altercation, thereby precluding a qualified immunity finding. *See Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("[The defendant-officer] cannot be granted immunity because, again taking the plaintiffs' version of the facts, his own unreasonable action prompted the danger he

faced. Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."). *See also Strand*, 910 F.3d at 916 (denying qualified immunity where "fracas leading to [defendant-officer's] use of deadly force began with his issuance of parking tickets"). Perhaps the officers did not *themselves* create the danger they perceived, but really were simply *anticipating* a foot chase; however, I cannot rely on that interpretation when viewing the facts in favor of the plaintiff at summary judgment, particularly where the plaintiffs' interpretation is the seemingly obvious one based on the actual statements caught on audio. An alternative interpretation, one in line with the defendants', would have to be adopted by a jury assessing the officers' credibility, not this court at summary judgment.

Perhaps more significantly, Heaggan-Brown's actual shooting of Smith is objectively unreasonable on plaintiffs' version of events. As mentioned above, even if Smith's behavior appeared suspicious, Smith was not in the midst of committing a violent crime nor did he pose a threat of serious physical harm to either the officers or those around him prior to the officers' engagement. Nor had Smith, under plaintiffs' version of events, done anything to even give officers probable cause to believe that he had committed a crime involving serious physical harm or threatened harm. Nor is there any hard, undisputable evidence that either of the officers in pursuit gave Smith any kind of verbal warning prior to Heaggan-Brown shooting him. *See* ECF No. 52 at ¶¶ 31, 39. Even accepting that Smith reached down to retrieve the gun while looking back at Heaggan-Brown, the fact that Smith possessed a gun is not controlling and does not grant Heaggan-Brown an irrebuttable or ironclad presumption that Smith posed an

imminent threat, particularly where Smith grasped it by the muzzle instead of the handle. *See, e.g*, *Weinmann v. McClone*, 787 F.3d 444, 449–50 (7th Cir. 2015) ("if [decedent] had the gun raised to his shoulder and pointed at [defendant-officer], then [defendant-officer] would have been justified in using deadly force and hence entitled to qualified immunity").

Whatever reasonable arguments that could be had as to the first shot, Heaggan-Brown's second shot fired 1.69 seconds later, when considered most favorably to the plaintiffs, is the shooting of a *subdued* suspect. Smith was in an incredibly vulnerable position: he was unarmed, on his back, hands above his head, with his palms open. *See Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). *See also Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (in determining reasonableness, we "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage."); *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) ("In some cases each discrete use of force must be separately justified."); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (looking at "totality of circumstances" means that "a jury might reasonably conclude that the circumstances of the encounter here reduced the need for force as the situation progressed").

Heaggan-Brown argues that, as Smith was falling to the ground, Smith's hand moved in a manner that suggested Smith was reaching for a weapon hidden in his waistband, thereby making Heaggan-Brown's fear of imminent harm objectively reasonable. ECF No. 45 at 19 ("after being shot, Smith moved his right hand towards

his waistband, contrary to the officer's commands, and while looking at Heaggan-Brown."); ECF No. 57 at 1 ("after being shot once, Smith's arm moved towards his waist where a second weapon could have been hidden."). On my review of the record, I find that a reasonable jury could certainly find Heaggan-Brown's belief that Smith might be armed with a second weapon was unreasonable; unlike the deceased in *Horton*, Smith was wearing snug, form-fitting clothing (tank-top shirt and shorts) far less conducive to concealing an additional weapon than a sweatshirt and pants. And frankly, the defendants' argument that, in the course of Smith's fall, the movement of Smith's right hand near his waist being perceived by a reasonable officer as a movement for a second gun in his waistband is just not persuasive (at summary judgment, no less) given the court's review of video evidence that indicates Smith's hand was in the vicinity of his waistband for all of three camera stills before moving up towards his head, empty and palm open. *See* ECF No. 50-36 (MALAFA stills, 377-379).

What is clear from the footage (from both officers' body cameras) is that Smith was prone and subdued in the moments leading up to Heaggan-Brown pulling the trigger for the second shot. *See id.* (MALAFA stills, 380-405); ECF No. 50-29 (HEAGGAN-BROWN stills, 750-772). Frankly, it is difficult to think of a more vulnerable position that Smith's body could have been in during the moments leading up to Heaggan-Brown firing the second (and ultimately fatal) shot. When video footage firmly settles a factual issue, there is no genuine dispute about it (*see supra* note 6), and courts will not indulge stories clearly contradicted by the footage. *See Horton*, 883 F.3d at 944; *See also Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (appellate court "should have viewed the facts in the light depicted by the

videotape" where no reasonable jury could have believed nonmoving party's version of events). Here, however, plaintiffs' proffered version of events is not obviously contradicted by the video evidence submitted and certainly could be believed by a reasonable jury. Available video evidence simply does not give defendants' version of events the kind of undeniable weight needed to carry the day at summary judgment.

Defendants put forward three primary cases from the Seventh Circuit they believe analogous where qualified immunity was granted to defendant-officers, claiming that these similarities warrant the same grant here. *See* ECF No. 45 at 11-15. However, the cases prove distinguishable on further inspection. Unlike with the decedent in *DeLuna v. City of Rockford, Illinois*, 447 F.3d 1008 (7th Cir. 2006), who was known to be violent based on multiple sources, had an extensive arrest record, and had a history of weapons possession, Heaggan-Brown did not enter the encounter with any such knowledge of Smith. Nor was Heaggan-Brown summoned to the scene of a domestic disturbance in progress, responding to a near-identical incident involving the same persons one week prior. Nor was Smith acting erratically, appearing shirtless in the early hours of a cold spring morning, explicitly threatening and advancing towards the officer, making him backpedal forty to fifty feet before the officer ultimately fired his weapon. *Id.* at 1011 (DeLuna told the officer "I've got something for you. You are going to have to kill me." And, as the situation escalated: " 'If you are going to shoot me, shoot me here,' pointing to his chest with his right hand."). *See also Wynalda*, 999 F.2d at 247 (7th Cir. 1993) ("If [the suspect] had threatened the officer with a weapon and then run off with the weapon, a reasonable officer in Wynalda's place could believe that [the suspect] created a danger to the community."). Defendants' use of *Horton* is also

inapposite for the fact that the defendant-officer there used deadly force when confronted by suspects attempting an armed robbery, outnumbered four-on-one in a closed environment, with the officer quite literally fighting for his life, at one point struggling with one of the suspects over the suspect's revolver. 883 F.3d 941.

Finally, Defendants' direct our attention to *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973 (7th Cir. Sept. 26, 2017). Defendants do point out some compelling similarities between the circumstances of this case and ours, namely that the court granted qualified immunity where pursuing officers shot a fleeing suspect who was holding a gun. But there also exists several critical differences. The *Conley-Eaglebear* chase took place at night, in response to a tip from a reliable informant that an incident was in progress, specifically that the informant had just observed a white male (Conley-Eaglebear) pull up his shirt and display a handgun tucked in his waistband. *See Conley-Eaglebear v. Miller*, No. 14-CV-1175-PP, 2016 WL 633363, at *1 (E.D. Wis. Feb. 17, 2016). Further, it was undisputed that the defendant-officer twice yelled "stop" while in pursuit, shooting Conley-Eaglebear twice in the back after it appeared that the gun in Conley-Eaglebear's possession "was moving toward [the officer]." *Conley-Eaglebear*, 2017 WL 7116973 at *2. Significantly, officers did not continue to shoot Conley-Eaglebear after he fell to the ground, even where Conley-Eaglebear's gun remained under his right hand as he lay on the ground. Finally, and perhaps most importantly, Conley-Eaglebear was not killed. The Seventh Circuit has repeatedly cautioned courts against granting summary judgment in excessive force cases, particularly where the victim has been killed by the defendant-officer. *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (agreeing with the Ninth

Circuit that summary judgment in excessive force cases should be "granted sparingly" due to nature of *Graham* reasonableness inquiry); *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009) (summary judgment often inappropriate in excessive force cases where "parties typically tell different stories about what happened"). *See also Cyrus*, 624 F.3d at 862 (prudential concern against summary judgment in excessive force cases "particularly relevant" where plaintiff has died "because the witness most likely to contradict the officer's testimony—the victim—cannot testify"). Plaintiffs' version of events, as supported by the record, shows a violation of Smith's Fourth Amendment rights.

**2. Whether the right was "clearly established" at the time of its alleged violation**

In establishing the second prong in the qualified immunity analysis, a plaintiff bears the burden of establishing that the constitutional right was "clearly established." *Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013). A plaintiff can show that a right is "clearly established" by statute or constitution in at least two ways: (1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Steidl v. Fermon*, 494 F.3d 623, 632 (7th Cir. 2007) (citing *Smith v. City of Chicago,* 242 F.3d 737, 742 (7th Cir.2001)). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quoting *Ashcroft v. al–Kidd,* 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011)). This analysis also requires considering the facts most favorably to plaintiffs. *See, e.g., Sallenger*, 473 F.3d at 742

("Viewing the facts in the light most favorable to the plaintiff, a reasonable officer would have known that [the alleged force] violated the individual's Fourth Amendment right to be free from excessive force.").

With respect to the first shot, plaintiffs put forward *Weinmann*, 787 F.3d at 448 (recognizing "constitutional right not to be shot on sight if [individual] did not put anyone else in imminent danger or attempt to resist arrest for a serious crime"), and *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) (denying qualified immunity when an officer shot an individual holding a gun when testimony diverged as to whether the gun was pointed upward or at the officer), neither of which provide substantially similar circumstances to ours. *See* ECF No. 55 at 36-37. However, plaintiffs rightly point out that directly analogous precedent is not necessary where the principle of limiting deadly force to situations with "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others", as expressed by the Supreme Court in *Garner*, is clearly violated. *Id.* at 36. *See also Burgess v. Lowery*, 201 F.3d 942, 944–45 (7th Cir. 2000) (explaining possibility that "the existence of the right was so clear… that no one thought it worthwhile to litigate the issue."). Put another way, there is no perfectly or even closely analogous case because a reasonable officer would know that using deadly force, without warning, after instigating a chase with no probable cause to believe that the fleeing civilian committed or threatened to commit a violent crime, the officer having weapon drawn from the very beginning of the encounter, and the fleeing civilian in the process of discarding his weapon, would be so plainly excessive as to violate the individual's Fourth Amendment right to be free from excessive force.

Further, with respect to the second shot, plaintiffs have shown that it is clear under either approach that the right violated is clearly established. *See* ECF No. 55 at 37-38. Plaintiffs present numerous cases that show a clearly established right at stake with respect to the second shot. *See Becker*, 821 F.3d at 928 ("[W]ell-established that police officers cannot continue to use force once a suspect is subdued"); *Abbott v. Sangamon County, Ill.*, 705 F.3d at 732 ("[W]ell-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects"); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) ("[P]rohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon."). *See also Strand,* 910 F.3d at 918 ("The clearly established law comes from cases in which we have emphasized that a subdued suspect has the right not to be seized by deadly or significant force, a right which has been well-established for decades."). As alleged, Smith's Fourth Amendment right to be free from deadly force when subdued and unarmed was a clearly established right and understood as such by reasonable officers at the time. Plaintiffs have met their burden in this respect.

Regardless, whether a reasonable officer would know that shooting a subdued, unarmed, and vulnerable suspect, as is alleged, violates a constitutional right is not truly debatable. Only a reckless officer would find reasonable the use of deadly force in this manner and under these circumstances. Heaggan-Brown is not entitled to qualified immunity at summary judgment. Accordingly, his summary judgment motion is denied.

**C. Plaintiffs' Fourteenth Amendment Due Process claim**

Plaintiffs also bring claims for violations of Smith's Fourteenth Amendment Due Process rights. *See* ECF No. 1 at ¶¶ 108-113 ("Count II"); ECF No. 55 at 23-25. Defendants based their summary judgment motion on qualified immunity and did not raise any objections to plaintiffs' Fourteenth Amendment claim on non-qualified immunity grounds in their initial brief, ECF No. 45, instead laying out such an argument for the first time in their reply brief. ECF No. 57 at 1, n. 1. As plaintiffs correctly point out, new arguments cannot be raised in a reply brief. *See James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived."); *Nelson v. La Crosse Cty. Dist. Atty. (State of Wisconsin)*, 301 F.3d 820, 836 (7th Cir. 2002) (it is "well settled that issues raised for the first time in a reply brief are deemed waived"). Accordingly, I will not address the parties' Fourteenth Amendment arguments at this point.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment (ECF No. 44) is **DENIED**. **IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file documents under seal (ECF No. 53) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2019.

s/Lynn Adelman_____
LYNN ADELMAN
District Judge